ARI D. KUNOFSKY
JOSHUA D. ZIMBERG
Trial Attorneys, Tax Division
U.S. Department of Justice
PO Box 227
Washington, DC 20044
Tel. (202) 353-9187
Fax (202) 514-6866
Ari.D.Kunofsky@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 18-cv-15099-ZNQ-LHG |
| | ) | |
| SHANT HOVNANIAN, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO THE VSHPHH TRUST**

The United States submits the following statement of undisputed facts in support of its

Motion for Summary Judgment as to the VSHPHH Trust under Fed. R. Civ. P. 56 and Local

Rule 56.1 and states as follows:

1.      Shant Hovnanian lived at a property commonly known as 520 Navesink River

Road, Freehold, New Jersey.  (Pachava Dep., Vol. I, p. 15:9-22.)  His parents lived next door at a

property known as 500 Navesink River Road, Freehold, New Jersey.  *Id.*

2.      During this litigation, Shant and his sister, Nina Hovnanian, lived in Armenia.

(*E.g.*, Pachava Dep., Vol. I, p. 21:14-15 (Nina testifying she lives in Armenia 90% of the time),

16:12-17:12 (Nina testifying that her brother has no current address but that a letter could be

delivered to her in Armenia, and she would deliver it to him).)

**I.      Shant Hovnanian's Income Tax Liabilities.**

3.      A delegate of the Secretary of the Treasury made the following federal income tax

(Form 1040) assessments against Shant for the tax periods identified below:

| Tax Period | Date of Assessment | Amount of Tax Assessment | Balance as of September 30, 2018 |
|---|---|---|---|
| 2002 | 10/22/2008 2/13/2013 | $3,914,430 241,764 | $12,274,759 |
| 2003 | 10/22/2008 2/13/2013 | $7,964 $309,108 | $840,528 |
| 2004 | 2/13/2013 | $983,773 | $3,074,834 |
| 2007 | 3/29/2010 | $11,223 | $19,268 |
| | | **Total** | **$16,209,389** |

(Compl. ¶ 14.)

4.      This liability arose from Shant engaging through various entities in illegal and

improper tax shelters during the early 2000s.  After the IRS audited the partnerships, the Tax

Court upheld the Service's determination.  *See, e.g., Rovakat v. Comm'r*, T.C. Memo. 2011-225

(Sept. 20, 2011).  The Second and Third Circuits affirmed the Tax Court's decisions.  *Int'l*

*Strategic Partners, LLC v. Comm'r*, 455 F. App'x 91 (2d Cir. 2012); *Rovakat, LLC v. Comm'r*,

529 F. App'x 124 (3d Cir. 2013).

5.      This Court has already entered default judgment as to the amount owed by Shant

for these taxes.  (Dkt. 35.)

6.      Federal tax liens arose upon assessment of the income tax assessments described

in paragraph 1, above.  26 U.S.C. § 6321.  These federal tax liens attached to Shant's property

and rights to property then owned or thereafter acquired.  *See id*.

7.      Notice of federal tax liens were filed against Shant for these federal liabilities well

before January 1, 2015.  (Ex. 101, Notices of Federal Tax Lien.)

II.     **Village Mall.**

8.      The Village Mall is a two-floor strip mall.  It is located at 1 Dag Hammarskjold Boulevard, Freehold, New Jersey (Block 143, Lot 25.04).  (Ex. 102, Deed.)

9.      On January 1, 2015, Shant's parents (Vahak and Hasmig Hovnanian) transferred the Village Mall to the VSHPHH Trust for $1.00.  (Ex. 102, Deed.)  The seller's certificate reflected that the transfer was for a nominal amount and thus no real estate tax was due.  *Id*., p. 3.

10.     William Reed Rankin, *Esq*., notarized the deed.  *Id*., p. 4.  Rankin also represented Shant in the Tax Court that gave rise to the liabilities in this matter.  *Int'l Strategic Partners, LLC v. Comm'r*, 455 F. App'x 91, 92 (2d Cir. 2012); *Rovakat, LLC v. Comm'r*, 529 F. App'x 124 (3d Cir. 2013).

11.     The deed was recorded on July 31, 2015, seven months after the transfer. (Ex. 102, Deed, p. 1.)

12.     Vahak died shortly thereafter on August 31, 2015.   (Pachava Dep., Vol. I p. 211:14-17).  Hasmig (a/k/a Paris) Hovnanian died in November of 2016.  *Id*., p. 204:7. Shant's father had been ill at the time of the transfer of the Village Mall to the VSHPHH Trust. (VSHPHH Dep., Vol. I, p. 79:8-19.)

13.     The first floor of the Village Mall has tenants who pay rent.  These tenants are small businesses like a hairdresser, podiatrist, and physician.  (VSHPHH Dep., Vol. I, p. 101:7-16.)  The average rent collected is approximately $78,000 per year.  (*See* Ex. 104, Hollobaugh Exp. Report, p. 41, Ex. K.)  On the first-floor leases, the landlords were Paris and Vahak.  (*E.g.,* Ex. 103, Lease.)  The VSHPHH Trust did not produce any leases after January 1, 2015, to reflect the new landlord and the tenants summoned by the IRS provided leases showing the landlords were Paris and Vahak.  *Id*.

14.     Shant managed the tenants' rental of space at the Village Mall and had them either contact him directly or through his secretary, Karen Gandolfo.  (VSHPHH Dep., Vol. I, pp. 104:21-105:2.)

15.     The second floor of the Village Mall included an office for Vahak, an office for Gandolfo, and a desk that Shant would use.  (Gandolfo Dep., pp. 113:18-114:17.)  There were also conference rooms and a kitchenette.  *Id.*

16.     Shant reported to a Revenue Officer that he used the Village Mall as his personal residence, leaving his minor children to live at his 9,000 square foot home on their own.  (MacGillivray Dep., pp. 87:16-88:8.)

17.     The VSHPHH Trust could not produce any proof that Shant resided or lived at the Village Mall.  (Ex. 106, VSHPHH Resp. to Req. for Prod. 16 (stating there were no leases of anyone related to Shant for the Village Mall).)  No lease was provided.  *Id.*

18.     Gandolfo testified she would come to the office at 7:30 or 8:00 in the morning to the Village Mall.  (Gandolfo Dep., pp. 66:20-69:8.)  She did not see any evidence of someone residing at the Village Mall, such as a person sleeping there.  *Id.*

19.     The Village Mall is not zoned for residential use.  (VSHPHH Dep., Vol. I, p. 118:15-17.)

20.     Shant did not pay rent for using the space for his office or for his alleged residence at the Village Mall.  (Gandolfo Dep., p. 114:14-17 (Q. "Did Shant ever pay rent for using office space either as an office or as a residence? A. I don't think so.")).

21.     Several entities controlled by Shant and discussed below used the Village Mall as office space.  Despite being the Rule 30(b)(6) representative of the VSHPHH Trust, Nina refused to say if these entities paid rent.  (VSHPHH Dep., Vol. I, pp. 109:12-110:19.)

4

22.     These entities did not pay rent.  (Ex. 104, Hollobaugh Exp. Report, Ex. K.)

### III.    Shant Hovnanian's Related Entities.

23.     The Defendants have not identified or produced records for any bank accounts in

Shant's name during the time from 2015 to 2018.  Instead, Shant used bank accounts in the name

of several other entities to pay for both business and personal expenses.  These entities used the

Village Mall's second floor as their address.  Below is a description of the relevant entities.

### A.  HovSat, Inc.

24.     HovSat, Inc. was established in 1984.  (Ex. 107, New Jersey Business Gateway

Report for HovSat.)

25.     Vahak (*i.e*., Nina and Shant's father) was listed as the president.  *Id*.  HovSat,

doing business as GrandView Cable, provided cable television services.  (Gandolfo Dep.,

p. 22:15-25; VSHPHH Dep., Vol. II, p. 176:17-22.)

26.     In 2012, the State of New Jersey revoked the entity's status because it had not

filed an annual report since 2009.  (Ex. 107, New Jersey Business Gateway Report for HovSat.)

27.     HovSat continued to operate after 2012.

28.     From at least 2015 through 2019, HovSat had several accounts with Affinity

Federal Credit Union.  (Ex 104, Hollobaugh Exp. Report, p. 39-44, Ex. K.)[1]

29.     On September 1, 2014, HovSat entered into a Co-Location Agreement with

Omniverse.  (Ex. 108.)  Shant signed the agreement as HovSat's managing partner.  *Id*.

---

[1] Jessica L. Hollobaugh, CPA/ABV, CFE, is an expert witness who produced a 43-page report to
the United States.  (Ex. 104.)  This report also contained detailed schedules of sources and uses
of cash from the Affinity Federal Credit Union and other entities.  The report and schedules are
431 pages.  The United States is producing just the report itself, her qualifications, and Schedule
K, which is the summary of the sources and uses of cash in HovSat's bank account.

30.    On November 1, 2017, HovSat entered into a Joint Venture Agreement with Omniverse.  (Ex. 109.)  Shant signed the agreement on HovSat's behalf as its authorized representative.  *Id*.

31.    Even though Shant held himself out as an authorized representative, the VSHPHH Trust maintains that he has no role with HovSat.  (VSHPHH Dep., Vol. I, p. 24:4-11.)  When asked if Shant controlled HovSat, the VSHPHH Trust's representative said that Shant was not in charge of HovSat but was just the trustee.  *Id*.  When asked who controlled HovSat, she could not answer.  *Id*.

32.    The VSHPHH Trust tried to assert that Karen Gandolfo was in charge of HovSat.  (VSHPHH Dep., Vol. I, p. 25:19-26:23.)   When asked why a bookkeeper was in charge, VSHPHH Trust could not explain, and she said that was "before" Nina was in charge (*i.e.*, some unspecified point in late 2017).  *Id*.

33.    Gandolfo is a long-term secretary and bookkeeper that provided services to various Hovnanian entities.  (*E.g*., VSHPHH Dep., Vol. I, pp. 33:24-34:11.)  The VSHPHH Trust could not explain why a secretary is managing this company.  *Id*.

34.    Gandolfo admits she took instructions from Shant about how to spend the funds in the HovSat account. (*E.g.*, Gandolfo Dep., pp. 90:24-91:5 (Gandolfo took instruction from Shant on payment of bills), 106:9-22 (Gandolfo generally followed Shant's instructions regarding the VSHPHH Trust until Nina took over as trustee)).

35.    Shant told Nina about HovSat's role with the Village Mall, and said it was managing the property.  (VSHPHH Dep., Vol. I, p. 23:16-24:11.)  No written contract was provided in discovery showing this managerial arrangement.

36.     At the same time, as a Rule 30(b)(6) representative, Nina could not say who was managing HovSat (and thus, perhaps, the Village Mall) and declined to admit it was Shant.  *Id.*

37.     Shant arranged for Gandolfo to be the sole person with access and authority over the HovSat bank accounts. *Id.*, pp. 67:20-68:3; (Gandolfo Dep., pp. 102:16-103:20; *see, e.g.,* Ex. 110, Bank Signature Cards.)  Gandolfo took instructions from Shant until late 2017 or 2018, while also contending that she did not know his exact role with HovSat.  (Gandolfo Dep., pp. 102:16-103:20.)

38.     For example, in connection with the two agreements with Omniverse, over $720,000 was deposited into HovSat's bank account.  (Ex. 104, Hollobaugh Exp. Report, Ex. K.) Shant instructed Gandolfo to treat these funds as "data service center" income on HovSat's accounting files.  (Gandolfo Dep., p. 99:3-13.)  She did not know what data service center income meant.  *Id.*

39.     Gandolfo admitted that she would pay Shant's personal expenses from the HovSat account when he instructed her to do so.  *Id.* pp. 53:10-54:13.

40.     Gandolfo testified she treated HovSat, the Village Mall, and the VSHPHH Trust as one in the same, she could not differentiate them, and she went to Shant for instruction regarding these entities.  (Gandolfo Dep., pp. 97:19-98:23.)

41.     After this litigation commenced in October 2018, the VSHPHH Trust opened a bank account in its own name at TD Bank in December 2019, which it started using to deposit the Village Mall rental income.  (Ex. 104, Hollobaugh Exp. Report, p. 37; VSHPHH Dep. Vol II, p.189:23-190:19.)  The accounts at Affinity Federal Credit Union stopped being used.  *Id.*  Yet the VSHPHH Trust and HovSat continued to operate from this single account.  *Id.*

42.     HovSat used the mall's second floor.  (*E.g.*, MacGillivray Dep., p. 34:25-35:10.)

43.     The VSHPHH Trust has not produced a written lease for HovSat.  HovSat paid no rent to the Village Mall.  (Hollobaugh Exp. Report, p. 41.)

**B. SpeedUS**

44.     SpeedUS, Corp., along with its wholly owned subsidiary SpeedUSNY.com, LP (collectively, "SpeedUS"), was a publicly traded corporation.  In its last Annual Report filed with the Securities and Exchange Commission (Form 10-K), Shant was listed as the Chairman of the Board of Directors, President, and Chief Executive Officer.  (Ex. 111, Form 10-K, item 10.)

45.     Vahak (Shant's father) was listed as one of the directors of SpeedUS.  He and Shant were the largest owners of stock.  *Id*., items 10, 12.

46.     SpeedUS stopped operating before the period relevant to this suit (*i.e.*, January 1, 2015).  (Ex. 105, Pallinkus Exp. Report, p 8.) ("There is no dispute that Speed[US] has not had any business dealings since the early 2000s and the sources of funds and uses of funds were personal in nature.").

47.     SpeedUS listed its address as the Village Mall on its final Annual Report with the Securities and Exchange Committee.  *Id*., p. 1.  The VSHPHH Trust has asserted SpeedUS is still a tenant of the Village Mall.  (VSHPHH Dep., Vol. I, pp. 33:24-34:11.)

48.     VSHPHH Trust did not produce a written lease between SpeedUS and the Village Mall.  SpeedUS paid no rent to the Village Mall.  (Ex. 104, Hollobaugh Exp. Report, p. 41.)

49.     SpeedUS had an account at Morgan Stanley.  The VSHPHH Trust's own expert agrees that during the period relevant to this suit, Shant used this account for his personal use.  (Ex.105, Paulikens Exp. Report, p. 8.)

50.     Karen Gandolfo is a SpeedUS employee, who had a role as a secretary or bookkeeper.  (VSHPHH Dep., Vol. I, pp. 33:24-34:11.)  She has been compensated in part through HovSat during the relevant time.  (Hollobaugh Exp. Report, p. 44.)

51.     In 2015, SpeedUS opened an account with Interactive Brokers.  (Gandolfo Dep., pp. 56:11-57:15.)  Shant asked Gandolfo to open the account but she "never accessed it [or did]… anything with it."  *Id.*  Gandolfo asked why Shant wanted the account in her name rather than his name, but he refused to tell her.  *Id.*

**C.  HovBilt**

52.     HovBilt is another Hovnanian-controlled entity that filed for bankruptcy in 2013.  (Ex. 112, *In re HovBilt,* No. 13-bk-30341, dkt. 25 (Bankruptcy Sch. & Stmt. of Fin. Aff.).)  The VS Hovnanian Group owned 99.5% of HovBilt.  *Id.*, SOFA item 21.  According to the Defendants, Shant's father owned the VS Hovnanian Group, which in turn owned HovBilt.  (Pachava Dep., Vol. I, p. 39:16-40:7.)  Shant was the executive vice president of HovBilt.  (Ex. 112, SOFA, item 21.)

53.     In its bankruptcy schedules, HovBilt stated it rented office space at the Village Mall during the bankruptcy.  *Id.*, Sch. F. (listing rent due to Paris, who is Shant's mother).  HovBilt represented it incurred rent of $5,000 per month.  *Id.*; Ex. 113, *In re HovBilt,* 13-30341-MBK, dkt. 286, p. 6 of 11.  Shant signed the declaration under penalties of perjury.  *Id.*, p. 1.

54.     The VSHPHH Trust has not produced any evidence showing this rent was paid.[2]

---

[2] Other companies that Shant controlled, like Zargis Medical Corporation, listed the Village Mall as their main address.

IV.     **VSHPHH Trust.**

55.     Shant's parents formed the VSHPHH Trust on December 28, 2012.  (Compl.,

¶ 29; Ans. ¶ 29).  It was funded with $1.  (Ex. 114, VSHPHH Trust, Art. I.)

56.     William Reed Rankin, *Esq*., drafted the VSHPHH Trust Agreement.  (VSHPHH

Dep., Vol. I, pp. 13:14-15, 19:5-10; Ex. 114, VSHPHH Trust Agreement (acting as notary).)

Rankin advised the family afterwards, including during this litigation.  *Id*., pp. 12:24-13:16.

57.     Shant and Nina were named as co-trustees of the VSHPHH Trust.  (Compl., ¶ 29;

Ans. ¶ 29).  Their five children are the beneficiaries.  (Compl., ¶ 29; Ans. ¶ 29; Ex. 114,

VSHPHH Trust, Art. IV).

58.     The trustees were provided discretion to manage the principle and income of the

VSHPHH Trust for the beneficiaries.  (Ex. 114, VSHPHH Trust, Art. IV-V.)  A trustee,

however, is prohibited from exercising their discretionary powers if they were otherwise

"obligated to support or maintain the Beneficiary of such separate trust in such manner as to

discharge any part or all of his or her obligation to support or maintain the Beneficiary of such

separate trust."  (Ex. 114, VSHPHH Trust, Art. V(C).)  This provision means that if the

VSHPHH was paying expenses of one of Shant's children, then Nina, as co-trustee, had to

approve.  *Id*.  Shant paid for expenses of his children from trust funds by paying private school

tuition while he was the only trustee doing any actions.  The VSHPHH Trust produced no

records showing that Nina authorized those payments.

59.     The VSHPHH Trust had the power to "open and maintain bank accounts."

(Ex. 114, VSHPHH Trust, Art. XII(K).)  The VSHPHH Trust did not open its own bank account

until December 2019.  (*E.g.,* VSHPHH Dep., Vol. I, pp. 65:2-66:6).

60.     The VSHPHH Trustees were required to maintain a book of accounts showing each beneficiary's proportionate share of principal, income, and expenses.  (Ex. 114, VSHPHH Trust, Art. X (requiring the maintaining of a book of accounts if the trustees did not physically segregate each Beneficiary's sub-trust.)  The VSHPHH Trust did not produce its own accounting records or book of accounts during discovery.

61.     A trustee of the VSHPHH Trust could resign if the trustee provided written notice to the other trustees.  (Ex. 114, VSHPHH Trust Art XIV, XV(F).)

62.     The VSHPHH Trust alleged that Shant resigned sometime in 2017, either August, September, or the Fall of 2017.  (VSHPHH Dep., Vol. I, pp. 20:17-21:25, 54:21-55:3; Vol. II., 243:16-22, 244:2-20.)  It could not produce the written notice of resignation.  *Id*.

63.     The VSHPHH Trust also could not explain why Shant resigned despite it being a noticed topic for a Fed. R. Civ. P. 30(b)(6) deposition.  *Id*.

64.     On June 14, 2017, the IRS sent notices to Shant demanding payment of the federal tax liabilities.  (Ex. 115.)

65.     The VSHPHH Trust never filed income tax returns (Form 1041) with the IRS. (Ex. 116, (IRS transcript reflecting no Form 1041s filed); MacGillivray Dep., pp. 89:19-92:19 (explaining VSHPHH Trust had no income tax returns filed).)

**V.     Shant Hovnanian Controlled the Village Mall.**

66.     The VSHPHH Trust admits Shant Hovnanian exercised substantial control until he allegedly resigned in 2017.  (VSHPHH Dep., Vol. I, p. 27:6-9 ("Shant was the person really in touch with Karen [Gandolfo], and – for the VSHPHH before [2018]. He would confer with me, but he was, you know, in charge more or less."), 37:16-18 (Shant was "primarily in charge"), 54:14-20 (Shant was responsible for monitoring the Village Mall property)).

11

67.     When the VSHPHH Trust took legal title to the Village Mall, rent checks from the first-floor tenants continued to be paid to a bank account held in the name of Shant's father. *Id*, p. 67:7-25.  Shant allowed the checks to be paid to the account in his father's name rather than the VSHPHH Trust.  *Id*.

68.     The rent was not used for paying expenses of the Village Mall from that account. (Ex. 104, Hollobaugh Exp. Report, p. 37.)  Instead, rent was deposited from the father's account into Shant's account in the name of HovSat.  *Id*.

69.     In early 2017, Shant instructed the tenants to pay rental income directly to HovSat, rather than to his father's account or the non-existent account for the VSHPHH Trust. (VSHPHH Dep., Vol. I, pp. 67:9-15, 104:12-20.)  At least one tenant was told to pay rent directly to HovSat at Shant's express instruction.  (Ex. 117, Email from Karen Gandolfo to tenant; Gandolfo Dep., pp. 110:9-24.)[3]  Rent was paid to HovSat through December of 2019. (Ex. 104, Hollobaugh Exp. Report, p. 12.)

70.     Nina never had authority over the HovSat account and could not access it. (VSHPHH Dep., Vol. I, p. 68:2-5.)  On paper, Gandolfo was the only person with access to the account.  *Id*.

71.     Shant could use HovSat funds how he saw fit.  (*E.g.*, Gandolfo Dep., p. 54:6-13 (Shant would instruct Gandolfo to transfer funds from HovSat to cover household expenses), 90:24-91:5 (Gandolfo took instruction from Shant on what bills to pay), 98:3-8, 106:9-22 (Gandolfo followed Shant's instructions regarding the VSHPHH Trust).)

---

[3] Gandolfo alleges that she did not tell the truth in her email to the tenant because she did not actually receive a direct instruction from Shant.  Whether that statement is true is not material. The VSHPHH Trust has admitted the instruction came from Shant.  Further, the tenants followed her instructions, showing that Shant was not just a random interloper but instead was in charge of the Village Mall.

72.     Nina had no role or interest in Shant's activities when he controlled the Village Mall.  During the Rule 30(b)(6) deposition of the VSHPHH Trust, Nina tried to say she was apprised of trust information and decisions after they occurred.  *Id*. (VSHPHH Dep., Vol. I, pp. 22:3-24:3.)  Yet when asked what Shant actually did, Nina testified that she did not know what he did before he resigned as trustee and had to "learn[] the ropes" after his resignation.  *Id*.

73.     Nina did not monitor the rent generated by the Village Mall or the HovSat account.  (VSHPHH Dep. Vol. II, pp. 179:7-180:23.)   She just trusted Shant and his secretary.  *Id*.  When asked whether HovSat (d/b/a Grandview Cable) shared the same files for accounting with the VSHPHH Trust or Village Mall, she said she did not think so (even after producing those records in discovery).  *Id.*, pp. 132:23-133:15.

74.     As the VSHPHH Trust's only Rule 30(b)(6) designee, Nina testified that she was "very surprised" about the commingling of records, even after the VSHPHH Trust produced those records in response to discovery requests.  *Id.* 133:2-7.  Her surprise demonstrates she did not take a role in the operations of the Trust where she was purporting to be a co-trustee with Shant over the past five years.

## VI.     The Village Mall's Funds Were Commingled.

75.     The VSHPHH Trust did not have financial statements, ledgers, or accounting records.  (Ex.106, VSHPHH Resp. to Req. for Prod. ¶¶ 7-9.)

76.     The limited amount of tracking of Village Mall funds was done through a Quickbooks accounting file for HovSat using the name Grandview Cable.  (VSHPHH Dep., Vol. I, p. 134:9-13.)  HovSat and the Village Mall commingled funds, without any segregation or earmarking of the Village Mall's funds.  (*See, e.g.,* Ex. 104, Hollobaugh Exp. Report, p. 40.)

77.     On the second day of its two-day deposition in February of 2021, the VSHPHH Trust admitted the QuickBooks files were incomplete and insufficient.  (VSHPHH Dep., Vol. II, pp. 155:10-157:3.)  The VSHPHH Trust stated it would hire an accountant or auditor to provide an accurate financial picture of the VSHPHH Trust.  *Id.*

78.     The VSHPHH Trust never turned over that accurate financial picture in discovery.

79.     The VSHPHH Trust could not explain why the VSHPHH Trust failed to keep its own set of records and comingled its accounts with HovSat.  *Id.*, Vol. I, p. 134:9-13 ("Q. … [F]rom the trust's perspective why Grand View Cable – why the trust's financial records were recorded in Grand View Cable [QuickBook files]. A. I can't answer that. I have no idea.").

80.     The VSHPHH Trust authorized the trustees to "make loans to such persons, firms, corporations and entities" or "engage in business with the property held under this Trust Agreement as a sole proprietor, or as a general or limited partner, or as a member of a limited liability company, with all the powers customarily exercised by an individual so engaged in." (Ex. 114, VSHPHH Trust Art. XII(L)-(M).)

81.     The VSHPHH Trust could not produce any records – like contracts, invoices, loans, or leases – showing the trust engaged in any businesses before this litigation began. (Ex. 106, VSHPHH Trust Resp. to Req. for Prod. 7 (requesting documents reflecting expenses).)

82.     When preparing for a Rule 30(b)(6) deposition on behalf of the VSHPHH Trust where the finances of the Trust were at issue, Nina refused to look at any bank accounts that preceded the opening of the account at TD Bank in December 2019. (*See* VSHPHH Dep., Vol. I, pp. 141:23-142:10.)  She asserted the HovSat bank records were not the VSHPHH Trust's records even though all the rent collected was deposited into the HovSat account.  *See id.*

83.     The VSHPHH Trust asserts HovSat was acting as the manager for the VSHPHH Trust.  There is no evidence of such an arrangement like a contract.  The only service HovSat allegedly provided was being a bank account.  (VSHPHH Dep., Vol. I, p. 177:4-16, 178:2-22.)

84.     HovSat received nothing in compensation for its managerial services.  *Id*., p. 179:7-9.  The VSHPHH Trust could not say if the rents deposited into the HovSat bank account were used to pay HovSat's expenses.  *Id*., p. 179:11-23.

## VII.   Shant Hovnanian Received the Benefits and Bore the Expenses of the Village Mall.

85.     The following is a summary of the HovSat bank account activities:

**HOVSAT/VILLAGE MALL CASH FLOW**
**SUMMARY OF BANK ACCOUNTS (NOTE 1)**
**January 1, 2015 to September 30, 2020**                                                                                    **EXHIBIT K**

| | | 2015 | 2016 | 2017 | 2018 | 2019 | September 2020 | Jan 2015 - Sept 2020 |
|---|---|---|---|---|---|---|---|---|
| **Opening Cash** | | $ 1,266.37 | $ 31,733.08 | $ 24,766.85 | $ 11,624.78 | $ 73,559.21 | $ 7,142.33 | $ 1,266.37 |
| **Sources and Uses of Cash** | | | | | | | | |
| **Village Mall** | | | | | | | | |
| Sources | | | | | | | | |
| Rental Income | | - | 4,344.17 | 71,372.20 | 75,129.37 | 78,915.99 | 71,632.76 | 301,394.49 |
| Rental Income- Hovnanian entities | F | - | - | - | - | - | - | - |
| Rental Income- AFCU x1502 | E | 78,770.00 | 72,700.00 | 11,255.00 | - | - | - | 162,725.00 |
| Uses | | | | | | | | |
| Real Estate Taxes | B | - | (63,323.09) | (33,959.77) | (34,128.39) | (34,563.54) | - | (165,974.79) |
| Repairs & Maintenance | | (3,975.89) | (3,073.13) | (4,960.11) | (4,741.54) | (42,030.61) | (6,973.00) | (65,754.28) |
| Utilities | | (9,503.99) | (8,046.76) | (8,986.94) | (10,947.05) | (9,291.54) | (11,541.90) | (58,318.18) |
| Other Uses | G | (15,059.11) | (9,705.57) | (7,900.57) | (12,404.93) | (9,524.74) | (5,165.17) | (59,760.09) |
| **Net Village Mall prior to Litigation Costs** | | 50,231.01 | (7,104.38) | 26,819.81 | 12,907.46 | (16,494.44) | 47,952.69 | 114,312.15 |
| Professional Fees | | - | - | - | (6,000.00) | (92,700.00) | (6,000.00) | (104,700.00) |
| **Net Village Mall** | | 50,231.01 | (7,104.38) | 26,819.81 | 6,907.46 | (109,194.44) | 41,952.69 | 9,612.15 |
| **GrandView / Hovsat** | | | | | | | | |
| Sources | | | | | | | | |
| Paid to Hovsat/Grandview | | 21,118.88 | 11,813.81 | 13,329.22 | 18,237.22 | 12,729.40 | 11,697.89 | 88,926.42 |
| Zargis Medical | A | 84,650.00 | 66,179.00 | 16,950.00 | 8,500.00 | 23,400.00 | - | 199,679.00 |
| Omniverse | | 99,000.00 | 108,000.00 | 108,000.00 | 224,225.25 | 181,462.00 | - | 720,687.25 |
| Uses | | | | | | | | |
| DirecTV | | (65,907.92) | (69,626.86) | (70,785.67) | (67,096.43) | (68,163.07) | (21,903.08) | (363,483.03) |
| Maintenance - Kevin Morrison | | (48,392.97) | (45,405.22) | (42,971.79) | (46,607.99) | (53,751.27) | (30,186.51) | (267,315.75) |
| Karen Gandolfo | | (11,431.21) | (5,888.66) | (6,041.27) | (6,228.00) | (13,327.50) | (13,838.27) | - |
| Storage Rental- Zac's Garage | | (4,494.00) | (4,494.00) | (5,122.11) | (4,889.83) | (5,431.14) | (5,219.28) | (29,650.36) |
| Consulting | | (49,073.87) | (26,907.58) | - | - | - | - | (75,981.45) |
| Utilities | G | (5,742.17) | (4,543.70) | (4,475.82) | (4,874.88) | (4,133.77) | (166.60) | (23,936.94) |
| Computer/Internet/Programming | H | (9,581.39) | (9,066.63) | (8,600.64) | (9,837.64) | (9,128.83) | (3,605.14) | (49,820.27) |
| Other Uses | I | (10,412.32) | (6,124.39) | (4,920.66) | (5,341.73) | (4,693.91) | (3,646.44) | (35,741.46) |
| **Net GrandView / Hovsat** | | (266.97) | 13,955.77 | (4,638.74) | 106,085.97 | 58,961.91 | (67,469.24) | 106,628.70 |
| **Other Sources and Uses** | | | | | | | | |
| Hovnanian International | | - | - | - | - | 6,000.00 | 49,980.00 | 55,980.00 |
| VEC Realty, LLC (Paid to VSHPHH) | | - | - | - | - | 15,003.00 | - | 15,003.00 |
| Speedus NY Account Transfers | | 4,000.00 | 17,000.00 | - | - | 5,000.00 | - | 26,000.00 |
| Speedus NY Account Transfers | | (18,400.00) | (18,400.00) | (12,000.00) | (40,000.00) | (45,000.00) | - | (133,800.00) |
| Speedus NY Expenses Paid | D | (5,074.05) | (5,518.21) | (6,291.97) | (5,610.99) | (5,469.51) | (5,317.03) | (33,281.46) |
| Other Deposits | | - | - | - | - | 200.00 | - | 200.00 |
| Interest Income | | 0.72 | 0.74 | 5.78 | 5.70 | 15.30 | 0.13 | 28.37 |
| 520 Navesink River Road Expenses | C | - | (3,000.15) | (936.00) | (2,949.00) | (960.00) | - | (8,745.15) |
| Pachava Trust Account Transfers | | - | - | - | - | 9,500.00 | (5,000.00) | 4,500.00 |
| Other Expenses- Cash/Unidentified | | - | (3,000.00) | (229.45) | (200.00) | (437.00) | (6,750.70) | (10,617.15) |
| NCC Membership | | - | - | - | (2,305.01) | - | - | (2,305.01) |
| Drivers License Expenses (Shant) | | (24.00) | - | (71.50) | - | - | - | (95.50) |
| Children's School Costs | | - | - | (15,800.00) | - | (36.14) | (4,500.00) | (20,336.14) |
| **Net Other Sources & Uses** | | (19,497.33) | (13,817.62) | (35,323.14) | (51,059.00) | (16,184.35) | 28,412.40 | (107,469.04) |
| **Ending Cash** | | $ 31,733.08 | $ 24,766.85 | $ 11,624.78 | $ 73,559.21 | $ 7,142.33 | $ 10,038.18 | $ 10,038.18 |

(Ex 104, Hollobaugh Report, Ex. K.)

86. Based on the summary above, among other things:

    i. No rental income was ever distributed to the trust's beneficiaries.

    ii. The Village Mall received $238,441 for the period from January 1, 2015, to December 31, 2017.

    iii. Shant took the rental income for his personal benefit.  From 2015 to 2017, $48,000 was transferred to the SpeedUS account where Shant then used the funds for his personal use.  (Ex. 105, Paulikens Exp. Report, p. 8 (admitting the "Speed[US account's] ... the sources of funds and uses of funds were personal in nature.").)  An additional $17,683 was paid to cover expenses Shant normally paid from the SpeedUS account.

    iv. The amount of $15,800 was paid to the Ranney School where his children attended school.  Under the terms of the VSHPHH Trust Shant could not authorize the Trust to make this payment because it was a personal Shant's parental obligation.  (Ex. 114, VSHPHH Trust, Art V(C).)

    v. Shant's Country Club membership, driver's license fees, and expenses that he was responsible to pay for 520 Navesink River Road were paid from the HovSat account.

    vi. Karen Gandolfo received significant payments from HovSat even though she was a SpeedUS employee.

87. The VSHPHH Trust had no records reflecting the payments made from HovSat or the Village Mall to Shant or on his behalf. (Ex. 106, Resp. to Req. for Prod. 24.)  It could not provide evidence before this litigation began where a trustee authorized the payment, any consideration given for the payment, or any written explanation of the payment (demonstrating

the payment was intended as compensation, a gift, a loan, *etc*).  *Id*.  The VSHPHH Trust also

could not produce records showing how it reported these payments to the IRS either on its

(unfiled) tax returns or via an informational return like a Form W-2 for reporting wages or a

Form 1099 for non-employee compensation.  *See id*.

88.     No funds from the Village Mall were ever distributed to the VSHPHH Trust

beneficiaries.  (Ex. 104, Hollobaugh Exp. Report, Ex. K.)

89.     The VSHPHH Trust paid none of the expenses of the Village Mall.  *Id*.

90.     Shant used $201,204 from his personal funds in his SpeedUS account to pay the

real estate taxes due on the Village Mal in 2005.  (*Id.*, p. 19; Ex. 105, Paulikens Exp. Report,

pp. 21-22 ("We do not dispute the factual accuracy of the flow of funds . . . .").)

91.     The VSHPHH Trust had no record showing why Shant paid the real estate taxes

from SpeedUS or reflecting whether that payment was a gift or loan to the Trust.

92.     When the VSHHPHH Trust's Rule 30(b)(6) designee (Nina) was asked why

Shant was paying the real estate taxes, she said "you need to ask him.  I don't know" despite

transfers from SpeedUS being one of the topics for the Rule 30(b)(6) deposition.  (VSHPHH

Dep., Vol. I, pp. 98:6-99:23.)  Nina alleged that until the date of the deposition, she was unaware

the transfer of $201,204 ever occurred.  *Id*.

93.     The payment of $201,204 was the largest expense paid for the Village Mall.

(Ex. 104, Hollobaugh Exp. Report, Ex. K.)

94.     The other Village Mall expenses, like utilities and real estate taxes, were paid

from HovSat. *Id.*

Date: May 13, 2022,

>                            */s/ Ari D. Kunofsky*
>                            ARI D. KUNOFSKY
>                            JOSHUA D. ZIMBERG
>                            Trial Attorney, Tax Division
>                            U.S. Department of Justice
>                            Post Office Box 227
>                            Washington, D.C. 20044
>                            Telephone: (202) 353-9187
>                            Facsimile: (202) 514-6866
>                            Email: Ari.D.Kunofsky@usdoj.gov
>                            *Counsel for the United States*