UNITED STATES OF AMERICA
Plaintiff,

v.

SHANT HOVNANIAN,
PETER HOVNANIAN, as trustee for the Pachava Asset Trust,
NINA HOVNANIAN, Individually and as trustee for the
VSHPHH Trust
et al.

Defendants

EXPERT RESPONSE REPORT

**Plaintiff
Exhibit**

105



**United States of America ("Plaintiff") v.**
**Shant Hovnanian, Peter Hovnanian as trustee for Pachava Asset Trust, Nina Hovnanian**
**(individually and as trustee for the VSHPHH Trust), et al ("Defendants")**

---

### **Table of Contents**

| | **Tab** |
|---|---|
| **Independent Accountants'  Letter** | A |
| **List of Documents and Information Considered** | B |
| **Curriculum Vitae**<br>        **Randall M. Paulikens, CPA/ABV/CFF/CITP** | C |

# Tab - A

# FRIEDMAN LLP®

## ACCOUNTANTS AND ADVISORS

September 28, 2021

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
40 E Main Street
Moorestown, NJ  08057

Re:     United States of America v. Shant Hovnanian, et al

Dear Mr. Hanamirian:

You have requested that we examine the expert report prepared on behalf of the United States of America in the above referenced matter. By your request, we submit this response report to the Expert Report prepared by Jessica L. Hollobaugh, CPA/ABV, CFE of WithumSmith+Brown, P.C. dated June 30, 2021, (the "Withum Report").  In that report, Ms. Hollobaugh indicates that she was hired to "*assist the Government in determining if these trusts are the nominee or alter ego of Shant*". According to the Complaint, Shant owes approximately $5.5 million in tax from 2002 through 2007, which with penalties and interest totals approximately $16.2 million.

The Complaint includes Adelphia Water Company, Inc.; MTAG Services, LLC; Ulysses Asset Sub II, LLC; and the Township of Howell. Withum provides no analysis of any claims by these parties.  As a result we will not provide any commentary either, but we reserve the right to respond if information is provided subsequently.

As we will discuss in this report, the Withum Report opines that the bank accounts of various entities including Speedus NY, Zargis, Inc., Village Mall, and others were interrelated with the Pachava Trust ("Pachava") and the VSHPPH Trust ("VSHPPH") (together "the Trusts"). As a result of that interrelation, the Withum Report concludes, although not clearly stated (as it would be a legal opinion), that these entities, including the Trusts, are the alter egos of Shant Hovnanian.  Further Withum opines that Shant received a personal benefit from the house at 520 Navesink River Road – the main asset of Pachava.  By claiming that Shant received a benefit from the trust assets, the United States is seeking to pierce the

601 Route 73 North, Suite 400, Marlton, NJ 08053  p 856.830.1600  f 856.396.0022        friedmanllp.com

Your livelihood, empowered.                                    An Independent Member Firm of DFK with offices worldwide.

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

Trusts to reclaim that property as the personal asset of Shant and use the sale of that property to satisfy his tax obligations.

Despite its length and the amount of detail presented in its 431 page report along with the "detailed citations" therein, Withum does not actually support what the United States seeks - which is to show how Shant Hovnanian's actions can transmute property that was owned by his parents, put into Pachava for Shant's children and other property that was put into YSHPHH (the trust that benefits Shant's children as well as his sister Nina Hovnanian's children) can ultimately be transferred from the children's trust to the United States government to satisfy liens belonging to someone who never owned the property.

As we will discuss throughout our response, the Withum Report is full of assumptions, incomplete analysis and is written with many descriptions suggesting that Withum's conclusions were inevitable. When we include additional facts that are apparent from the documents, depositions, as well as providing critical perspective, many of the "facts" that are cited to "*prove the Governments claim*" we believe - fall short.

Withum states that based upon their professional experience, Shant has received a benefit from the various assets discussed by Withum.  Withum did not measure that benefit, did not carve out Shant's benefit from the benefits others receive from the assets or conduct, and never discussed whether the benefit was material or greater than the benefits the other interested parties (his children and his sister's children) received. Lastly, Withum does not overtly acknowledge that others even received benefits.

For ease of comparison, we will maintain the naming organization used by Withum and will at times reprint sections of the Withum Report to make the additional facts and our analysis easier to compare.

## Background

The matter of the United States of America v. Shant Hovnanian et al, is essentially a collection matter whereby the United States seeks to foreclose on assets that are not directly owned by Shant Hovnanian. The assets being sought have been titled in two trusts set up for the benefit of Shant's children (Pachava Trust) and his children and his sister Nina's children  - VSHPHH Trust [1].  According to the Complaint,

---

[1] Complaint paragraph 29.

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

Shant has defaulted on a $16.0 million assessment. This particular litigation is seeking to collapse/pierce the various entity veils so the United States can foreclose on the underlying assets held by the two Trusts to settle Shant Hovnanian's tax debt.

For ease of comparison we reprint Withum's description of the individuals and certain entities.  The footnotes are references from the Withum Report.

- **Shant Hovnanian** (*"Shant"*) *is a Defendant in this matter.*
- **Vahak S. Hovnanian** (*"Vahak Sr."*) *was Shant and Nina Hovnanian's father.[3] Vahak Sr. passed away on August 31, 2015.[4]* **Paris Hasmig Hovnanian** (*"Paris"*) *was Shant and Nina's mother[5] who passed away in November 2016.[6]*
- *The* **Shant S. Hovnanian Asset Trust** (*"Shant Trust"*) *was established on October 8, 2007, with Shant Hovnanian identified as the Settlor and Hilde Jenssen Hovnanian as the Trustee.[7]*
- *The personal residence located at* **520 Navesink Road**, *Middletown Township, New Jersey ("520 NRR") was transferred into the Shant Trust on June 21, 2011[8].* <u>Counsel has requested that I assume that no gift tax returns were filed to report this transfer.</u> Underlining added by Friedman LLP
- *On October 11, 2011, the Shant Trust was retitled as the* **Pachava Asset Trust**[9] *("Pachava Trust"). A corrective deed was filed on December 16, 2011 transferring the 520 NRR property from the Shant Trust to the Pachava Trust.[10]*
- **Hilde Jenssen Hovnanian** (*"Hilde"*) *was Shant's second wife[11] and the original trustee for the Shant Trust and renamed Pachava Trust.[12] Hilde served as trustee until April 2015.[13]*
- **Peter Hovnanian** (*"Peter"*), *Shant's cousin,[14] was appointed as a trustee of the Pachava Trust[15] from August 2016[16] through November 1, 2016.[17]*
- *The* **VSHPHH Asset Trust** (*"VSHPHH Trust"*) *was established on December 28, 2012 by Shant's Parents as the Settlors and Shant and his sister, Nina Hovnanian, as the Trustees.[18] A deed dated January 1, 2015, transferred a commercial/retail property located at 1 Dag Hammarskjold Boulevard, Freehold, New Jersey, known as the* **Village Mall,** *("Village Mall") from Shant's Parents to the VSHPHH Trust.[19]* <u>Counsel has requested that I assume that no gift tax returns were filed to report this transfer.</u> Underlining added by Friedman LLP
- **William Read Rankin** (**"Read"**) *is a lawyer who has represented Hovnanian entities and individuals.*
- **Nina Hovnanian** (*"Nina"*) *is the current trustee of Pachava Trust and VSHPHH Trust.[20] She is also the sister of Shant.[21]*
- **Vahak W. Hovnanian** (*"Vahak Jr."*) *is Shant's oldest son[22], and is approximately 24 years old.[23] Shant has two other children, Paris and Charentz, approximate ages 17 and 16, respectively.[24]*
- **Hovsat, Inc. dba Grandview Cable** (*"Hovsat"*) *was incorporated on November 19, 1984.[25]* <u>The State of New Jersey reports that Vahak Hovnanian was the last reported President and that the entities status was</u>

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

> *revoked in 2012, and has not been reinstated, for not filing annual reports for two consecutive years.*[26]
> Underlining added by Friedman LLP *However, after Vahak Sr.'s death in 2015, Hovsat entered into a joint venture agreement with Omniverse on November 1, 2017 ("Joint Venture Agreement") and Shant signed as the authorized representative.*[27]

- **Speedus Corp** was formed in October 1995 under the name CellularVision USA, Inc. ("CVUS") to serve as a holding company for 100% of Hye Crest Management Inc. ("Hye Crest") and CellularVision of New York, LP ("CVNY"). Hye Crest had been formed in 1988 and CVNY in 1993 by Shant, Bernard Bossard and Vahak Sr.[28] In February 1995, CVUS consummated its Initial Public Offering.[29] In 1999, CVUS undertook a merger and changed its name to Speedus.com, and, at or around the same time CVNY, a wholly-owned subsidiary of Speedus.com ("Speedus.com") changed its name to **SpeedusNY.com, LP** ("Speedus NY").[30] Shant was also identified as the Chairman of Speedus NY.[31] Similarly, in June 2002, Speedus.com changed its name to Speedus Corp. (together with subsidiary Speedus NY, "Speedus").[32] Shant, as Chairman of the Board of Directors, President, and Chief Executive Officer for Speedus, filed Form 15 with the SEC to effect a termination of the registration of its common stock in 2011.[33] Per the filing, Speedus planned to maintain a public listing on the OTC Pink Sheets market, or other similar market.[34]

- **Hovbilt, Inc.** ("Hovbilt") was a wholly owned subsidiary of VS Hovnanian and affiliate, and their principal business activity was the acquisition, development, and sale of residential real estate.[35,36] On October 1, 2013, Hovbilt filed a Summary of Schedules with the United States Bankruptcy Court, identifying VS Hovnanian as the 99.5% equity holder, and Shant, as Vice-President, signed the filing.[37] As of December 31, 2008, VS Hovnanian Group, Inc. ("VS Hovnanian") was reportedly owned by Shant, Shant's Parents, and Nina Tower Hovnanian (Shant's first wife).[38,39,40]

- **Zargis Medical Corp.** ("Zargis") was a global medical device company that was 90% majority owned by Speedus as of the last 10-K filed in 2009. [41] On April 1, 2011, 3M acquired certain assets of Zargis.[42] Nina testified that Zargis is currently wholly owned by Speedus.[43]

- **Hovnanian International** was a company owned by Vahak Sr. which owns a gated community named Vahakni located in Armenia.[44] Nina testified that Hovnanian International was placed in an Armenian trust following Vahak Sr.'s death.[45]

- **Karen Gandolfo** ("Gandolfo") was an employee of Speedus beginning in 1997.[46]

We note that while Nina (daughter), Hilde (ex-daughter in law) and Gandolfo (office worker) were deposed in their various capacities, none of them are fully aware of the complete financial picture of their branch of the Hovnanian family.  There were inconsistent recollections and many responses that indicate that they did not know many facts.  Therefore citation of aspects of their testimony to "prove a point",

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

given their lack of total knowledge may create a misleading picture of the interactions of the individual and the entities. The two original owners of the assets in both Trusts were Shant's father and his mother. They (Shant's parents) passed away in August 2015 and November 2016 respectively. It is quite likely that their knowledge of the assets and liabilities and history exceeded Hilde's and Nina's and Gandolfo's. Also there is no indication other than the written documents moving the assets into their grandchildren's Trust as to their reasons and motivations for skipping Shant and his sister Nina.  As Judge Learned Hand is famously quoted:

> *"Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes."*

Withum did not address that Shant's parents were free to leave their assets to anyone they wished nor what Shant's parents motivations would be to bypass BOTH Shant and Nina and put assets in trust for their grandchildren.  Withum does not argue the fact (neither does the government) that the assets went directly from Shant's parents to the Trusts and that neither Shant or Nina "touched" those assets. Withum also noted that gift tax returns were not filed.  However, Withum did not communicate the fact that the filing or failure to file a gift tax return does not perfect or negate the transfer of the underlying property. The property was transferred and was recorded at the county clerk's office. Withum also did not indicate that the failure to file the gift tax returns was Shant's parents' responsibility – not Shant's.  Mentioning the failure to file the gift tax returns has no effect on Shant.  That is his parents' failure. Ultimately though not filing does not move the assets away from the trust, back to Shant and ultimately to the United States government.

**High Level Summary of Our Withum Critiques.**

The Withum Report includes approximately 431 pages from the title page through the last page of Exhibit K.  Most of this information is portrayed as "General Ledgers" of SpeedUS NY (141 pages); Zargis (46 pages); Pachava Trust (40 pages); Hovstat (109 pages).  In short, 336 out of 431 pages is reprints of detail transactional information (as created by Withum).

Including this information in an accountant's expert report is not improper, however, the fact that these are called "general ledgers" would suggest (strongly) that these are complete records of the entities. For background, a general ledger contains all of the accounts of a business including balance sheet accounts (assets, liabilities and equity) and income statement accounts (revenue and expenses).  The balance sheet

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

items reflect the sum total of all of the transactions for an entity since inception, while the income statement items reflect transactions for the current year.  (At the close of the year, through a journal entry, the income statement accounts are zeroed out and the net effect posted to retained earnings so the income statement accounts start with a zero balance at the beginning of the each year.) Leaving out the beginning balances from the balance sheets ignores years of activity.

Throughout her deposition, Gandolfo claimed that she was not a trained bookkeeper or accountant and that she merely paid the bills and performed no bank reconciliations or other work to make sure the records were complete.  This was properly cited in the Withum Report. As a result, any accountant would not consider the records complete, and therefore not accurate as a portrayal of the financial status and the results of operations of an entity.

**Withum's Forensic Analysis**

Beginning on page 13, Ms. Hollobaugh provides a detailed discussion of her actions and steps taken *"for purposes of determining the sources and uses of cash within each entity"*

Nowhere does Ms. Hollobaugh discuss the steps she performed to determine if the beginning assets and liabilities were properly carried forward, nor did she indicate that she traced any of the historic information to tax returns, financial statements or anything.  Therefore, portraying her work as "General Ledgers" implies a completeness that simply does not exist.  For example, if there were loans or capital contributions were made to the various entities by Shant, Vahak, Paris or others, repayment of those loans and capital contributions could be proper. The Sources and Uses analysis prepared by Withum would not reflect the entire transaction and might suggest impropriety when there was none. Withum omitted these steps on every bank statement on every entity that they reviewed.  Thus this incomplete theme is common and repeated throughout our response.

The work performed by Withum – (basic bookkeeping - posting cash receipts and deposits – a cumbersome process over the period of time that Withum covered) - is incomplete, and thus may be misleading to a user.  Note this does not mean the actual postings are incorrect - based upon our review they are correct such as they are for the specific time frame covered.  However, Withum's work is analogous (and as reliable) as putting a brand new second floor on a house that has a poor or non-existent foundation.  The second floor may be very good, but the floor is not supported by the rest of the structure and will thus fail regardless of the craftsmanship on that floor.

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

Portraying Withum's work as a general ledger, knowing it is not complete suggests a completeness and accuracy that is not earned.

**Inconsistencies Between Complaint and Withum's "Findings"**

In the Complaint paragraph 38, the United States claims that Adelphia Water is a Hovnanian controlled entity owned 25% by Shant, 25% by Nina and 50% by their parents. In paragraph 39, the United States claims that Adelphia Water (a defendant) had its corporate charter revoked in 2012.  Later in paragraph 40, the United States claims that "*because Adelphia Water had its corporate charter revoked, Shant Hovnanian and Nina Hovnanian are now the owners of the corporate assets including the 572 Wyckoff Mills Road property*". Unsaid, but presumably assumed by the US Attorney, is that since both parents have passed away, by virtue of being Vahak and Paris children -  Shant and Nina are 100% owners of the corporate assets. (No mention is made of Vahak or Paris actions or their will between 2012 and their deaths.)

While this is a legal issue, our understanding is that according to the United States, if the corporate charter is revoked, the ownership of the underlying assets goes to the shareholders in their individual capacity as owners.  Therefore, Adelphia Water's property is subject to Shant and Nina's creditors – the US in this case. We are not aware of the defenses to this claim, nor if it is an appropriate summary of the law.

Withum is clearly aware of this aspect of the case since it is part of the Complaint. However, Withum makes significant mention in their discussion of Speedus that all of the activity was personal. Withum provides no explanation what the practical difference in using assets of an entity that has had its charter revoked (as the United States claims to foreclose on Adelphia Road) and using assets from an entity whose charter was revoked to pay personal expenses.  We also note that while Withum discusses Hovsat extensively, Withum does not actually cover Hovsat in their conclusion.

While it is not recommended, you are allowed to pay personal expenses from your business provided that they are properly accounted for and are not deducted for taxes. Since Withum did not provide a complete accounting of the assets and liabilities, Withum has no way to know if the disbursements were returns of capital from the inactive business or the repayment of loans. Since there is no dispute that Speedus is not an operating business, using its bank accounts is not improper.  Withum has provided no citation (other than their opinion) supporting this.

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

**Speedus**

On page 21 of the Withum Report we reprint for ease of reading.

*My analysis of the Speedus NY Bank Accounts is summarized as follows:*

- *Shant was an authorized signer on all accounts and was the only holder of the Speedus NY Morgan Stanleydebit card. There has been no evidence to indicate that anyone besides Shant had access to the Speedus NY Bank Accounts during the period of my review.*
- *Additionally, based on testimony provided, and my analysis and discussion as presented in this report, Speedus NY does not appear to be carrying on any ongoing business operations within the Speedus NY Bank Accounts, as supported by the following:*
  - *Gandolfo indicated that Speedus has not had any business operations since the early 2000s. Gandolfo receives paychecks from Speedus but indicated that she does not perform any duties for Speedus.*
  - *Speedus and Speedus NY have not filed any income tax returns to report any business income or expenses during the period of my review.*
  - *Between May 2013 and July 2020, the funding sources of the Speedus NY Bank Accounts were primarily Shant's personal funds, including gifts and divorce proceeds, and a settlement of legal malpractice claims relating to prior tax litigation. Accordingly, there were no significant funding sources that indicate there was any ongoing business operations.*
  - *The expenses paid from the Speedus NY Bank Accounts include personal expenses including groceries, medical expenses, clothing, travel and restaurants, children's school costs, cash withdrawals, Navesink Country Club dues, and other entertainment expenses.*
- *In addition, the Speedus NY Bank Accounts directly funded the $201,204 satisfaction of a tax lien against the Village Mall in 2015, and a $319,349 tax lien against 520 NRR in 2017. The properties were titled to the VSHPHH Trust and Pachava Trust, respectively, at the times these payments were made.*

***Accordingly, it is my opinion that the Speedus NY Bank Accounts were comprised of personal deposits, included little, if any, ongoing business income, and were used by Shant to fund personal expenses, a $201,204 satisfaction of a tax lien against the Village Mall in 2015, and a $319,349 tax lien against 520 NRR in 2017.***

Factually, these findings are correct. There is no dispute that Speedus has not had any business dealings since the early 2000s and the sources of funds and uses of funds were personal in nature. We also note

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

that the variety of the deposits and transfers out occurred in 2016 and prior which was two years before this litigation was commenced.

Withum did not present complete General Ledgers and did not appear to investigate the beginning balances. As a result, it is unclear if Withum's reported results tell the complete story. Withum did not mention if paying for personal expenses – if properly accounted for is improper.

**Zargis –**

On page 27 of the Withum Report we reprint for ease of reading.

- *Shant is the only signatory on the account.*

- *Additionally, based on testimony provided, and my analysis and discussion as presented in this report, Zargis does not appear to be carrying on any ongoing business operations within the Zargis Bank Account, as supported by the following:*
  - *There are residual deposits from 3M into this account, but there are no associated business expenses for Zargis paid through the account, such as payroll, rent, or utilities, which would be indicative of ongoing business operations. Gandolfo is wired funds from the Zargis Bank Account, even though she testified that she does not provide any services for Zargis.*
  - *Zargis has not filed any income tax returns setting forth any business activity during the period of my analysis.*
- *My analysis also demonstrated that the Zargis Bank Account acted as a clearing account for other entities, whereby funds were deposited to the Zargis Bank Account and then transferred out, as follows:*
  - *Of the $1,091,674 in funding sources between September 2013 and January 2020, at least $934,786 is transferred to or for the benefit of a related entity or individual.*
  - *$410,927 of funds due to Hovsat/Grandview for cable services are deposited to the Zargis Bank Account. Funds from the Zargis Bank Account totaling $338,229 are then transferred to the Hovsat Bank Account.*
  - *The Zargis Bank Account received $340,000, or 33% of its funding, from the Speedus NY Bank Accounts on January 13 and 17, 2017. $319,349 of the funds were immediately passed through the account to pay a real estate tax lien of 520 NRR.*

***Accordingly, it is my opinion that Shant used the Zargis Bank Account as a clearing account for funds of other entities, including, but not limited to, monies transferred in from the Speedus NY Bank Accounts for the payment of a real estate tax lien on 520 NRR.***

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

Factually, these finding are correct. Zargis would appear to function as a clearing account. Similar to Speedus, there is no longer any business. Withum did not cite a law or a requirement that this is improper. (Again, it is not recommended.)  But Withum did not indicate that there was anything improper from a tax reporting perspective.  Rather Withum confirms that these were personal transactions. We also note that the variety of the deposits and transfers out occurred in 2017 and prior which was a year before this litigation was commenced.

**Pachava and 520 Navesink River Road.**

The key asset that the US is seeking in this collection matter is the real estate located at 520 Navesink River Road ("520 NRR") in Middletown, NJ.  All of the Withum Report was organized to show that Shant used funds from other accounts to pay for various expenses for 520 NRR. Withum therefore suggests that Shant commingled the Pachava Trust and his other assets to such a degree that the beneficiaries of the Pachava (Shant's children) should lose the asset that was gifted to them by their grandmother. Nina testified on page 21 of her deposition for the Pachava Trust that Shant's children were 24, 17 and 16. Since her deposition was in January 2021, we can infer the years Shant's children were born.  Vahak (born 1997), Paris (born 2004) and Chates (born 2005).

For ease of comparison we reprint this description from page 1 on the Withum Report.

> *In 2008, Shant, his wife Hilde Jenssen Hovnanian ("Hilde"), and their children moved into a newly constructed residence at 520 Navesink River Road ("520 NRR"). 520 NRR was built as a place for Shant's family to reside. Title to the house, however, was in the name of Shant's mother, Paris Hovnanian ("Paris"). Shant did not pay any rent to live in the property but paid for the ongoing costs of the home.  On June 11, 2011, Paris transferred Shant's personal residence at 520 NRR into the Shant Hovnanian Asset Trust ("Shant Trust"), and, on October 11, 2011, the Shant Trust was renamed the Pachava Trust ("Pachava Trust"). Shant and his family continued to reside at 520 NRR after the property was transferred to the Pachava Trust. Shant still did not pay any rent for the usage of the property. Additionally, many of the costs of 520 NRR, including real estate taxes, were not paid by the Pachava Trust but were instead paid through bank accounts held in the name of SpeedusNY.com, LP ("Speedus NY") and Zargis Medical Corp. ("Zargis").*

We reprint Withum's description from page 8 below:

> *520 NRR and the Transfer to the Pachava Trust*
> *Shant and Hilde moved into 520 NRR with their children around summer 2008. [60] The property was titled to Paris, Shant's mother, but the family did not pay rent to Paris.[61] Hilde testified that it was considered their family house and home, and Shant and Hilde were responsible for the upkeep.[62] Shant and Hilde used the home as their family home until September of 2013[63] when the family moved to Norway.[64] On June 21, 2011, while Shant and his family were residing at*

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

520NRR,[65] the property was transferred from Shant's mother, Paris, to the Shant Trust.[66] The Shant Trust had been established by Shant in 2007 with Shant as settlor, Hilde as trustee, and their three children as beneficiaries.[67] Several months later, on October 11, 2011, the Shant Trust, which was holding 520 NRR, was renamed the Pachava Trust but the settlor, Shant, and trustee, Hilde, remain unchanged in the amendment.[68] Hilde, as initial trustee, testified that Shant's parents did not contribute any assets to the trust other than 520 NRR.[69]

In 2013, the family moved to Norway, and, between 2013 and 2015, Shant was traveling between Armenia, Norway, and the U.S., staying at 520 NRR when in the U.S.[70] Shant and Hilde divorced in April of 2015, and, while the children continued to reside in Norway, Hilde indicated that Shant left for the United States, and, to her knowledge, he resided at 520 NRR while there.[71] In August of 2015, the children moved back to the United States and lived with Shant at 520 NRR.[72]

We reprint Withum's conclusion from page 36 below.

*My analysis of the Pachava Morgan Stanley Account is summarized as follows:*

- *Even though Shant was not a known signatory on the Pachava Morgan Stanley Account, Shant had the ability to direct the movement of funds in and out of the account, regardless of whether there was another alleged trustee during the time.*
- *Prior to being moved to the Pachava Trust in 2011, 520 NRR was the family home for Shant, Hilde and their children. After 520 NRR was transferred into a trust for the benefit of Shant's three children, Shant continued to obtain the benefit of living in the property without paying any rent to the Pachava Trust.*
- *Expenses of 520 NRR were funded through bank accounts in other entities names, either through direct payment of 520 NRR expenses, or through the transfer of funds from those accounts to the Pachava Morgan Stanley Account. However, Pachava Trust returns do not evidence any loans to related parties, accounting records were not maintained to track any of the related party transfers or payments, and Speedus, Zargis, and Hovsat have not filed any tax returns. The transfers to the Pachava Morgan Stanley Account and expenses of 520 NRR known to be funded through other bank accounts are as follows:*
  - *$366,977 of real estate taxes for 520 NRR were funded through the Zargis Bank Account, which acted as a conduit of the funds received from the Speedus NY Bank Accounts. Speedus NY Bank Accounts were comprised of personal deposits, included little, if any, ongoing business income, and were used by Shant to fund personal expenses, along with property tax liens.*
  - *Other expenses of 520 NRR, totaling $12,548.39, including landscaping, repairs and maintenance, and disposal costs, were funded directly through the Hovsat Bank Accounts.*
  - *Speedus NY Bank Accounts transferred $156,998 and the Zargis Bank Account transferred $25,350 directly into the Pachava Morgan Stanley Account.*

**Accordingly, it is my opinion that Shant obtained a benefit by living at 520 NRR without the payment of fair market rent and carried the burden of ownership of 520 NRR by funding the real estate taxes and other expense of the property through other bank accounts he utilized. Additionally, although Shant was not a known signatory on the Pachava Morgan Stanley**

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

*Account, he maintained the ability to direct the movement of funds and payment of expenses, regardless of whether there was another trustee.*

**Discussion of Withum Findings on Pachava and 520 NRR**

Similar to other assets and accounts, what Withum recited in their report is not incorrect, but is incomplete and misleading.  Put another way, it is not what Withum said, it is what they did not say.

History of the Navesink River Road property

Shant's parents owned a parcel of land (with a main house and a guest house) on Navesink River Road for many years and used it as their personal residence.  This was described by Hilde in her deposition beginning on page 14.  Hilde and Shant met in October 2001 and were married in October 2002. (Shant's oldest son Vahak is from a prior relationship). They lived in New York.  Paris and Charentz were born in approximately 2004 and 2005 respectively.  The house was built between 2006 and 2007 and Shant, Hilde and the three children moved into the house in the summer of 2008. They lived there until September of 2013 when they moved to Norway for a new position for Hilde.

Hilde testified that the title remained at all times in Shant's mother's name until June 21, 2011 when Shant's mother transferred the house into the Shant S Hovnanian Trust which later changed its name on October 11, 2011 to the Pachava Trust.  520 NRR was built on a portion of land owned by Shant's parents so their children and grandchildren could stay at the property.

During the Counsel for the United States' questioning in the depositions, many questions were raised about the lack of rent being paid by the Shant family (Shant, Hilde and the three children). Multiple times in their report, Withum brought up that the Shant family never paid rent. However, Withum never discussed what the fair market value rent should be, what costs should be covered by that rent, nor did Withum provide any analysis as to what the total costs to operate the property would or should be from the time it was built until today.

We will break up our discussion into four sections 1)  the period where Shant's mother owned the property when Shant and his immediate family lived there – summer 2008 through the date Shant's mother put the property in the Pachava Trust (June 11, 2011).  2) The period that Pachava owned the house until September 2013 when Shant and his immediate family moved to Norway (approximately 3

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

years). 3) The period that Shant and his family lived in Norway and 4) The period is after the divorce in 2015.

<u>Summer 2008 through June 11, 2011</u>

It is true that rent was never paid by Shant and his family to his mother for the approximate 3 years that she owned the house before she transferred it to the Pachava Trust.  Withum never delineated what costs the Shant family paid for the upkeep of the house nor what those costs would or could be nor the source of those funds.  While Withum also pointed out the lack of rent, Withum did not discuss what that rent would be and what that rent would cover.

Rent usually covers the costs of ownership of the property as well as provide a return for the owner. (Interest, taxes, repairs, utilities, etc.).  Gross rental agreements usually contain one payment that covers everything in one payment.  Various incarnation of "net" leases means that the tenant pays directly for certain expenses.  Withum never discussed this.

Generally there are gift tax ramifications for providing free rent or reduced price rent to family members under the theory that the use of a property has a value that has been transferred. Again Withum did not discuss this.

You are allowed to gift up to a certain amount each year to anyone and not have to file a Gift Tax Return. That amount in 2008 was $12,000; $13,000 for 2009 through 2012; $14,000 for 2013 through 2017; and $15,000 since 2018.

Shant's parents, since they were married can BOTH give the limit to a recipient (a total of $24,000 in 2008; $26,000 in 2009 through 2012; $28,000 in 2013 through 2017).  Withum did not discuss that Shant's parents could give $120,000 to Shant and his immediate family – 5 people times $24,000 in 2008; $130,000 for 2009 through 2012; $140,000 for 2013 through 2017.

It is true that Shant lived in 520 NRR but so did his wife Hilde and their three children.  Thus the first $120,000 to $130,000 of the rent could have been considered a gift from the parents to each of Shant's family.  Since this series of gifts was below the annual exclusion, there is no gift tax return required. Since Withum never delineated, how much the rent should have been (remember Shant's family moved in during 2008 when real estate prices were much lower than they are today) nor what Shant' immediate families contribution to that rent was Withum did not measure if there was a net benefit to anyone.

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

Therefore, Withum's conclusion that "Shant received a benefit", while possibly true (although Withum did not prove if or how much), ignores the amount his children and wife received as well. It also ignores the materiality of any economic benefit. The US Attorney is seeking to show that Shant is the effective owner of the property – not Pachava. Thus ignoring the benefits that Pachava is providing the beneficiaries (living in the house) while attributing those same benefits to Shant weakens the US attorneys commingling claim that Withum is trying to prove.

<u>June 11, 2011 through September 2013</u>

This is the period that Pachava owned 520 NRR when Shant's immediate family lived there (before moving to Norway). Pachava was set up to benefit Shant and Hilde's children.  Withum made no mention or cited any regulation that suggests that it is improper for the parents (Shant and Hilde) to reside in the same house as their minor children.  Withum made no mention or citation that prohibits the children from living in, benefiting from assets held in trust for their benefit. Again, Withum provided no analysis of what the appropriate rent would have been or how much Shant and Hilde contributed to the house to "offset" that rent.

Again, Withum's conclusion "Shant received a benefit" may or may not be true – Withum provided no analysis that might show that Shant and Hilde paid 40% of the operating costs (2 of the 5 people living in the house). The children should not have to pay rent to their trust.

<u>September 2013 through May 2015</u>

This is the period that Shant and his immediate family lived in Norway and used the house when visiting the States.  We also note that Hilde was the Trustee.  During her deposition, Hilde, beginning on page 42, indicated that she set up many 520 NRR bills on autopay.  Her reasoning was that the family lived in Norway and managing the two properties was cumbersome.  She also indicated that while she and Shant communicated about the house, the bills needed to be paid and that Shant did not have a say [2].

Beginning on page 48 of her deposition, Hilde discussed that Shant's side of the family paid for the house and beginning in 2014 to 2015 Hilde's sources primarily paid for the house.  Again, Withum did not provide any commentary or any analysis of what the rent should or could be, nor did Withum provide an

---

[2] Hilde deposition page 24

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

analysis of the support Hilde and Shant provided by virtue of her work efforts in Norway.  (A married couple's earnings, are considered joint in most jurisdictions.) Withum did not measure what Shant's contributions through the marital efforts were in 2013 through the divorce in May of 2015.

Therefore Withum's claim that Shant received a benefit in 2013 through 2015 is not supported by the totality of the evidence.

<u>May 2015 to date</u>

Hilde and Shant divorced in May of 2015. As part of the divorce, Shant received sums of money as part of the settlement. Withum included these funds in their analysis and noted that these funds were used to pay bills for 520 NRR (without  any credit as a rent offset). As part of the marital settlement, Hilde resigned as trustee. According to Hilde's deposition, after the divorce in May 2015, Shant returned to the United States.  In August 2015, the children moved to the United States and lived with Shant at 520 NRR. We remind the reader that Pachava was set up to hold 520 NRR for the children's benefit and Withum cited no prohibition against a parent residing with their children. We also note that in New Jersey in the family law context, the fact that a custodial parent received some benefit from child support does not negate the fact that the child support is required.  Withum did not delineate where Shant's benefit begins after Shant's responsibility to his children ends while caring for them in the house that is held in trust for them.

Withum did not provide any analysis of the appropriate rent that should be paid for the use of the property nor what Shant's appropriate contribution to the overall cost of living at the house should be at any time while Shant was living with the children as a single parent.  Three of the residents living in the house from August 2015 through 2018 were the beneficiaries of the trust and Withum cited no prohibition against those beneficiaries using the asset. Thus 75% of any rental income is unnecessary since the beneficiaries were entitled to use the asset.  The children returned to Scandinavia to stay with Hilde in the summer of 2018 [3].

Nowhere in the Withum Report do they quantify the amount of any benefit that Shant actually received "net".  While Shant may have enjoyed the use of the home, Withum has not identified anything specific, improper or unusual.  In fact, Withum has not identified any benefit that is not explained by annual gifts

---

[3] Hilde Deposition page 60

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

from his parents (2008 to 2011) and benefits beyond his children's right to live in the property held for them (2011 through 2013 and 2015 through 2018).

Hilde's Resignation

There is no dispute that Hilde resigned as trustee as part of the divorce and it took time to locate a replacement trustee. Peter Hovnanian (Shant's cousin) was named trustee beginning in August 2016 and resigned effective November 1, 2016. After that point (November 20, 2017 or 2016) Shant's sister Nina took over as trustee. Nina's deposition discussed December 2017 while the US attorney indicated it was only two month between Peter and Nina which suggests 2016.

Withum devoted several pages (pages 27 through 30) outlining instances when "*even when there was an appointed trustee, Shant directed Morgan Stanley with respect to the movement of funds in and out of the Pachava Morgan Stanley account*"[4]   However, each of those instances were to cover shortfalls in the accounts to cover automatic payments. Hilde testified she set up many payments to be done automatically while they were in Norway.  This means that Shant was transferring funds into Pachava from other accounts to pay regular recurring bills and not truly moving assets in and out of Pachava.

In other words, Shant was maintaining the status quo by funding the costs of 520 NRR.  Even during the initial period after December 20, 2017 when Nina was appointed trustee, Shant had money moved into Pachava to cover shortfalls. Withum did not provide any guidance or citation what is required or allowed when there is no trustee for a trust or if there is a transition of if the beneficiaries of the trust should be harmed by having the underlying property neglected. The Pachava Trust allows people to make gifts to the trust- which is what Shant actually was doing. Withum did not provide any guidance or citation of appropriate behavior when there is no trustee and the beneficiaries of the trust are minors (as in the case here) or have not reached the age when they may receive the trust principal or begin to make decisions.

By the absence of any acknowledgement of the need to maintain the property, Withum is perhaps suggesting that the appropriate action for Shant would be to let the property go – which would violate his duties to his minor children and may cause difficulty in caring for them.

---

[4] Page 30 of the Withum Report

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

Again, while this is a legal issue, most of Withum's examples of Shant's commingling actually are deposits into Pachava to maintain the asset. Similar to the other time periods, Withum does not "credit" Shant's payments (from whatever source) as a payment for his use of the property.  While we have pointed out Withum's analysis is not complete, Withum did have the information to make this calculation for the periods that they analyzed – and chose not to do.

**Conclusion of Shant and 520 NRR and Pachava**

Without repeating the last section, the Withum Report leaves out a great deal of analyses (rent analysis, gift exclusion, children's use of their trust property, etc.). While the exact conclusions by Withum are factually accurate in a vacuum, when additional facts that were available to Withum are included, Withum's conclusion are weakened and it becomes problematic to pierce the trust veil to show that Shant is the rightful owner of 520 NRR.  While we concede that Shant's use of related party accounts is less than optimal, Withum did not show it was improper.

Withum's conclusion on page 31 through 36 support the facts that Hilde and Shant from 2014 supported the house and the children.  Withum identifies $470,906 in sources of fund in the Pachava's Morgan Stanley account – yet none was credited by Withum as a partial payment for the use of the house or as a mitigation of their claim that Shant benefited.

We are of the opinion that despite Withum's detailed analysis, their conclusions are not supported by the totality of the evidence or practical sense.

**VSHPHH Trust and the Village Mall**

Beginning on page 37, Withum begins its section of the VSHPHH Trust.  On page 49 Withum concludes

- *Although the title of the Village Mall was transferred to the VSHPHH Trust, other corporate procedures consistent with a property transferred to, and held in, a trust were not followed. Furthermore, Shant and related entities benefited from usage of the second-floor office space without the payment of rent and the cash flow generated by the Village Mall was primarily used for the direct and/or indirect benefit of Shant.*

Similar to the Pachava section of our response, it is more what Withum did not say.  We understand, and Withum points out that there was confusion between the testimony of Gangolfo (the office worker), Hilde

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

and Nina who was the trustee of VSHPHH on the "*function of Hovsat, who is responsible for Hovsat, the interrelationship between Hovsat and the Village Mall and who benefits from any income from Hovsat*".

Withum's final conclusions on page 49 do not mention Hovsat despite writing extensively about it in their report. On page 39 Withum states that based upon the complaint between Omniverse, Shant is actively involved with the operations of Hovsat. Withum goes on in their report to discuss the transfers of money.

Similar to Pachava, Speedus, and Zargis, Withum did not provide any evidence that it traced the beginning assets and liabilities of Hovsat and Village Mall to determine the full picture of the payments of funds and any liabilities or returns of capital that Hovsat made. Nor did Withum indicate that Hovsat was cash flow negative without related party transactions.

**Village Mall**

Withum notes that Village Mall was transferred into the VSHPHH Trust on January 1, 2015. We understand from Nina that the VSHPHH is a trust to benefit all five of the grandchildren of Shant and Nina's parents. There is no dispute that the title to the property was transferred from Shant and Nina's parents.

With regard to the cash flow of Village Mall, Withum provided this chart from page 41 of their report.

| Village Mall | 2015 | 2016 | 2017 | 2018 | 2019 | Sep-20 | Total |
|---|---|---|---|---|---|---|---|
| **Sources** | | | | | | | |
| Rental Income | - | 4,344 | 71,372 | 75,129 | 78,916 | 71,633 | 301,394 |
| Rental Income- Hovnanian entities | - | - | - | - | - | - | - |
| Rental Income- AFCU x1502 | 78,770 | 72,700 | 11,255 | - | - | - | 162,725 |
| Total Rental Income | 78,770 | 77,044 | 82,627 | 75,129 | 78,916 | 71,633 | 464,119 |
| **Uses** | | | | | | | - |
| Real Estate Taxes | - | (63,323) | (33,960) | (34,128) | (34,564) | - | (165,975) |
| Repairs & Maintenance | (3,976) | (3,073) | (4,960) | (4,742) | (42,031) | (6,973) | (65,754) |
| Utilities | (9,504) | (8,047) | (8,987) | (10,947) | (9,292) | (11,542) | (58,318) |
| Other Uses | (15,059) | (9,706) | (7,901) | (12,405) | (9,525) | (5,165) | (59,760) |
| Total Uses | (28,539) | (84,149) | (55,807) | (62,222) | (95,410) | (23,680) | (349,807) |
| **Net Village Mall prior to Litigation Costs** | $ 50,231 | $ (7,104) | $ 26,820 | $ 12,907 | $ (16,494) | $ 47,953 | $ 114,312 |
| Professional Fees | - | - | - | (6,000) | (92,700) | (6,000) | (104,700) |
| **Net Village Mall** | $ 50,231 | $ (7,104) | $ 26,820 | $ 6,907 | $ (109,194) | $ 41,953 | $ 9,612 |

From this chart, it is clear that there are some incomplete and/or missing transactions. This illustrates why some of Withum's conclusions may not be fully supported even though their factual statement is accurate. (It just may not be complete.) While the rental revenue is consistent between 2015 and 2019 (2020 is a partial year) certain expenses and Withum's assertion that Village Mall generated positive cash flow is

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

misleading since there are no real estate taxes reflected in 2020.   (2015 and 2016 average out to the approximate $31,500 per year).   This agrees with Nina's testimony that revenue of approximately $75,000 and the expenses basically netted out and there were no profits. Further, Nina testified (in early 2021) she has been working to improve the property which is suggestive that the $6,973 in 2020 for repairs and improvements is understated. We also understand that legal fees from this litigation to protect the investment would have to be paid from somewhere.

Withum notes that during the bankruptcy of Hovbuilt, there were schedules, showing that Hovbuilt was recording $5,000 per month in rent.  The bankruptcy sheets[5] show that those payments were unpaid and over a year of such amounts were unpaid.  Withum provided no analysis if $5,000 is a reasonable rent or what a reasonable rent should be.  Withum also points out that there was no related party rent since January 2015 even though the space has an office for Vahak Sr. and office for Gandolfo and a desk that Shant uses.

Withum does not provide any analysis as to the rentability of the space or what price. Nina testified on page 102 of her deposition that the "*upstairs is all open space*". On page 108, she indicates "*Its's not like it has been kept up fastidiously*" which suggests that the property needed work which she testified she was doing on page 103 of her deposition.

Thus while Withum pointed out the lack of related party rent, Withum did not discuss the amount of that rent; the amount of space that a property manager may need to manage the day to day affairs of the Village Mall, nor the current and historical demand for the space.   Summarizing, according to the documents the related parties were not paying the $5,000 and there is no discussion of the ability to rent all or a portion of the space nor what improvements would need to be made to improve it and make it rentable.

Withum also notes that part of Shant's divorce proceeds were used to satisfy the tax lien on Village Mall – yet Withum does not consider this to be a form of payment for the use of any space. Since the tax lien (approximately $201,000) was satisfied in 2015, it is suggestive that the real estate taxes at approximately $30,000 per years were seriously in arrears for 2014 and prior. It would seem that such a payment would cover rent for a long period of time.

---

[5] EXPERTREQ 0004

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

We note that Withum's summary schedule on page 46 ignores 2019 where Village Mall's cash flow was a negative $109,000 and in 2020 did not reflect real estate taxes or the improvements Nina testified to.

On page 43 of the Withum Report, they reprint a schedule that shows the sources and uses of Hovsat/Grandview. We reprint it as follows:

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|---|
| **Sources and Uses of Cash** | | | | | | | |
| **GrandView / Hovsat** | | | | | | | |
| Sources | | | | | | | |
| Paid to Hovsat/Grandview | 21,119 | 11,814 | 13,329 | 18,237 | 12,729 | 11,698 | 88,926 |
| Zargis Medical | 84,650 | 66,179 | 16,950 | 8,500 | 23,400 | - | 199,679 |
| Omniverse | 99,000 | 108,000 | 108,000 | 224,225 | 181,462 | - | 720,687 |
| Uses | | | | | | | - |
| DirecTV | (65,908) | (69,627) | (70,786) | (67,096) | (68,163) | (21,903) | (363,483) |
| Maintenance - Kevin Morrison | (48,393) | (45,405) | (42,972) | (46,608) | (53,751) | (30,187) | (267,316) |
| Karen Gandolfo | (11,431) | (5,869) | (6,041) | (6,228) | (13,328) | (13,838) | (56,735) |
| Storage Rental- Zac's Garage | (4,494) | (4,494) | (5,122) | (4,890) | (5,431) | (5,219) | (29,650) |
| Consulting | (49,074) | (26,908) | - | - | - | - | (75,981) |
| Utilities | (5,742) | (4,544) | (4,476) | (4,875) | (4,134) | (167) | (23,937) |
| Computer/Internet/Programming | (9,581) | (9,067) | (8,601) | (9,838) | (9,129) | (3,605) | (49,820) |
| Other Uses | (10,412) | (6,124) | (4,921) | (5,342) | (4,694) | (4,248) | (35,741) |
| **Net GrandView / Hovsat** | **$ (267)** | **$13,956** | **$ (4,639)** | **$106,086** | **$58,962** | **$(67,469)** | **$106,629** |

Withum's statement that through 2020 Hovsat/Grandview is cash flow positive, is factually true, but Hovsat/Grandview is only cash flow positive due to the funds being deposited by Zargis Medical – covered elsewhere.  Withum previously said that Zargis was only a transfer account and had no operations.  Therefore, the only reason Hovsat/Grandview was cash flow positive was the funds from Zargis. Hovsat/Grandview are not cash flow positive based on the above. In fact, without Zargis, would have been cash flow negative by approximately $94,000.

Further analysis of 2020 (based on Withum's chart above) suggests that without Omniverse, Hovsat will be severely cash flow negative and will not be able to fund either Kevin Morrison's or Karen Gandolfo's compensation going forward.  Given the fact that Withum relied upon the lawsuit filed by Omniverse, for some of its information, makes the following statement (reprinted from page 46) factually correct but misleading.

*As previously outlined, both the Village Mall and Hovsat/Grandview generated positive cash flow within the Hovsat and VSHPHH Bank Account between January 1, 2015 and December 31, 2018, however, that cash flow was utilized  to make other payments as follows:*

*Friedman LLP*

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

| | 2015 | 2016 | 2017 | 2018 | 2015-2018 |
|---|---|---|---|---|---|
| Opening Cash | $ 1,266 | $ 31,733 | $ 24,767 | $ 11,625 | $ 1,266 |
| Cash Flow of Village Mall and Grandview/Hovsat | | | | | |
| Net Village Mall prior to Litigation Costs | 50,231 | (7,104) | 26,820 | 12,907 | |
| Professional Fees | - | - | - | (6,000) | |
| Net Village Mall | 50,231 | (7,104) | 26,820 | 6,907 | 76,854 |
| Net GrandView / Hovsat | (267) | 13,956 | (4,639) | 106,086 | 115,136 |
| Net Cash Flow prior to Other Uses | 49,964 | 6,851 | 22,181 | 112,993 | 191,990 |
| Other Sources and Uses | | | | | |
| Net to/from Speedus NY Bank Accounts | (14,400) | (1,400) | (12,000) | (40,000) | (67,800) |
| Payment of Speedus NY Expenses | (5,074) | (5,518) | (6,292) | (5,611) | (22,495) |
| 520 Navesink River Road Expenses | - | (3,900) | (936) | (2,949) | (7,785) |
| Children's School Costs | - | - | (15,800) | - | (15,800) |
| NRCC Membership & Drivers License (Shant) | (24) | - | (72) | (2,305) | (2,401) |
| Interest Income | 1 | 1 | 6 | 6 | 13 |
| Other Expenses- Cash/Unidentified | - | (3,000) | (229) | (200) | (3,429) |
| Net Other Uses | (19,497) | (13,818) | (35,323) | (51,059) | (119,697) |
| Change in Cash | 30,467 | (6,966) | (13,142) | 61,934 | 72,293 |
| Ending Cash | $ 31,733 | $ 24,767 | $ 11,625 | $ 73,559 | $ 73,559 |

As shown, by cutting off the analysis at 2018, Withum implies that Village Mall was cash flow positive by $76,854 when it was really not if you include 2019 and 2020. Hovsat/Grandview was only cash flow positive due to approximately $199,000 in deposits from Zargis. Repeating, since Withum did not indicate any effort to properly record the beginning balances for the assets or liabilities of any of the entities, by definition their analysis and conclusions are incomplete with regard to the sources and uses.

**WITHUM'S FINAL CONCLUSION**

On page 49, Withum states the following (reprinted in italics). Our summary response follows in regular text.

> *Based on the assumptions, analyses and discussions presented within this report, it is my opinion within a reasonabledegree of professional certainty that:*

- > *The Speedus NY Bank Accounts were comprised of personal deposits, included little, if any, ongoing business income, and were used by Shant to fund personal expenses, a $201,204 satisfaction of a tax lien against the Village Mall in 2015, and a $319,349 tax lien against 520 NRR in 2017;*

We do not dispute the factual accuracy of the flow of funds, but remind the reader that Withum failed to

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

reconcile their findings to the properly carried forward assets and liabilities from either tax returns or financial statements.  Therefore the snapshot analyzed by Withum does not present the complete picture and propriety of the interactions.  Therefore relying upon it to pierce entity veils is premature at best since it the analysis by Withum is not complete.

- *Shant used the Zargis Bank Account as a clearing account for funds of other entities, including, but not limited to, monies transferred in from the Speedus NY Bank Accounts for the payment of a real estate tax lien on 520 NRR;*

Factually, these findings are correct, Zargis would appear to function as a clearing account. Similar to Speedus, there is no longer any business. Withum did not cite a law or a requirement that this is improper. (Again, it is not recommended.)  But Withum did not indicate that there was anything improper from a tax reporting perspective.  Rather Withum confirms that these were personal transactions. We also note that the variety of the deposits and transfers out occurred in 2017 and prior which was a year before this litigation was commenced. Again we remind the reader that Withum failed to reconcile their finding to the properly carried forward assets and liabilities from either tax returns or financial statements. Therefore the snapshot analyzed by Withum does not present the complete picture and propriety of the interactions.  Therefore relying upon it to pierce entity veils is premature at best since the analysis by Withum is not complete.

- *Shant obtained a benefit by living at 520 NRR without the payment of fair market rent and carried the burden of ownership of 520 NRR by funding the real estate taxes and other expense of the property. Additionally, although Shant was not a known signatory on the Pachava Morgan Stanley Account, he maintained the ability to direct the movement of funds and payment of expenses, regardless of whether there was another trustee;*

The Withum Report left out a great deal of analyses (rent analysis, gift exclusion, children's use of their trust property, etc.). We have shown that Withum' incomplete analysis does not prove that Shant received a benefit nor what that benefit was. Further, Withum cites Shant's actions to put money into the Pachava accounts to cover automatic payments set up by the prior trustee.  Withum did not offer an alternative procedure what else could or should have been done while there was no trustee.  It would have potentially

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

damaged the property (no insurance or utilities) which would violate Shant's responsibility to his children since they lived there.

While we concede that Shant's use of related party accounts is less than optimal, Withum did not show it was improper. Withum's conclusion on page 31 through 36 support the facts that Hilde and Shant from 2014 supported the house and the children.   Withum identifies $470,906 in sources of funds in the Pachava's Morgan Stanley account – yet none was "credited" by Withum as a partial payment of for the use of the house or as a mitigation of their claim that Shant benefited. In effect, Withum contradicted themselves.

We are of the opinion that despite Withum's detailed analysis, their conclusions are not supported by the totality of the evidence or practical sense.

- *Although the title of the Village Mall was transferred to the VSHPHH Trust, other corporate procedures consistent with a property transferred to, and held in, a trust were not followed. Furthermore, Shant and related entities benefited from usage of the second-floor office space without the payment of rent and the cash flow generated by the Village Mall was primarily used for the direct and/or indirect benefit of Shant.*

Withum did not consider any of the payments from personal funds to be a payment for any benefit. Also, Withum did state that leases were not drawn up but later found that the tenants were long time tenants with month to month arrangements. Lastly Withum did not provide any analysis of the rental value, the needs or the condition of the property to determine if the upstairs was in fact rentable.

Withum's own work and the testimony from Nina indicates that Village Mall breaks even.  Withum did not provide any analysis of the rentability of the second story (open space) nor the amounts that would be generated.

**Final Commentary**

Withum provided a great deal of bookkeeping analysis, that while accurate in a vacuum, is incomplete since Withum did not investigate nor carry forward the beginning assets and liabilities which are required to show that general ledgers (which Withum included 300 plus pages of) are accurate and complete.  By

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.

definition, Withum's snapshots of activity do not reflect the full story and should be viewed cautiously in relying on Withum's conclusions.

We find it curious that despite devoting many pages to Hovsat/Grandview, Withum did not mention either in its conclusion.  As shown, Hovsat/Grandview will likely lose money now that the Omniverse revenue is stopped (see Withum's charts for 2020 and the lawsuit itself).  Further, Hovsat/Grandview was only cash flow positive due to money from Zargis.

After reviewing the totality of all of the information, there are valid, common sense explanations for the activity that Withum and the US Attorney seek to use to foreclose on assets that were put in trust for the Hovnanian grandchildren, that were never actually owned by the grandchildren's parents.

The Withum Report is full of assumptions, incomplete analysis, is written with many descriptions suggesting that Withum's conclusions were inevitable. When we include additional facts that are apparent from the documents, depositions, as well as providing critical perspective, many of the "facts" that are cited to "*prove the Governments claim*" we believe - fall short.

Withum states that based upon their professional experience, Shant has received a benefit from the various assets discussed by Withum.  Withum did not measure that benefit, did not carve out Shant's benefit from the benefits others receive from the assets or conduct, and never discussed whether the benefit was material or greater than the benefits the other interested parties (his children and his sister's children). Lastly, Withum does not overtly acknowledge that others even received benefits. Withum also never considered the payments Withum described as any offset to any benefits.

To a reasonable degree of professional certainty, we do not believe that the Withum Report provided adequate evidence of activity that would support the piercing of the entity veils.

John M. Hanamirian, Esq.
Hanamirian Law Firm, P.C.
Shant Hovnanian et. al.


We thank you for the opportunity to be of service to you in this matter. We reserve the right to update our

report and/or provide additional testimony should any further information become available.


Very truly yours,

Friedman LLP


Randall M. Paulikens, CPA/ABV/CFF/CITP
Partner, Forensic Litigation and Valuation Services

# Tab - B

(1) 10.8.2007 Trust Agreement;

(2) Trust Agreement Amendment - Shant S Hovnanian Asset Trust - Pachava Asset Trust 10.11.2011;

(3) 1.11.2021 Pachava Asset Trust Day 1 Deposition Mini Transcript;

(4) 1.12.2021 Pachava Asset Trust Day 2 Deposition Mini Transcript;

(5) VSHPHH Trust Deposition Day 1 Mini Transcript;

(6) VSHPHH Trust Day 2 Mini Transcript;

(7) 2021.6.30 U.S. v. Hovnanian- Expert Report;

(8) <u>Supporting documents for Plaintiff's Expert Report</u>:

    a.  2_19cv1156_THIRD_PARTY_COMPLAINT_against_Third_Party_Defendant;

    b.  3M Press Release;

    c.  520 Navesink River Rd - payment history with dates;

    d.  1502 Credits Binder1;

    e.  1502 Credits Binder2;

    f.  1502 Credits Binder3;

    g.  1502 Credits Binder4;

    h.  1502 Credits Binder5;

    i.  2020.03.09 Foreclosure Lis Pendens;

    j.  2020.10.15 Tax Sale Cert Cancellation;

    k.  Cellularvision 1996 Annual Report 10-K;

    l.  EXPERTREQ-000001;

    m.  EXPERTREQ-000002;

    n.  EXPERTREQ-000004;

    o.  EXPERTREQ-000039;

    p.  Hovsat Inc state docs;

    q.  MEMBER#_712150_-_MEMBER_NAME_VAHAK_S_HOVNANIAN_-_SSN_206288443_-_ORIG_DATE_10-12-2011_-_DOC_TYPE_ENR (1);

    r.  SPDE 0.0004 0.0000 0.00% _ Speedus Corp;

    s.  SPEEDUS COM INC 1999 Annual Report 10-k;

    t.  Speedus Com Inc. 1998 Annual Report 10-K;

     u.   Speedus Corp 2002 Annual Report 10-K;

     v.   Speedus Corp 2009 Annual report 10-K_A;

     w.  Speedus Corp 2011 8-K Current report;

     x.   Speedus Corp 2011 Notice of termination.;

     y.   Speedus Corp;

     z.   SpeedusNY.comLP;

     aa. SpeedusNY_com Business Report;

     bb. V Honanian 2015;

     cc. V Honanian 2016;

     dd. V Honanian 2017;

     ee. V Honanian 2018;

     ff.  V Honanian 2019; and

     gg. V Honanian 2020-2021.

(1) <u>Pachava Asset Trust Exhibits</u>:

     a.   Exhibit A;

     b.   Pachava 01 through Pachava 38; and

     c.   Pachava 100 through 102.

(2) <u>VSHPHH Trust Exhibits</u>:

     a.   KSG004 through KSG005;

     b.   KSG008 through KSG015; and

     c.   VSHPHH 001 through VSHPHH 029.

(3) Hilde Jenssen Mini Deposition Transcript 4.15.2021;

(4) <u>Hilde Jenssen Exhibits</u>:

     a.   D1 and D2;

     b.   Exhibit 4;

     c.   Exhibit 37;

     d.   Exhibit 38;

     e.   Hilde 1 and Hilde 2;

     f.   Morgan Stanley 01;

    g.  Morgan Stanley 04;

    h.  Morgan Stanley 10;

    i.  Pachava 11; and

    j.  Pachava 14;

(5) Karen Gandolfo Mini Deposition Transcript;

(6) <u>Karen Gandolfo Exhibits</u>:

    a.  KSG 001 through KSG 016;

    b.  Pachava 19;

    c.  Pachava 23; and

    d.  Pachava 36.

(7) <u>Anthony Falcone Documents</u>:

    a.  FALCONE-000001;

    b.  FALCONE-000014;

    c.  FALCONE-000030;

    d.  FALCONE-000042;

    e.  FALCONE-000056;

    f.  FALCONE-000063;

    g.  FALCONE-000083;

    h.  FALCONE-000099;

    i.  FALCONE-000114;

    j.  FALCONE-000124;

    k.  FALCONE-000135;

    l.  FALCONE-000150;

    m.  FALCONE-000164;

    n.  FALCONE-000171;

    o.  FALCONE-000185;

    p.  FALCONE-000189;

    q.  FALCONE-000195;

    r.  FALCONE-000221;

    s.  FALCONE-000244;

t.  FALCONE-000248;

u.  FALCONE-000271;

v.  FALCONE-000278;

w.  FALCONE-000290;

x.  FALCONE-000293;

y.  FALCONE-000299;

z.  FALCONE-000303; and

aa. FALCONE-000327.

# Tab - C

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**





## SUMMARY

Over 35 years of public accounting experience representing all sizes of clients from small solo practitioner professional practices to large Fortune 50 public companies. Performs all phases of litigation support, including lost profits and damage calculations, business valuations, matrimonial accounting, mergers and acquisitions, criminal (prosecution and defense), bankruptcies, forensic accounting, wrongful death calculations, and discovery. Many years of traditional accounting experience including the taxation and reporting for closely-held businesses and individuals. Involved in feasibility studies of new ventures or acquisitions from initial contact through "closing" both from the buying and selling side. Consults in connection with mergers and acquisitions, buy/sell agreements, compensation arrangements.

**Present Position:**

**Partner**
**Forensic Accounting, Litigation Support & Valuation Services**
Friedman LLP
Accountants and Advisors
The Galleria
2 Bridge Ave, Suite 522 – The Atrium
Red Bank, New Jersey 07701
(732) 852-5501 Mobile 732-674-5462
Email: rpaulikens@friedmanllp.com
Website: www.friedmanllp.com

February 2016 to Present

**Former Positions:**

**Partner**
Litigation/Valuation/Law Firm Support Services
WithumSmith+Brown
November 1997 to January 2016

**Supervisor**
Litigation Support
Druker, Rahl & Fein
January 1995 to November 1997

**Manager/**
**Network Administrator**
A.J. Santye & Co.
September 1988 to January 1995

**Staff Accountant**
Sidney W. Binder & Co.
September 1986 to September 1988

**Staff Accountant**
Druckman & Hill
January 1986 to September 1986

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

## CREDENTIALS/EDUCATION

BA degree in Economics, Minor in Physics, *Rutgers University*

Certified Public Accountant (CPA), New Jersey

Accredited Business Valuation (ABV) from the AICPA

Certified in Financial Forensics (CFF) from the AICPA

Certified Information Technology Professional (CITP) for the AICPA

## PROFESSIONAL ORGANIZATIONS/MEMBERSHIPS

American Institute of Certified Public Accountants (AICPA)

New Jersey Society of Certified Public Accountants (NJSCPA)

## TRIAL/ARBITRATION EXPERT TESTIMONY

Timothy Tyson, Keith Lyon and James Scandura v. Avara Pharmaceuticals, Avara Pharma Services, Ltd. And Leonard Levie
(Civil Arbitration) 2019

Gene Camali, Nada Camali and Core Fusion v. Paladino, Strike Zone Fitness et al
(Bergen County, NJ) 2019

Sergio Magarik, individually and on behalf of Kraus USA, Inc. v. Kraus USA, Inc., Michael Rukhlin, and Russel Levi
(Nassau County, NY) 2018, 2019

First Manhattan Consulting Group, LLC. v. Novantas, Inc. Andrew Frisbie, Peter Gilchrist and Jonathan West
(Manhattan County Supreme Court, NY) 2017

Zeus Scientific, Inc. v. Alere, Inc.
(Civil Arbitration) 2017

Northern Star Management v. Castlepoint National Insurance Company
(Civil Arbitration) 2015

Hyundai Wie v. Nelson Rowell et al.
(Federal Bankruptcy) 2014

Silecky Firm v. Squire Sanders & Dempsey
(Civil Arbitration) 2011

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

## TRIAL/ARBITRATION EXPERT TESTIMONY - Continued

Golden v. Golden
(Monmouth County Superior Court, NJ) 2007

Axelrod v. Central Garden & Pet et al
(Monmouth County Superior Court, NJ) 2005

In the Matter of Ketchow
(Monmouth County Chancery Court, NJ) 2005

Gillette Enterprises v. Amboy National Bank
(Middlesex County Superior Court, NJ) 2004

United States Dredging v. Murphy, Gallagher et al.
(Nassau County Supreme Court, NY) 2004

United States v. Joseph Luparella
(Criminal Federal Court) 2004

Cunningham v. Cunningham
(Mercer County Chancery Court, NJ) 2003

Thomas Neary v. Boro of Ridgefield Police Department
(Bergen County Municipal Court, NJ) 2001

Couri v. Couri
(Bergen County Chancery Court, NJ) 2001

Chesed Clothing v. Paul Fedder D/B/A Business Mailing Company
(Ocean County Superior Court, NJ) 2000

## DEPOSITION TESTIMONY

Estate of Kentos v Richard D. Schibell, Esq., Schibell & Mennie, LLC,
Schibell, Mennie & Kentos,
Monmouth County
Valuation for Shareholder Dissolution - 2021

Timothy Tyson, Keith Lyon and James Scandura v Avara Pharmaceuticals,
Avara Pharma Services, Ltd. And Leonard Levie
Arbitration
Valuation for Shareholder Dissolution - 2019

US National Bank Association v. 2150 Joshua's Path et al
United States District Court
Eastern District of New York
Analysis of Trial Demonstratives - 2019

## RANDALL M. PAULIKENS
CPA/ABV/CFF/CITP

---

### DEPOSITION TESTIMONY - Continued

Shinnick v STIGroup, Inc., et als
Bergen County, NJ
Valuation for Shareholder Dissolution - 2019

Sergio Magarik, individually and on behalf of Kraus USA, Inc. v.
Kraus USA, Inc., Michael Rukhlin, and Russel Levi
Nassau County, NY
Lost Profits/Commercial Damages, 2017 and 2018

DR Music, Inc. and DR Handmade Strings, Inc. v. Cenveo Corporation
Federal Court, District of New Jersey
Lost Profits/Commercial Damages, 2017

First Manhattan Consulting Group, LLC v. Novantas, Inc. Andrew Frisbie, Peter Gilchrist and
Jonathan West
New York City
Lost Profits/Commercial Damages, 2017

Northern Star Management v. Castlepoint National Insurance Company
New York City
Lost Profits/Commercial Damages, 2015

Ocasio v. Rutgers University
Essex County, NJ
Lost Wages/Improper Termination, 2014

American Polymers Corporation v. PolyStar Products, Inc. et al.
Central Irrigation Supply, Inc. v. PolyStar Products, Inc et al and Consolidated Cases
Mercer County, NJ
Commercial Damages, 2013

McGee v. Kane et al.
Hudson County, New Jersey
Lost Profits, Commercial Damages, 2013

Paramount Homes at Asbury Park v. Tishman Construction Corp of New Jersey et al.
Monmouth County, New Jersey
Lost Profits, Commercial Damages, 2013

Public Service Electric And Gas Company v. Colonnelli Brothers, Inc. et al.
Union County, New Jersey
Commercial Damages, 2013

Daelim Trading Co v. Giagni Enterprises et al.
United States District Court
Southern District of New York
Commercial Damages, 2013

## RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

---

### DEPOSITION TESTIMONY - Continued

Frank Leonard v. Claus Joens et al.
Essex County, NJ,
Shareholder Buyout, 2013

Miller v. South Amboy Board of Education
Middlesex County, NJ
Wrongful Termination, 2011

Ravin, Sarasohn, Cook, Baumgarten, Fisch and Rosen, P.C. v. Lowenstein Sandler, P.C.
Morris County, NJ
Lost Profits, Damages, 2009

Donald J. Pliner of Florida v. Carl R. Danziger, Operations Management Service
United States District Court
Southern District of New York
Breach of Fiduciary Duty, CPA Malpractice, 2008

Conoco Phillips v. Alstom Power, Inc.
Union County, NJ
Lost Profits/Commercial Damages, 2008

Entology v. Storch, Jolley, Amell
Morris County, New Jersey
Lost Profits, Breach of Contract, Business Valuation, 2007

Golden v. Golden
Monmouth County, New Jersey
Dispute of Payments, Business Ownership, 2005

Mazza v. NRI Data, Inc.
Mercer County, NJ
Lost Profits, Breach of Contract, Business Valuation, 2004

Bel Fuse, Inc. v. Lucent Technologies, Inc.
Middlesex County, New Jersey
Lost Profits, Breach of Contract, Business Valuation

Gillette Enterprises et al v. Amboy National Bank, et al.
Middlesex County, New Jersey
Valuation of Payment Streams, 2004

Dr. Herbert R. Axelrod and Evelyn Axelrod v. Central Garden & Pet Company, Inc.
Monmouth County, New Jersey
Lost Profits, Breach of Contract, Business Valuation, 2003

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

---

## PRESENTATIONS

**Webinars** –

The Knowledge Group
> "Practical E discovery Advice for lawyers" – December 2015

WithumSmith+Brown
> "Valuation Issues in Startup Companies" - September 2014

Meeker Sharkey
> "Disaster Recovery" - February 2012

Accounting Today Institute
> "Business Valuation Series FASB 157" – December 2010, May 2011

## Live Presentations-

Eastern Monmouth Chamber of Commerce
> "Tax and Financial Ideas for the end of 2020" November 2020

Friedman - Continuing Legal Education Programs
> "The New Tax Code and Its Impact on The Matrimonial Practice" - 2018

American Academy of Matrimonial Lawyers – New Jersey Chapter
> "Navigating COVID Disruptions" – July 2021

New Jersey Society of Certified Public Accountants – State Organization
> "Cost of Capital" December 2015
> "Ibbotson v. Duff & Phelps" - December 2009
> "When Clients Divorce" - October 2009
> "Employees – Your Most Important Asset –
>> How to Ensure that they are NOT a Liability" - September 2008
> "Myths, Misconceptions, and the realities of the Financial Aspects
>> of Divorce in New Jersey", multiple presentations - 2007, 2008
> "Discussion of SSVS #1" - June 2008
> "Valuation Tips for Intangibles and Goodwill for Controllers" - September 2007
> "Standards of Value"- December 2005

New Jersey Certified Public Accounting Society – Monmouth/Ocean Chapter
> "Tips on Recognizing Workplace Fraud" - November 2011
> "Helping Clients with Family Owned Business Navigate
>> Intergenerational Transfers" - December 2010
> "Round Table Discussion Ibbotson v Duff & Phelps" - November 2009

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

---

**PRESENTATIONS - Continued**

**Live Presentations- (continued)**

New Jersey Society of Certified Public Accountants– Mercer Chapter

"When Clients Divorce" - November 2010

WithumSmith+Brown– Continuing Legal Education Programs

"Quantifying Damages" - multiple presentations 2010 to 2014

'Reading and Understanding Financial Statements" - multiple presentations 2010 to 2014

"When Clients Divorce-Basic Economics" - December 2010

"Managing Cash Flow in a Professional Practice" - December 2010, March 2012

"Business Valuation Basics" - multiple presentations 2010 to 2012

"Preventing and Detecting Fraud in Not for Profits" - November 2011

WithumSmith+Brown – In House Presentations

"The New IRA Distribution Rules" - December 2001

"Engagement Management" - multiple presentations 2007 to 2013

"Know Your Strength – Supercharge your Marketing Success" - July 2009

WithumSmith+Brown – Annual Partners' Network

"Forensic Investigation – An Introduction, Also Known As
Is Someone Stealing From Me?" - June, 2008

"Employees – Your Most Important Asset - How to ensure
they are NOT a liability" - November, 2008

Houston Family Law Conference– Houston Law School

"Business Valuation for a Family Lawyer" May 2012, May 2014

Association of Government Accountants – North Carolina Chapter –

"Enabling a Fraudster" - April 2013

New Jersey Institute of Continuing Legal Education –

"Tax Aspects in Business Sales" - July 2013

New Jersey Healthcare Financial Management Association –

"Valuing a Medical Practice" - July 2014

# RANDALL M. PAULIKENS
### CPA/ABV/CFF/CITP

## PRESENTATIONS - Continued

### Live Presentations- (continued)

New Jersey State Bar Association

"Round Table – Hot Tips for Litigators" May 2021

"You Thought Cash Was Hard – Try Cyber Currency" March 2019

"Use of Forensic Accountants in Civil Litigation –Panel Discussion" – May 2016

"Hot Tips for Hot Litigators –Panel Discussion" – October 2016

"Valuation of Assets/Tax Implications of Alimony Buyouts" - March 2012

State of Pennsylvania– Audit Training

"Enabling a Fraudster" - April 2012

Association of Government Accountants

"Tips Tipoff and Other Ideas to Recognize Workplace Fraud" - April 2012

Healthcare Management Association NY

"The Legal Aspects of Revenue Cycle Audits" - November 2011

Philadelphia Chapter Certified Fraud Examiners

"Enabling a Fraudster" - February 2012

National Association of Certified Valuation Analysts

"Current Trends in Business Valuation" - December 2008

"Commercial Damages" - July 2006

William Patterson College – Accounting Society

"Forensic Investigation – for College Students" - November 2008

Raymond James Financial Services

"Financial Fraud – at Home, in the Workplace
and the Financial Markets" - September 2009

American Payroll Association – Jersey Shore Chapter
"Developing and Testing Internal Controls for
Payroll Professionals"- August 2008

National Association of Trial Executives
"Fraud Prevention, Identity Theft & the Accountable CEO" - July 2011

# RANDALL M. PAULIKENS
**CPA/ABV/CFF/CITP**

---

## PRESENTATIONS - Continued

### Live Presentations- (continued)

DFK International -

"Mergers and Acquisitions – So Many Smart People Structured this – So Why Are They Fighting Now?" – May 2017

Central New Jersey Estate and Financial Planning Council
"Valuation Discounts" - December 2006

National Shooting Sports Symposium
"How to Write a Business Plan" - June 2000

Inn of Transactional Attorneys – Bergen Chapter
"How a CPA Can Help a Client Sell Their Business" – October 2016

## PUBLICATIONS

Law 360- "When Should You Rely on Your Company Counsel and When Should You Rely on Your Own" Fall 2016

Commerce Magazine- "Forensic Accounting Roundtable" September 2014

Commerce Magazine- "Forensic Accounting Roundtable" August 2012

New Jersey Society of CPAs Magazine– "The New Economics of Divorce" Jan/Feb 2012

New Jersey Society of CPAs Magazine– "Helping Your Client Measure the Costs of Eminent Domain" July/August 2011

New Jersey Society of CPAs Magazine– "Practical Considerations for Handling Shareholder and LLC Member Disputes" March/April 2011

Whitepaper - "Having Your Cake and Eating It Too", May 2008

Whitepaper – "Managing Cash Flow in a Professional Practice During Economic Downtimes", May 2008

The Journal - "Alternate Methods for Dispute Resolution" Fall 2007

New Jersey Society of CPAs (Website)– "Saving on Auto Insurance Properly" March 2007

The Journal – "A Hasty Agreement Can Lead to Litigation", Fall 2006

The Journal – "What is Your Business Worth?", Fall 2004

The Journal – "Welcome to the Fascinating World of Forensic Accounting", Winter 1999

New Jersey Lawyer – "Lawyers, CPAS Team to Combat Workplace Fraud", July 2004

Proceedings – "Developing a Business Plan" June 2000

The Range Reporter – "On Target With Your Taxes", Winter 2000

The Range Reporter - "The Tax Man Cometh", January/February 1999