## CO-LOCATION AGREEMENT

This Co-Location Agreement (together with the Attachments, this "**Agreement**") is entered into by and between Hovsat Cable, ("**Hovsat**"), and Omnibox.TV and its affiliates ("**Subscriber**"), to be effective as of September 1, 2014 (the "Effective Date"). The parties hereby agree as follows:

1.1. Building. "Building" means the building generally known as "Tinton Fall Seniors Building" or "TFSB" and located at 2500 Shafto road, Tinton Falls, New Jersey.

1.2. Data Center. "Data Center" means the data center facility located at the Building, which is operated and controlled by Hovsat, and at which Hovsat shall provide the majority of the Services.

1.3. Force Majeure Event. "Force Majeure Event" means any event beyond the reasonable control of a party including acts of God, fires, floods, vandalism, sabotage, war, terrorist action, riot, civil commotion, rebellion, general labor stoppage, interruptions in telecommunications or utilities services, acts of any government, regulatory or any other competent authority or compliance with any law or governmental or regulatory order, rule, regulation or direction. For avoidance of doubt, a Force Majeure Event shall include any failure, malfunction or error of any telecommunications, computer or other electrical, mechanical or technological application, service or system or any computer virus to the extent the same is beyond the party's reasonable control. Market conditions and/or fluctuations (including a downturn in either party's business) will not be deemed Force Majeure Events.

1.4. Initial Term. "Initial Term" has the meaning given that term in Section 8.

1.5. Losses. "Losses" has the meaning given that term in Section 7.

1.6. Person. "Person" means an individual, partnership, joint venture, corporation, trust, limited liability company, unincorporated organization, association, joint stock company, Authority, or any other form of association or entity.

1.7. Purchased Equipment. "Purchased Equipment" means all computer equipment, accessories, peripherals, software and other materials that (i) are designated to be located at the Data Center by Subscriber prior to the Service Commencement Date with Hovsat's prior consent, which shall not be unreasonably withheld or delayed. 1.8. Services Commencement Date. "Services Commencement Date" has the meaning given that term in Section 2.1.3.

1.9. Services. "Services" means Hovsat's provision of equipment cabinet space, electrical power, air-conditioning for equipment cooling, telecommunications connectivity to Subscriber circuits, Subscriber telecommunications connectivity, Hovsat internal ethernet network connection for Hovsat signals to the Subscriber Systems and all other services to be provided by Hovsat pursuant to and in accordance with this Agreement.

1.10. Specifications. "Specifications" has the meaning given that term in Section 2.1.

1.11. Subscriber Cabinet. "Subscriber Cabinet" has the meaning given that term in Section 2.2

1.12. Subscriber Systems. "Subscriber Systems" has the meaning given that term in Section 2.

2. SERVICES

2.1 Services at Data Center.

In the event Subscriber seeks to deliver or cause to be delivered to the Subscriber Cabinet, from time to time during the term of this Agreement, additional computer equipment, accessories, peripherals, software or other materials (collectively, "**Additional Equipment**") to be covered by the Services, then Subscriber shall so notify Hovsat. Subscriber shall provide Hovsat with such information as Hovsat may reasonably request to enable Hovsat to determine

Plaintiff Exhibit 108

based on space availability and Data Center infrastructure and logistical requirements, whether to permit Subscriber to deliver and/or install any Additional Equipment. Within one (1) business day following receipt of all such information, Hovsat shall notify Subscriber whether such permission is granted (which shall not be unreasonably withheld or conditioned) and, if so, any additional reasonable requirements (including size limitations, power consumption levels, infrastructure support requirements, etc.) applicable to any such Additional Equipment. Without limiting the foregoing, Subscriber shall not deliver to or install in the Data Center any equipment or other materials reasonably likely to harm the Data Center, Hovsat's equipment, networks or systems or third party equipment, networks or systems. The Purchased Equipment and any Additional Equipment shall collectively be referred to as the "**Subscriber Systems**." Subscriber shall be responsible for all costs and expenses associated with the delivery to and installation in the Data Center of any approved Additional Equipment and for ensuring that such Additional Equipment satisfies the additional requirements, if any, applicable to such Additional Equipment as so notified to Subscriber by Hovsat. Hovsat shall use commercially reasonable efforts to have the Building make available to Subscriber commercial standard loading docks to permit Subscriber to deliver and remove, as necessary, the Subscriber Systems to and from the Subscriber Cabinet. No other equipment is available for use by Subscriber and it shall be Subscriber's sole responsibility to supply any equipment necessary to deliver and install any approved Additional Equipment or Subscriber Systems (other than for the Initial Installation). Subject to Subscriber's compliance with the terms of this Agreement, Subscriber shall be permitted access to the Data Center and the Subscriber Cabinet on a reasonable basis, as necessary to deliver, install, operate, monitor, maintain, repair, replace and/or remove any or all of the Subscriber Systems. If Subscriber seeks to deliver, install, maintain, repair, replace, and/or remove any approved Additional Equipment or other Subscriber Systems other than during normal business hours, Subscriber shall notify Hovsat thereof and of the dates and times when Subscriber is available to deliver and/or install such equipment so that Hovsat may schedule an after hours appointment with the Building. Promptly following receipt of such notice, Hovsat shall use commercially reasonable efforts to schedule an appointment at a time mutually acceptable to the Building and Subscriber. Subscriber shall be solely responsible for any additional fees or costs associated with any access to the Building other than during normal business hours (including any overtime costs of union personnel at the Building).

2.2 Subscriber Cabinet. Hovsat shall provide the cabinet space, for the Subscriber Equipment, within the Data Center (the "**Subscriber Cabinet**"). The Subscriber Cabinet shall be suitable, as reasonably determined by Hovsat.

2.3 Ownership of Items. Hovsat warrants and agrees that (i) Subscriber shall retain all right, title and interest (or leasehold or license interest, as applicable) in and to the Subscriber Systems, (ii) Hovsat shall have no right, title or interest (ownership or otherwise) in any of the Subscriber Systems, and (iii) Hovsat shall have no right to grant a security interest in or otherwise encumber any of the Subscriber Systems; provided, that Hovsat shall be permitted to take a lien on any Subscriber's Systems to the extent Subscriber fails to make any payment owed by Subscriber to Hovsat or any of its Affiliates hereunder in accordance with the terms of this Agreement.

2.4 Liens. Hovsat shall not cause (or allow any Person under its direction or control to cause) any of the Subscriber Systems, or any interest therein, to become subject to any Lien, other than any Lien imposed by Subscriber.

2.5 General Representations, Warranties and Covenants.

Each party represents, warrants and covenants as follows: (i) it is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization; (ii) it has full power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement; (iii) this Agreement constitutes the valid and legally binding obligation of it enforceable in accordance with its terms and conditions (subject to applicable bankruptcy laws and laws generally affecting the rights of creditors); and (iv) its execution and delivery of this Agreement and its performance or receipt of the Services (as applicable) will not (1) violate (or constitute an event which, with the giving of notice, the passage of time, or both, would violate) any provision of its charter, bylaws or other governing document, or (2) conflict with, result in a breach of, or constitute a default under (or constitute an event which, with the giving of notice, the passage of time, or both, would conflict with, result in a breach of, or constitute a default under) any other agreement or arrangement or any law, regulation, order or decree by which it or any of its property is bound. Hovsat further represents and warrants that it shall provide the Services in a good or workmanlike manner, with professional diligence and skill, and in accordance with the requirements of this Agreement and customary industry standards.

2.6. Subscriber represents, warrants and covenants that (a) it has the legal right and authority, and will continue to own or maintain the legal right and authority, during the term of this Agreement, to place and use any Subscriber Systems at the Data Center as contemplated under this Agreement; (b) the performance by Subscriber of its obligations and use by Subscriber of the Services will not violate any reasonable Data Center rules communicated to Subscriber from time to time in writing; (c) neither Subscriber nor the Representatives or the Subscriber Systems shall unreasonably, negligently or intentionally interfere with Hovsat's or its customers' use of any services provided at or from, or equipment located at, the Data Center; (d) all equipment, materials and other tangible items placed by Subscriber at the Data Center shall be used in compliance with all applicable manufacturer specifications regarding safety; (e) Subscriber shall, at its own expense, keep the Subscriber Systems in good repair, appearance and condition, other than normal wear and tear; and (g) Subscriber shall not knowingly permit the transmission of any material in violation of any applicable laws, rules or regulations by or through the Subscriber Systems.

3. INVOICING; PAYMENT TERMS.

3.1 Pricing and Fees. All fees, charges and expenses relating to the performance of the Services are set forth on Attachment A to this Agreement.

4. CONFIDENTIAL INFORMATION.

4.1 Confidential Information.

4.1.1 Definition. For purposes of this Agreement, subject to Section 4.1.3(a), "Confidential Information" means any information or materials disclosed by, or on behalf of, either party or any of its Affiliates to the other party or any of its Affiliates in connection with this Agreement that is marked or otherwise designated "confidential" or "proprietary" or the like or that, due to the nature of such information or materials or the circumstances surrounding such disclosure, should reasonably be considered to be confidential or proprietary in nature. Hovsat agrees that

all information or materials with respect to any of the Subscriber Systems, the network design or other layout or architecture with respect thereto, or data feeds or other connections with respect thereto, Subscriber Systems, are the Confidential Information of Subscriber, regardless of the source of such information or materials and regardless of whether or not marked or otherwise designated as "confidential" or "proprietary" or the like.

4.1.2 Confidential Treatment.

(a) Each party shall treat as confidential all of the Confidential Information of the other party, and shall not disclose or use (and shall not permit any other Person to whom any Confidential Information of the other party or any Agreement Confidential Information is disclosed by, on behalf of, for the benefit of or at the request of such party (each a "**Recipient**," which term shall also include the receiving party) to disclose or use) any of the Confidential Information of the other party except as expressly permitted under this Agreement. Without limiting the foregoing, each party shall use (and shall cause each other Recipient to use) at least the same degree of care that such party uses to prevent the disclosure or misuse of its own confidential information of like nature or importance, but in no event less than reasonable care, to prevent the disclosure or misuse of any Confidential Information of the other party. Subject to the foregoing, and except as may be specifically agreed from time to time by the parties, each party shall not, and shall not permit any other Recipient to, (i) communicate or disclose, directly or indirectly, any of the Confidential Information of the other party (or any portion thereof) to any Person (other than communications or disclosures by such party to employees or contractors of such party, but only to the extent that such employees or contractors have a need for such information in order to allow such party to exercise the rights specifically granted to such party by this Agreement or to carry out the obligations imposed on such party by this Agreement in accordance with the terms of this Agreement and have agreed in writing to confidentiality and limited use obligations as described; (ii) use any Confidential Information of the other party (or any portion thereof) in any manner except as expressly contemplated by this Agreement; or (iii) take any other action with respect to the Confidential Information of the other party (or any portion thereof) inconsistent with the confidential and proprietary nature of such Confidential Information.

(b) Each party may copy and distribute to such of its employees and contractors as are reasonably necessary to fulfill its obligations or to exercise its rights hereunder, the Confidential Information of the other party; provided that each party agrees not to make (or permit any Recipient of such party to make) more copies or distributions of any Confidential Information of the other party than shall be reasonably necessary in connection with its permitted use thereof. Disclosure of any Confidential Information shall not be deemed to represent an assignment or grant of any right, title or interest in such Confidential Information.

4.1.3 Exclusions

(a) Confidential Information of a party shall exclude information that the receiving party can demonstrate: (i) is independently developed or conceived by the receiving party after the date of this Agreement without reference to or use of any Confidential Information of the other party; (ii) becomes known to the receiving party, without restriction, from a third party who the receiving party reasonably believes, after due inquiry, has the right to so disclose it; or (iii) was generally known or available to the public at the time it was disclosed or at a later time through no act or omission of the receiving party or any other Person who the receiving party reasonably believes, after due inquiry, had an obligation to keep such information confidential.

(b) The restrictions set forth in Section 4.1.3(a)(i) shall not apply to Confidential Information that is required to be disclosed by either party pursuant to an order or requirement of any Authority; provided, however, that such party shall provide prompt prior notice thereof to the other party describing in reasonable detail such requirement and all Confidential Information of the other party required to be so disclosed, and shall use reasonable efforts and cooperate with the other party at the other party's expense to obtain a protective order or otherwise seek to prevent disclosure of such Confidential Information.

4.1.4 Confidentiality of Agreement. Each party agrees that the terms of, but not the existence of, this Agreement and any negotiations with respect to the same (collectively, the "**Agreement Confidential Information**") shall be maintained as confidential and that such party shall not, unless agreed to in writing by the other party, disclose or reveal, directly or indirectly, any of such Agreement Confidential Information to any Person except (i)(x) to the party's or its Affiliates' respective officers, directors, members, partners, managers, employees, attorneys or other professional advisors, or (y) to any actual or potential investor in, or purchaser of, such party, to any actual or potential banks or other financing sources of such party, and to their respective attorneys or other professional advisors; but in each case only to the extent that such Persons have a reasonable need to know the same for purposes of such relationship and agree to maintain the confidentiality of the same, or (ii) to the limited extent necessary to enforce its rights, or perform its obligations, under this Agreement. The provisions of this Section 4.1.4 shall not, however, (i) prohibit any party from disclosing to any Person the fact that Hovsat is providing certain Co-Location services to Subscriber, without further detail, or (ii) prohibit any party from disclosing any Agreement Confidential Information to the extent that such disclosure is required by Applicable Law, so long as the party seeking to disclose the same shall first have given prompt prior notice thereof to the other party describing in reasonable detail such requirement and all Agreement Confidential Information required to be so disclosed, and reasonably cooperates with the other party in its efforts, if any, to prevent or limit any such disclosure.

4.1.5 Cooperation. Each party agrees that, either upon learning of, or upon a showing by the other party of, any threatened or actual breach of the provisions of this Article 4 or of any threatened or actual unauthorized use or disclosure of all or any portion of the Confidential Information of the other party (or all or any portion of any Agreement Confidential Information) by any Recipient or any Person to whom such party or any Recipient of such party made available such Confidential Information or Agreement Confidential Information, or in the event of any loss of, or inability to account for, any of such Confidential Information or Agreement Confidential Information or any such information or materials, such party shall, without limitation of any liability that such party may have hereunder with respect to such threatened or actual breach or such unauthorized use or disclosure, loss or inability to account, give notice thereof to the other party and shall cooperate as reasonably requested by the other party in conjunction with the other party's efforts, if any, to seek appropriate injunctive relief or otherwise to prevent or curtail such threatened or actual breach or unauthorized use or disclosure, loss or inability to account or to recover such Confidential Information or Agreement Confidential Information.

4.1.6 Restrictions on Disclosure. Each party agrees that, to the extent it is permitted to disclose Confidential Information of the other party (or any Agreement Confidential Information) to any other Person (other than pursuant to Section 4.1.3(b), or the last sentence of Section 4.1.4), it

shall do so pursuant to a written non-disclosure agreement containing terms at least as protective of Confidential Information and Agreement Confidential Information as those set forth in this Article 4 (but with no further rights of disclosure and no rights of use on their own behalf).

4.1.7 Legends. Each party agrees that it will not remove, alter, deface or obscure any legends, notices, identifications or evidence of confidentiality, ownership, copyright, trademark or other proprietary or intellectual property rights, or any disclaimers of warranties, limitations of damages, or similar provisions, contained on or included in any of the Confidential Information of the other party, nor will such party allow any of its Recipients to do so. Each party shall (and shall cause its recipients to) reproduce any such legend, notice, identification, evidence, disclaimer or similar provision on any reproduction or modification of any of the Confidential Information of the other party and shall promptly add (or remove) any such legend, notice, identification, evidence, disclaimer or similar provision to the Confidential Information of the other party as the other party may reasonably request from time to time.

4.1.8 Return. Upon termination or expiration of this Agreement for any reason, upon request, each party promptly shall return to the other party all Confidential Information of the other party, including all copies of any thereof, under the possession or control of such party or any of its Recipients, or destroy or purge (or cause to be destroyed or purged) all systems and files of any such Person of any such Confidential Information. Upon request, each party shall promptly certify to the other party its compliance with this Section 4.1.8.

5. ACCESS AND SECURITY.

5.1 Data Center Access. Except with the advance written consent of Hovsat and Subscriber, Subscriber's access to the Data Center shall be limited solely to the Representatives. Subscriber and its Representatives shall cooperate with and comply with all reasonable and published security and safety measures provided to Subscriber by Hovsat from time to time, including the use of entry and exit logs and agreements, key cards, voice, photo, biometric or other personal identification recognition devices, and other mechanisms and devices for registering, tracking, and limiting access to the Data Center.

6. INSURANCE.

6.1 Subscriber Minimum Insurance Levels. Subscriber agrees to keep in full force and effect during the term of this Agreement (a) a broad form Commercial General Liability Insurance policy providing for coverage of at least one million dollars ($1,000,000.00) per occurrence, subject to an aggregate cap of two million dollars ($2,000,000.00), for bodily injury and property damage. In addition, Subscriber agrees to keep in full force and effect during the term of this Agreement a Worker's Compensation Insurance policy in an amount not less than that required by Applicable Law and Hovsat agrees to keep in full force and effect during the term of this Agreement a Worker's Compensation Insurance policy consistent with the policy that Hovsat maintains for its employees generally. Such policies (i) shall be written on an "occurrence" policy form and not on a "claims made" form; (ii) shall be primary and not contributory with the other party's liability insurance, if any; (iii) shall provide for not less than thirty (30) days advance written notice to the other party from the insurer or insurers, if more than one, of any cancellation, nonrenewal, or material change in coverage or available limits of liability; and (iv) shall be issued by an insurance company with a rating of no less than A-V in the current Best's Insurance Guide, or otherwise be acceptable to the other party, and admitted to engage in the business of insurance in the state in which the Services are actually provided. Each party's

Commercial General Liability Insurance coverage may be provided by a combination of primary, excess, and umbrella policies, provided that those policies are concurrent in all respects regarding the coverage afforded by the policies. The coverage of any excess or umbrella policy must be at least as broad as the coverage of the primary policy.

6.2 Certificates of Insurance. Subscriber shall (a) deliver to the other party certificates of insurance which evidence the minimum levels of insurance set forth Section 6.1 above; and (b) cause its insurance provider(s) to name the other party as an additional insured and to notify the other party in writing of the effective date of such coverage. Subscriber shall deliver the certificates of insurance required by this Section 6.1 Hovsat before the Effective Date; again at least ten (10) days before the expiration date of any applicable policy; and again on renewal of any applicable policy.

6.3 Obligations Continue Regardless of Insurance. The insurance requirements set forth in this Article 6 are independent of each party's indemnification and other obligations under this Agreement and shall not be construed or interpreted in any way to restrict, limit or modify each party's indemnification and other obligations or to limit each party's liability under this Agreement.

6.4 Waiver of Subrogation Rights. Each party agrees to cause the insurance companies issuing its insurance policies to waive any subrogation rights that those insurance companies may have against the other party, or its insurers, by way of contract or otherwise.

7. INDEMNIFICATION.

7.1 Indemnification. Subscriber, at its sole expense, hereby agrees to be liable for and to indemnify, hold harmless and (at the election of Hovsat) defend (with counsel reasonably acceptable to Hovsat) Hovsat, its Affiliates, and their respective directors, officers, members, partners, employees, agents and representatives, from and against any and all debts, liabilities, losses, costs and expenses, including reasonable attorneys' fees (collectively, "**Losses**"), to the extent arising out of or in any way related to, in whole or in part, in connection with: (i) any infringement or misappropriation of any intellectual property or proprietary rights arising out of the Subscriber Systems (but without limitation of any indemnification obligations that Hovsat may have with respect to the same under the Asset Purchase Agreement); (ii) any personal injury or tangible property damage to the extent caused by the negligence or willful misconduct of Subscriber; (iii) any third-party's alleged ownership or possessory interest, lien, trust, pledge, or security interest in the Subscriber Systems, including any attempt by such third party to take possession of the Subscriber Systems, except where caused by Hovsat or any person under Hovsat's direction or control (but without limitation of any indemnification obligations that Hovsat may have with respect to the same under the Asset Purchase Agreement); or (iv) Subscriber's or its Representatives' fraud, gross negligence or willful misconduct; in each case other than for Losses resulting from Hovsat's fraud, gross negligence or willful misconduct. Hovsat shall notify Subscriber of any matter with respect to which Hovsat or any other Person indemnified hereunder is entitled to seek indemnification from Hovsat under this Section promptly after Hovsat becomes aware of such matter, provided, however, that any failure to give prompt notice of such matter shall not relieve Subscriber from any of its liabilities or obligations hereunder with respect to such matter unless (and then only to the extent that) such failure materially and adversely affects the ability of Subscriber to indemnify against (or if applicable, defend) any claim or action arising out of such matter. In the event that Hovsat requests that