**Plaintiff Exhibit**

**111**

# Form 10-K/A Speedus Corp

## 10-K/A [Amend] - Annual report [Section 13 and 15(d), not S-K Item 405]

SEC.report (https://sec.report/) / SPEEDUS CORP (/CIK/0001002520) / Form 10-K/A (/Document/0001140361-11-009367/) / (Filer)

Published: 2011-02-14 19:13:33 (2011-02-14T19:13:33-0400)
Submitted: 2011-02-14
Filing Agent: EDGARFILINGS LTD (/CIK/0001140361)
Period Ending In: 2009-12-31

About Form 10-K/A (/Form/10-K/A/)

form10ka.htm ⎘ (https://sec.report/Document/0001140361-11-009367/form10ka.htm) SPEEDUS CORP 10-KA 12-31-2009

Zoom In  Zoom Out

## form10ka.htm

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

þ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2009

or

¨ TRANSITIONAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For transition period from _____ to _____

Commission file number: 000-27582

# SPEEDUS CORP.

(Name of small business issuer in its charter)

| | |
|---|---|
| **Delaware** | |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **1 Dag Hammarskjold Blvd., Freehold, New Jersey** | **07728** |
| (Address of Principal Executive Offices) | (Zip code) |

**(888) 773-3669**
(Registrant's telephone number)

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, par value $.01 per share** | **The NASDAQ Stock Market LLC** |
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12 (g) of the Act:
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.
Yes ¨ No þ

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
Yes ¨ No þ

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes þ No ¨

EXPERTREQ-000653

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ¨

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a
non-accelerated filer or a smaller reporting company. See definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                    Accelerated filer ☐
Non-accelerated filer ☐                       Smaller reporting company ☑

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).
Yes ¨ No þ

The aggregate market value of the Registrant's Common Stock held by non-affiliates of the Registrant was $1,132,264 on June 30, 2009, based on the closing trade price of the Common Stock on the NASDAQ Stock Market on that date.

The number of shares of Common Stock outstanding as of March 30, 2010 was 3,995,596.

### DOCUMENTS INCORPORATED BY REFERENCE

None

### SPEEDUS CORP.
### INDEX TO FORM 10-K

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 4 |
| Item 1A. | Risk Factors | 6 |
| Item 1B. | Unresolved Staff Comments | 10 |
| Item 2. | Properties | 10 |
| Item 3. | Legal Proceedings | 10 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 11 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 12 |
| Item 6. | Selected Financial Data | 13 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 14 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 20 |
| Item 8. | Financial Statements and Supplementary Data | 20 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 20 |
| Item 9A(T). | Controls and Procedures | 21 |
| Item 9B. | Other Information | 22 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 23 |
| Item 11. | Executive Compensation | 25 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 29 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 30 |
| Item 14. | Principal Accountant Fees and Services | 30 |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 31 |

2

*Index*

**Disclosure Regarding Forward Looking Statements**

This Form 10-K contains "forward-looking statements" within the meaning of Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). These statements appear in a number of places in this Form 10-K and include statements regarding the intent, belief or current expectations of the Company or its officers with respect to, among other things, the ability of the Company to make capital expenditures, the ability to incur debt, to service and repay such debt, as well as other factors that may affect the Company's financial condition or results of operations. Forward-looking statements may include, but are not limited to, projections of revenues, income or losses, capital expenditures, plans for future operations, financing needs or plans, compliance with covenants in loan agreements, plans for liquidation or sale of assets or businesses, plans relating to products or services of the Company, assessments of materiality, predictions of future events, and the ability to obtain financing, including the Company's ability to meet obligations as they become due, and other pending and possible litigation, as well as assumptions relating to the foregoing. All statements in this Form 10-K regarding industry prospects and the Company's financial position are forward-looking statements. Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date hereof. Although the Company believes that the expectations reflected in such forward-looking statements are reasonable, it can give no assurance that such expectations will prove to have been correct. The Company undertakes no obligation to publicly release the result of any revisions to these forward-looking statements that may be made to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

EXPERTREQ-000654

*Index*

**PART I**

ITEM 1.    BUSINESS

**Business Activities**

*Overview*

Speedus Corp. ("Speedus" or the "Company") operates primarily through its two majority-owned subsidiaries Zargis Medical Corp. ("Zargis") and Density Dynamics Corp. ("DDC").

In 2001 we co-invested with Siemens Corporate Research, Inc., a subsidiary of Siemens Corporation, in Zargis to develop advanced diagnostic decision support products and services for primary care physicians, pediatricians, cardiologists and other healthcare professionals. In March of 2008 we acquired a majority interest in DDC, a company breaking new ground in the development of DRAM based, energy efficient, sold-state drives ("SSD") with I/O acceleration technology. For additional information on each of these business segments and our other assets and operations, see the discussions below and "Notes to Consolidated Financial Statements — Note 11, Business Segment Information."

*Zargis*

Zargis is a medical device company focused on improving health outcomes and cost effectiveness through the development of computer-aided medical devices and telemedicine based delivery systems. Zargis was formed in 2001 when we co-invested with Siemens Corporate Research, Inc., a subsidiary of Siemens Corporation. As part of this transaction, Siemens contributed certain intellectual property including a core technology used in the Zargis Cardioscan™ device (Cardioscan).

Cardioscan is a non-invasive, diagnostic support solution that automatically analyzes acoustical data from a patient to determine whether or not the patient possesses a suspected diastolic or systolic murmur and whether or not they present a Class I indication for echocardiography referral. Heart murmurs can be a sign of serious types of valvular or other heart disease. Zargis' patented technology utilizes advanced signal processing algorithms deployed on a standard pc computer platform. Cardioscan received its initial FDA clearance in May 2004 and received its most recent clearance for Cardioscan in February, 2009. Cardioscan is fully integrated with the ZargisTelemed™ portal is also cleared for marketing in Australia, Canada, India, Singapore, South Africa and 31 European states.

In September of 2009, Zargis also announced FDA clearance to market its Signal X6™ device. Signal X6 is noninvasive and simultaneously records heart and lung sounds from six adhesive acoustic sensors. The recordings can be evaluated locally or, for locations where a cardiac specialist is not immediately available for consultation, transmitted through the Internet for remote evaluation. The sensors are adhesive, rather than handheld, which may reduce motion noise and increases clarity when compared to handheld stethoscopes. Zargis initially released Signal X6 in August 2009, when 510(k) clearance for the device was received.

In addition to the development of Cardioscan, Signal X6 and Zargis Telemed, Zargis has been awarded several contracts by the U.S. Army, most recently in August of 2009, to develop prototype versions of telemedicine systems for use in cardiology. These systems record, synchronize and analyze heart sounds, lung sounds and ECG signals in pediatric patients who are being cared for by remote military treatment facilities. The systems have been fully integrated with an existing Army telehealth platform.

Demand for medical systems designed to remotely project the expertise of cardiologists and other medical specialists is growing within both military and civilian environments worldwide and it is for this reason that Zargis has identified the field of telemedicine as a key focus area for product commercialization.

In February 2003, we acquired a controlling interest in Zargis of approximately 63%. At December 31, 2009, as a result of continued investment, our primary equity ownership was approximately 90%.

In October 2007, Zargis and the 3M Company entered into an exclusive multi-year marketing alliance involving Zargis' heart sound analysis software and 3M Littmann's next-generation electronic stethoscope. Under the agreement, Zargis supported 3M in its efforts to develop a next-generation stethoscope that is compatible with Zargis' heart sound analysis software. In addition, the alliance provides Zargis with a wide-range of marketing and promotional opportunities along with exclusive rights to sell its heart sound analysis software through the global distribution network of the Littmann brand. The agreement with 3M, based on the total number of Zargis fully diluted shares as of the agreement date, grants 3M a 5% equity position in Zargis following the first sale of Zargis' software through the 3M distribution channel (which occurred in August of 2009) as an access and exclusivity fee and an additional 5% equity in Zargis in the event that other conditions are met. The agreement also entitles 3M to a royalty payment based on sales of certain Zargis products and a seat on the Zargis Board of Directors.

*Index*

*Density Dynamics*

In March 2008, we obtained approximately a 75% equity interest in DDC. DDC is a newly formed company that was created to acquire the technology, assets and some of the operations of a developer and marketer of ultra-high speed storage systems for server networks and other applications.

DDC is continuing development of its line of environmentally friendly DRAM based solid-state storage and I/O acceleration technology. The Jet.io RamFlash and DramJet Solid State Drives are built in a standard 3.5" drive format. These drives are the core components for DDC high performance storage products. In January 2010, DDC launched its JetX10 acceleration appliance and its JetPod and JetNode expansion chassis which integrate the Jet.io Solid State Drives to deliver the highest performance and greatly reduces complexity, space requirements and power consumption in traditional storage solutions. All DDC products are designed for enterprise and cloud computing environments which demand the highest performance, durability and lowest power consumption.

**Other Business Activities**

*F&B Gudtfood*

In October 2008 we transferred the operations and liabilities of the remaining F&B restaurant store in to an unrelated third party for no consideration. We have reflected the accounts of F&B as a discontinued operation in our consolidated financial statements for the period ending December 31, 2008.

*Local Multipoint Distribution Service (LMDS) License*

EXPERTREQ-000655

We have an FCC commercial operating license which covers between 150 – 300 MHz of spectrum in the New York City area. The license has been renewed through February 1, 2016 conditioned upon demonstrating to the FCC by June 1, 2012 that we are providing "substantial service." As of December 31, 2009 the Company had not demonstrated to the FCC that it was providing "substantial service"; however, the Company expects it will demonstrate to the FCC that it is providing this "substantial service" by June 1, 2012.

*Internet initiatives*

In the fourth quarter of 2008, we ceased allocation of any material resources to our portfolio of internet initiatives, which included NetfreeUs, Wibiki, Adchooser and iMarklet.

*Other investments*

We have invested a portion of our assets in a portfolio of marketable securities consisting of publicly traded equity securities. We have in the past and may in the future sell publicly traded equity securities we do not own in anticipation of declines in the fair market values of these securities. As of December 31, 2009 and 2008, we had not sold any securities that we did not own.

We have also invested a portion of our assets in equity and debt instruments of non-publicly held companies. The Company monitors these investments for other than temporary impairment by considering current factors including economic environment, market conditions, operational performance and other specific factors relating to the business underlying the investment(s). The Company determined that based on the current general negative economic and liquidity environment affecting the ability of businesses to obtain credit and to raise money in the capital markets, and based on specific unobserved data received from the underlying entities indicating severe operational and liquidity problems, there was significant doubt as to whether these entities will be able to continue to operate as going concerns. Therefore, during the fourth quarter of 2008 the Company recorded an impairment charge of $800,000 against these assets reducing the fair value of these non-public investments to zero as of December 31, 2008.

**Competition**

Many of our present and potential competitors have longer operating histories and significantly greater financial, technical, marketing and other resources than we do and therefore may be able to respond more quickly than we can to new or changing opportunities, technologies, standards and customer requirements.

**Intellectual Property**

To protect our proprietary rights, we rely on a combination of copyright and trademark laws, trade secrets, confidentiality agreements with employees and third parties and protective contractual provisions. All of our employees have executed confidentiality and nonuse agreements that transfer any rights they may have in copyrightable works or patentable technologies to us.

We have applied for registration of our service marks and trademarks in the United States and in other countries. We may not be successful in obtaining the service marks and trademarks for which we have applied. To the extent we consider it necessary, we may file patents to protect our technology. Patents with respect to our technology may not be granted, and, if granted, patents may be challenged or invalidated. In addition, issued patents may not provide us with any competitive advantages and may be challenged by third parties.

5

*Index*

Despite our efforts to protect our proprietary rights, unauthorized parties may copy aspects of our products or services or obtain and use information that we regard as proprietary. The laws of some foreign countries do not protect proprietary rights to as great an extent as do the laws of the United States. In addition, others could possibly independently develop substantially equivalent intellectual property. If we do not effectively protect our intellectual property, our business could suffer. Companies have frequently resorted to litigation regarding intellectual property rights. We may have to litigate to enforce our intellectual property rights, to protect our trade secrets or to determine the validity and scope of other parties' proprietary rights.

**Government Regulation**

In general, we are not currently subject to direct federal, state or local government regulation, other than regulations that apply to businesses generally. However, the grant, renewal and administration of spectrum licenses is regulated by the Federal Communications Commission. See 'Business Activities, *Local Multipoint Distribution Service (LMDS) license'* for additional information on our "substantial service" demonstration and our contingent request for waiver or extension of the "substantial service" deadline. A failure by the FCC to conclude that we have demonstrated "substantial service" or to extend the deadline for demonstrating "substantial service" could have an adverse effect on the Company.

In addition, medical devices such as ours are subject to strict regulation by state and federal authorities, including the Food and Drug Administration and comparable authorities in certain states.

**Employees**

As of March 26, 2010, we had approximately 20 full time employees. We also rely on a number of consultants. None of our employees are represented by a collective bargaining agreement. We believe that we have a good relationship with our employees.

**Where You Can Find More Information**

We file annual and quarterly reports, proxy statements and other information with the Securities and Exchange Commission, and we have an Internet website address as www.speedus.com. We make available free of charge on our internet website address our annual and quarterly reports and proxy statements filed pursuant to Sections 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after we electronically file such material with the SEC. You may also read and copy any document we file at the Securities and Exchange Commission's public reference room located at 100 F Street, N.E., Washington, D.C. 20549. Please call the Securities and Exchange Commission at 1-800-732-0330 for further information on the operation of such public reference room. You also can request copies of such documents, upon payment of a duplicating fee, by writing to the Securities and Exchange Commission at 450 Fifth Street, N.W., Washington, D.C. 20549 or obtain copies of such documents from the Securities and Exchange Commission's website at sec.report.

**ITEM 1A. RISK FACTORS**

**Risks related to our business generally**

***Although we have been a public company since February 1996, we have reoriented our business several times and our current business has not generated any significant revenues to date.***

At the time of our initial public offering, our business was primarily a subscription television service. In November 1998, we terminated the subscription television business and began a limited pilot program for the delivery of high-speed Internet access. We encountered technical difficulties in this pilot program and reoriented our business on wireless data and other services. We have not yet generated any significant revenue from these businesses.

EXPERTREQ-000656

*We have recorded operating losses in each reporting period since our inception and may never be profitable.*

We have recorded operating losses and negative operating cash flows since our inception and have limited revenues. At December 31, 2009, we had an accumulated deficit of approximately $86.0 million. We do not expect to have earnings from operations or positive operating cash flow until such time as our strategic investments achieve successful implementation of their business plans and/or form alliances for the use of our capabilities in the future.

*We may not be able to fund our operations and continue as a going concern.*

We may not have funds sufficient to finance our operations and enable us to meet our financial obligations for the next twelve months. There can be no assurances that we will be able to consummate any capital raising transactions, particularly in view of current economic conditions. The inability to generate future cash flow or raise funds to finance our strategic investments could have a material adverse effect on our ability to achieve our business objectives.

6

The report of our independent registered public accounting firm for the fiscal year ended December 31, 2009 contains an explanatory paragraph which states that there is substantial doubt about our ability to continue as a going concern.

If we are not able to reduce or defer our expenditures, secure additional sources of revenue or otherwise secure additional funding, we may be unable to continue as a going concern, and we may be forced to restructure or significantly curtail our operations, file for bankruptcy or cease operations. In addition, a bankruptcy filing by one or more of our strategic investments could cause us to lose our investment and/or control and could prevent us from sharing in any future success of those strategic investments. The accompanying financial statements do not include any adjustments relating to the recoverability of the carrying amount of recorded assets or the amount of liabilities that might result should the Company be unable to continue as a going concern. Should we be successful in securing the necessary capital to continue operations, it is likely that such arrangements would result in significant dilution to each shareholder's ownership interest in the Company.

*If the recent volatility in the United States and global markets continue for an extended period of time, it may become more difficult to raise money in the public and private markets and harm our financial condition and results of operations.*

The United States and global equity markets have recently been extremely volatile and unpredictable, reflecting in part a general concern regarding the global economy. This volatility has also affected the ability of businesses to obtain credit and to raise money in the capital markets. If we are unable to obtain credit or raise money in the capital markets, we may not be able to continue to fund our current products or otherwise continue to maintain our business. Our existing operations and infrastructure may not be adequate to manage the growth necessary for successful implementation of our business plan.

Successful implementation of our business plan will require the management of growth. Our existing operations and infrastructure may not be adequate to manage such growth, and any steps taken to improve such systems and controls may not be sufficient. Our future success will depend in part upon attracting and retaining the services of current management and technical personnel. We also may not be successful in attracting, assimilating and retaining new personnel in the future as future growth takes place. We do not maintain "key person" life insurance policies on any of our key personnel.

*Shant S. Hovnanian, Vahak S. Hovnanian and trusts controlled by members of the Hovnanian family acting together can control the direction and future operations of our company.*

Shant S. Hovnanian, Vahak S. Hovnanian and trusts controlled by members of the Hovnanian family in the aggregate own approximately 41% of our outstanding Common Stock at December 31, 2009. As a result, acting together they may have the power to elect all of the members of our Board of Directors, amend our certificate of incorporation and by-laws and control the direction and future operations of our Company, in each case without the approval of any of our other stockholders.

*Our stock price has historically been volatile, which may make it more difficult for you to resell shares when you want at prices you find attractive.*

The trading price of our Common Stock has been and may continue to be subject to wide fluctuations. During 2009 and 2008, the high and low sale prices of our Common Stock on the Nasdaq Stock Market ranged from $8.83 to $0.27, and $3.25 to $0.25, respectively. The closing sale price of our Common Stock was $3.05 on March 17, 2010. Our stock price may fluctuate in response to a number of events and factors, such as quarterly variations in operating results, announcements of technological innovations or new products and media properties by us or our competitors, the operating and stock price performance of other companies that investors may deem comparable, and news reports relating to trends in our markets.

*We may not be able to maintain our listing with the Nasdaq Stock Market which may make it more difficult for you to resell shares when you want.*

On several occasions in the past, we were not in compliance with the Marketplace Rules of the Nasdaq Stock Market ("Nasdaq"), which require listed companies to maintain a closing bid price equal to or greater than $1.00.

On January 28, 2010 the Company received written notification from Nasdaq informing the Company that is did not meet the terms of the extension granted to the Company on December 11, 2009 to comply with the stockholders' equity requirement of Marketplace Listing Rule 5550(b) (the "Rule") which requires the Company to maintain either (1) a minimum of $2.5 million in stockholders' equity; (2) market value of listed securities of $35 million; or (3) net income from continuing operations of $500,000 in the most recently completed fiscal year or two of the last three most recently completed fiscal years. On February 2, 2010, the Company submitted an appeal by requesting a hearing with the Nasdaq Hearings Panel. As a result, a hearing was held on March 11, 2010, at which time the Company considered the plan the Company had developed and requested additional information from the Company regarding the Company's plans for regaining and sustaining compliance with the rule. The Panel generally issues a decision within 30 to 45 days following a hearing. While the Panel has the authority to grant the Company up to 180 days from January 28, 2010 to regain compliance with the Rule, there can be no assurance that the Panel will grant the Company's request for continued listing. The Company's securities will continue to be listed on Nasdaq during this appeal process. On January 27, 2010 Speedus engaged Morgan Joseph & Company, Inc., a full service investment bank, to evaluate strategic alternatives available to maximize shareholder value with respect to Speedus' Zargis subsidiary.

7

While the Company will demonstrate best efforts to regain compliance, and thus maintain its securities listing, there can be no assurance that the Company will be able to meet the above mentioned deadlines and otherwise regain compliance. Should the Company be unable to meet the requirements, Nasdaq will issue a determination to delist the Company's securities.

If our Common Stock were delisted from Nasdaq, trading in our Common Stock would have to be conducted on the OTC Bulletin Board or in the "pink sheets". If that were to occur, liquidity for our Common Stock could be significantly decreased which could reduce the trading price and increase the transaction costs of trading shares of our Common Stock.

*Sales of shares of Common Stock by major holders could adversely affect the market price of the Common Stock.*

EXPERTREQ-000657

Future sales of shares of Common Stock, or the availability of shares of Common Stock for future sale, may adversely impact the market price of the Common Stock prevailing from time to time.  Sales of substantial amounts of our Common Stock, or the perception that such sales could occur, could adversely affect the prevailing market price of the Common Stock. Sales of shares of Common Stock by major holders could adversely affect the market price of the Common Stock.

**The Company has identified material weaknesses in its internal controls over financial reporting**

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. In its assessment of the effectiveness of internal control over financial reporting as of December 31, 2009, and as reported in this Annual Report on Form 10-K for the fiscal year then ended, management identified such material weaknesses as evidenced by the fact that the Company was unable to timely close its books and file required reports as required by securities regulations and has not filed its income tax returns on a timely basis. Additionally, we were unable to complete our evaluation as to the effectiveness of internal control in a timely manner. There is a reasonable possibility that material misstatements in the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis unless management is successful in remediating such material weaknesses.

**Risks related to certain short-term investments**

**Securities that we invest in are subject to market price risks.**

As part of our overall investment strategy, we invest in publicly traded equity securities. We purchase these securities in anticipation of increases in the fair market values of the securities.

We have also invested in equity and debt instruments of non-publicly held companies and account for them under the cost method since we do not have the ability to exercise significant influence over operations. We monitor these investments for other than temporary impairment by considering current factors including economic environment, market conditions, operational performance and other specific factors relating to the business underlying the investment, and record reductions in carrying values when necessary. Based on non-observable data received from these non-publicly held companies, we have determined that the fair value of these investments is $0 as of December 31, 2009 and 2008. The Company recorded an impairment charge of $800,000 in the fourth quarter of 2008.

We have in the past and may in the future sell publicly traded equity securities that we do not own in anticipation of declines in the fair market values of the securities. When we sell securities that we do not own, we must borrow the securities we sold in order to deliver them and settle the trades. Thereafter, we must buy the securities and deliver them to the lender of the securities. Our potential for loss on these transactions is unlimited since the value of the underlying security can keep increasing which could have a material adverse effect on the Company's consolidated financial statements.  At December 31, 2009 and 2008, we had not sold any securities that we did not own.

Although a portion of the Company's cash is typically invested in securities, the Company has pursued an acquisition strategy that would, if successfully executed, eliminate any risk of it being deemed to be an investment company.

8

*Index*

**Risks related to investments in other companies**

**The value of our business may fluctuate because of companies that we may invest in.**

The value of our business may fluctuate because of companies that we may invest in. These companies may be development stage or privately held companies for which no public market exists for their stock. The valuations of our investments in privately held companies that we may invest in are indeterminate prior to their public offerings, and there can be no assurance that these offerings will occur since they will be dependent upon the development of these businesses, market conditions and other conditions over which we may have no control.

**Capital and management resources**

There will be a number of special issues that we will have to address for investment in start-up companies, including: the diversion of management attention in connection with both negotiating and overseeing these transactions; the potential issuance of additional shares of our Common Stock in connection with these transactions, which could dilute the rights of existing shareholders, and the need to incur additional debt in connection with these transactions. In addition, many, if not all, of these start-up companies will face the same, or similar, risks as we face in our own business.

**Managing growth**

Successful implementation of our business plan will require the management of growth. We cannot assure you that our existing operations and infrastructure will be adequate to manage such growth, or that any steps taken to improve such systems and controls will be sufficient. Our future success will depend in part upon attracting and retaining the services of current management and technical personnel. We cannot assure you that we will be successful in attracting, assimilating and retaining new personnel in the future as future growth takes place.

**Risks related to medical device companies**

**Risks related to government regulation and future regulatory requirements**

Medical devices such as ours are subject to strict regulation by state and federal authorities, including the Food and Drug Administration and comparable authorities in certain states.

Manufacturers of medical devices are required to comply with very specific rules and regulations concerning the testing, manufacturing, packaging, labeling and marketing of medical devices. Failure to comply with applicable regulatory requirements could result in, among other things, civil and criminal fines, product recalls, detentions, seizures, injunctions and criminal prosecutions.

In addition, these regulations are subject to future change. We cannot predict what material impact, if any, these changes might have on our business. Future changes in regulations or enforcement policies could impose more stringent requirements on us, compliance with which could adversely affect our business.

**Potential product recalls**

In the event that any of our products prove to be defective, we could voluntarily recall, or the FDA could require us to redesign or implement a recall of, any defective product. There is a possibility that we may recall products in the future and that future recalls could result in significant costs to us and in significant negative publicity which could harm our ability to market our products in the future.

**We could be exposed to significant liability claims.**

EXPERTREQ-000658

We could be exposed to significant liability claims if we are unable to obtain adequate insurance at acceptable costs and adequate levels or otherwise protect ourselves against potential product liability claims.

The testing, manufacture, marketing and sale of medical devices involve the inherent risk of liability claims. A successful product liability claim could affect or prevent commercialization of our medical devices, or cause a significant financial burden on us, or both, and could have a material adverse effect on our business, financial condition, and ability to market our medical devices.

**Health care providers may not be able to obtain adequate levels of third-party reimbursement.**

The success of our product may depend on the ability of health care providers to obtain adequate levels of third-party reimbursement. The amount of reimbursement available may vary. The cost of medical care is funded, in substantial part, by government insurance programs, such as Medicare and Medicaid, and private and corporate health insurance plans. Third-party payers may deny reimbursement at adequate levels if they determine that a prescribed device or diagnostic procedure is not used in accordance with cost-effective treatment methods as determined by the payer, or is experimental, unnecessary or inappropriate. The inadequacy of the reimbursement may have a material adverse effect on our business.

9

**The medical device industry is characterized by rapid technological changes and advances.**

Although the Company believes that its products are technologically current, the development of new technologies or refinements of existing ones by the Company's competitors could at any time make the Company's existing products technologically or economically obsolete. Although the Company is not aware of any pending technological developments that would be likely to materially and adversely affect its business or financial position, there can be no assurance that such developments will not occur at any time.

**We may rely on third parties to support the manufacture or commercialization of our products.**

We may rely on third parties, and possibly single third parties, to manufacture or commercialize our products. Third parties may not perform their obligations as expected. The amount and timing of resources that third parties devote to manufacturing or commercializing our product may not be within our control. The third party on whom we rely to commercialize our products may not be able to recruit and retain skilled sales representatives.

Furthermore, our interests may differ from those of the third party that manufacture or commercializes our products. Disagreements that may arise with the third party could limit the manufacture or commercialization of our products, or result in litigation or arbitration, which would be time-consuming, distracting and expensive. If the third party that supports the manufacture or commercialization of our products breaches or terminates its agreement with us, or fails to conduct its activities in a timely manner, such breach, termination or failure could result in the disruption of our business and could have a material adverse effect on our results of operations.

**ITEM 1B.    UNRESOLVED STAFF COMMENTS**

None.

**ITEM 2.    PROPERTIES**

Information on our major locations at December 31, 2009 is presented below:

| Location | Use | Square footage | Lease expiration | Renewal options |
|---|---|---|---|---|
| Princeton, NJ | Administrative and research (1) | 2,500 | 2010 | Month to Month |
| Stamford, CT | Administrative (1) | 850 | 2009 | Month to Month |
| Germantown, MD | Administrative and research (2) | 1,500 | 2010 | Month to Month |

(1) Zargis
(2) DDC

**ITEM 3.    LEGAL PROCEEDINGS**

*Withholding Tax Dispute*

On March 30, 2004, the Company entered into an Employment Agreement with Mr. Shant S. Hovnanian, effective as of April 25, 2002 (the "Employment Agreement"), providing for Mr. Hovnanian's employment as President and Chief Executive Officer of the Company. The Employment Agreement provided that Mr. Hovnanian was to be paid an annual salary. The Employment Agreement separately provided for Mr. Hovnanian to receive a contingent payment equal to 20% of the net proceeds (after legal and other expenses) realized by the Company from a Technology Rights Agreement dispute against Western International Communications and certain related claims. The Company reached a $15 million settlement of this claim in February 2004, resulting in a contingent payment of approximately $2.8 million, which was paid to an entity that Mr. Hovnanian controlled.

On January 22, 2009, the Internal Revenue Service (the "IRS") issued a "30-day letter" to the Company asserting that withholding income tax was due to the IRS in connection with this payment, plus interest and penalties, which totaled approximately $1.3 million ("Claim"). Thereafter, on February 23, 2009, the IRS issued notice of its intention to levy in respect of these claims. The Company appealed the IRS proposed tax adjustment and while the appeals process was underway, any related IRS levy had been stayed. The Company set aside sufficient cash to satisfy the Claim and other potential obligations that might have arisen with respect to this issue. The Company established a reserve of $1.3 million in accrued expenses and recorded a charge to selling, general and administrative expenses for this claim at December 31, 2008.

10

In December of 2009 the Company and the IRS reached an agreement in which the Company paid the IRS approximately $117,000 in full settlement of this matter. Accordingly, the Company reversed its $1.3 million reserve in accrued expenses and recorded a credit of approximately $1.2 million to the consolidated statement of operations in the year ended December 31, 2009.

EXPERTREQ-000659

**ITEM 4.  SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS**

At our Annual Meeting of shareholders held on December 17, 2009, we submitted the following matters to a vote of its shareholders, all of which were approved:

1. Election of Directors:

| Name of Director | Votes For | Votes Withheld |
|---|---|---|
| Shant S. Hovnanian | 3,010,943 | 125,846 |
| Vahak S. Hovnanian | 3,031,878 | 104,911 |
| William F. Leimkuhler | 3,059,543 | 77,246 |
| Jeffrey Najarian | 3,059,618 | 77,171 |
| Stephen X. Graham | 3,070,395 | 66,394 |

2. Ratification of Amper, Politziner & Mattia, LLP as the Company's registered public accounting firm:

| Votes For | Votes Against | Abstentions |
|---|---|---|
| 3,022,632 | 67,903 | 46,254 |

3. To approve an amendment to the Company's 2005 Stock Incentive Plan to increase the number of shares of common stock available for issuance by 150,000 from 319,842 to 469,842 shares, as adjusted.

| For | Votes Against | Abstentions |
|---|---|---|
| 1,585,906 | 144,186 | 5,032 |

11

*Index*

## PART II

**ITEM 5.  MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our Common Stock is listed for quotation on the Nasdaq Stock Market and trades under the symbol "SPDE (/Ticker/SPDE)." The following table sets forth high and low trade prices for the Common Stock for the fiscal quarters indicated.

| | High Sale | | Low Sale | |
|---|---|---|---|---|
| **2009** | | | | |
| First quarter | $ | 0.63 | $ | 0.27 |
| Second quarter | | 0.56 | | 0.32 |
| Third quarter | | 8.83 | | 0.50 |
| Fourth quarter | | 6.80 | | 2.50 |
| **2008** | | | | |
| First quarter | $ | 2.00 | $ | 1.22 |
| Second quarter | | 3.25 | | 1.01 |
| Third quarter | | 1.40 | | 0.25 |
| Fourth quarter | | 1.17 | | 0.28 |

On several occasions in the past, we were not in compliance with the Marketplace Rules of the Nasdaq Stock Market ("Nasdaq"), which require listed companies to maintain a closing bid price equal to or greater than $1.00.

In December 2008, the Company received written notification from Nasdaq that it no longer complied with Nasdaq's audit committee and independent director requirements under Marketplace Rules. Accordingly, in November 2009 the Company added an independent director who will serve on the audit committee, which brought the Company in full compliance with this requirement.

In addition, the Company failed to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2008, as well as its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2009 and June 30, 2009. Nasdaq advised the Company that it did not comply with Nasdaq's Marketplace Rule 5250(c)(1) since it had not filed its Form 10-Q for the period ended June 30, 2009. On August 12th, 2009, the Company announced that it received approval from Nasdaq for the plan the Company submitted to Nasdaq on June 15, 2009 for regaining compliance with Nasdaq filing requirements set forth in Marketplace Rule 5250(c)(1) (the "Rule"). As a result, Nasdaq granted the Company a time extension to comply with the filing requirements set forth in the Rule. The extension allowed the Company to regain full compliance with the applicable Nasdaq filing requirements, and for the Company to maintain its securities listing, provided that the Company filed its Form 10-K for the year ended December 31, 2008, its Form 10-Q for the period ended March 31, 2009, and its 10Q for the period ended June 30, 2009, as required by the Rule, no later than October 13th, 2009. Subsequently, the Company succeeded in filing its Form 10-K for the year ended December 31, 2008, and its 10-Q for the periods ending March 31, 2009 and June 30, 2009, on October 13, 2009, at which time the Company was in compliance with Marketplace Rule 5250(c)(1).

On January 28, 2010 the Company received written notification from Nasdaq informing the Company that it did not meet the terms of the extension granted to the Company on December 11, 2009 to comply with the stockholders' equity requirement of Marketplace Listing Rule 5550(b) (the "Rule") which requires the Company to maintain either (1) a minimum of $2.5 million in stockholders' equity; (2) market value of listed securities of $35 million; or (3) net income from continuing operations of $500,000 in the most recently completed fiscal year or two of the last three most recently completed fiscal years. On February 2, 2010, the Company submitted an appeal by requesting a hearing with the Nasdaq Hearings Panel. As a result, a hearing was held on March 11, 2010, at which time the Panel requested additional information from the Company regarding its plan for regaining and sustaining compliance with the Rule. The Panel generally issues a decision within 30 to 45 days following a hearing. While the Panel has the authority to grant the Company up to 180 days from January 28, 2010 to regain compliance with the Rule, there can be no assurance that the Panel will grant the Company's request for continued listing. The Company's securities will continue to be listed on Nasdaq during this appeal process. On January 27, 2010 the Company engaged Morgan Joseph & Company, Inc., a full service investment bank to evaluate strategic alternatives available to maximize shareholder value with respect to Speedus' Zargis subsidiary.

On March 18, 2010, the closing trade price of our common stock was $3.01 per share. As of December 31, 2009, there were approximately 200 shareholders and, to the best of our belief, approximately 2,500 beneficial owners of our common stock. During the year ended December 31, 2009, we did not make any sales of securities that were not registered under the Securities Act of 1933, as amended.

EXPERTREQ-000660

12

Index

We have never declared or paid any cash dividends on our common stock and do not intend to declare or pay cash dividends on the common stock at any time in the foreseeable future. Future earnings, if any, will be used for the expansion of our business.

**Issuer Purchases of Equity Securities**

The Company made no repurchases of its securities in the quarter ended December 31, 2009.

**Equity Compensation Plans**

Information regarding our Common Stock authorized for issuance under equity compensation plans is included in Item 11 of this Form 10-K.

**ITEM 6.    SELECTED CONSOLIDATED FINANCIAL DATA**

A smaller reporting company is not required to provide the information required by this Item.

13

Index

**ITEM 7.    MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*Overview*

Speedus Corp. ("Speedus" or the "Company") operates primarily through its two majority-owned subsidiaries Zargis Medical Corp. ("Zargis") and Density Dynamics Corp. ("DDC").

In 2001 we co-invested with Siemens Corporate Research, Inc., a subsidiary of Siemens Corporation, in Zargis Medical Corp. to develop advanced diagnostic decision support products and services for primary care physicians, pediatricians, cardiologists and other healthcare professionals.  In March of 2008 we acquired a majority interest in Density Dynamics Corporation, a company breaking new ground in the development of DRAM based, energy efficient, sold-state drives ("SSD") with I/O acceleration technology.  For additional information on each of these business segments and our other assets and operations, see the discussions below and "Notes to Consolidated Financial Statements — Note 10, Business Segment Information -'Zargis'".

*Zargis*

Zargis is a medical device company focused on improving health outcomes and cost effectiveness through the development of computer-aided medical devices and telemedicine based delivery systems.  Zargis was formed in 2001 when we co-invested with Siemens Corporate Research, Inc., a subsidiary of Siemens Corporation.  As part of this transaction, Siemens contributed certain intellectual property including a core technology used in the Zargis Cardioscan™ device (Cardioscan).

Cardioscan is a non-invasive, diagnostic support solution that automatically analyzes acoustical data from a patient to determine whether or not the patient possesses a suspected diastolic or systolic murmur and whether or not they present a Class I indication for echocardiography referral. Heart murmurs can be a sign of serious types of valvular or other heart disease. Zargis' patented technology utilizes advanced signal processing algorithms deployed on a standard pc computer platform. Cardioscan received its initial FDA clearance in May 2004 and received its most recent clearance for Cardioscan in February, 2009. Cardioscan is fully integrated with the ZargisTelemed™ portal is also cleared for marketing in Australia, Canada, India, Singapore, South Africa and 31 European states.

In September of 2009, Zargis also announced FDA clearance to market its Signal X6™ device.  Signal X6 is noninvasive and simultaneously records heart and lung sounds from six adhesive acoustic sensors. The recordings can be evaluated locally or, for locations where a cardiac specialist is not immediately available for consultation, transmitted through the Internet for remote evaluation. The sensors are adhesive, rather than handheld, which may reduce motion noise and increases clarity when compared to handheld stethoscopes.  Zargis initially released Signal X6 in August 2009, when 510(k) clearance for the device was received.

In addition to the development of Cardioscan, Signal X6 and Zargis Telemed, Zargis has been awarded several contracts by the U.S. Army, most recently in October of 2008, to develop prototype versions of telemedicine systems for use in cardiology. These systems record, synchronize and analyze heart sounds, lung sounds and ECG signals in pediatric patients who are being cared for by remote military treatment facilities. The systems have been fully integrated with an existing Army telehealth platform.

Demand for medical systems designed to remotely project the expertise of cardiologists and other medical specialists is growing within both military and civilian environments worldwide and it is for this reason that Zargis has identified the field of telemedicine as a key focus area for product commercialization.

In February 2003, we acquired a controlling interest in Zargis of approximately 63%. At December 31, 2009, as a result of continued investment, our primary equity ownership interest was approximately 90%.

In October 2007, Zargis and the 3M Company entered into an exclusive multi-year marketing alliance involving Zargis' heart sound analysis software and 3M Littmann's next-generation electronic stethoscope. Under the agreement, Zargis supported 3M in its efforts to develop a next-generation stethoscope that is compatible with Zargis' heart sound analysis software. In addition, the alliance provides Zargis with a wide-range of marketing and promotional opportunities along with exclusive rights to sell its heart sound analysis software through the global distribution network of the Littmann brand. The agreement with 3M, based on the total number of Zargis fully diluted shares as of the agreement date, grants 3M a 5% equity position in Zargis following the first sale of Zargis' software through the 3M distribution channel (which occurred in August of 2009) as an access and exclusivity fee and an additional 5% equity in Zargis in the event that other conditions are met. The agreement also entitles 3M to a royalty payment based on sales of certain Zargis products and a seat on the Zargis Board of Directors.

14

Index

*Density Dynamics*

EXPERTREQ-000661

In March 2008, we obtained approximately a 75% equity interest in DDC. DDC is a newly formed company that was created to acquire the technology, assets and some of the operations of a developer and marketer of ultra-high speed storage systems for server networks and other applications.

DDC is continuing development of its line of environmentally friendly DRAM based solid-state storage and I/O acceleration technology. The Jet.io RamFlash and DramJet Solid State Drives are built in a standard 3.5" drive format. These drives are the core components for DDC high performance storage products. In January 2010, DDC launched its JetX10 acceleration appliance and its JetPod and JetNode expansion chassis which integrate the Jet.io Solid State Drives to deliver the highest performance and greatly reduces complexity, space requirements and power consumption in traditional storage solutions. All DDC products are designed for enterprise and cloud computing environments which demand the highest performance, durability and lowest power consumption.

**Other Business Activities**

*F&B Gudtfood*

In October 2008 we transferred the operations and liabilities of the remaining F&B restaurant store in to an unrelated third party for no consideration. We have reflected the accounts of F&B as a discontinued operation in our consolidated financial statements for the period ending December 31, 2008.

*Local Multipoint Distribution Service (LMDS) License*

We have an FCC commercial operating license which covers between 150 – 300 MHz of spectrum in the New York City area. The license has been renewed through February 1, 2016 conditioned upon demonstrating to the FCC by June 1, 2012 that we are providing "substantial service." As of December 31, 2009 the Company had not demonstrated to the FCC that it was providing "substantial service"; however, the Company expects it will demonstrate to the FCC that it is providing this "substantial service" by June 1, 2012.

*Internet initiatives*

In the fourth quarter of 2008, we ceased allocation of any material resources to our portfolio of internet initiatives, which included NetfreeUs, Wibiki, Adchooser and iMarklet.

*Other investments*

We have invested a portion of our assets in a portfolio of marketable securities consisting of publicly traded equity securities. We have in the past and may in the future sell publicly traded equity securities we do not own in anticipation of declines in the fair market values of these securities. As of December 31, 2009, we had not sold any securities that we did not own.

We have also invested a portion of our assets in equity and debt instruments of non-publicly held companies. The Company monitors these investments for other than temporary impairment by considering current factors including economic environment, market conditions, operational performance and other specific factors relating to the business underlying the investment(s). The Company determined that based on the current general negative economic and liquidity environment affecting the ability of businesses to obtain credit and to raise money in the capital markets, and based on specific unobserved data received from the underlying entities indicating severe operational and liquidity problems, there was significant doubt as to whether these entities will be able to continue to operate as going concerns. Therefore, during the fourth quarter of 2008 the Company made an impairment charge of $800,000 against these assets reducing the fair value of these non-public investments to zero as of December 31, 2008.

**Critical Accounting Policies**

*General*

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements. The preparation of those financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the financial statements and the reported amounts of operating revenues and expenses during the reporting periods. Actual results could differ from those estimates. For a description of all of our accounting policies, see Note 2 to our consolidated financial statements included in this Form 10-K. However, we believe the following critical accounting policies affect the more significant judgments and estimates used in the preparation of our consolidated financial statements.

*Financial instruments*

Our financial instruments consist primarily of cash equivalents and marketable securities. The carrying value of cash equivalents approximates market value since these highly liquid, interest earning investments are invested in money market funds. Marketable securities consist of publicly traded equity securities classified as trading securities and are recorded at fair market value, i.e., closing prices quoted on established securities markets. Significant changes in the market value of securities that we invest in could have a material impact on our financial position and results of operations.

15

*Long-lived assets*

Long-lived assets, including fixed assets and other intangibles, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of any such asset may not be recoverable through estimated future cash flows from that asset. The estimate of cash flow is based upon, among other things, certain assumptions about expected future operating performance.

*Share-Based Payments*

The Company accounts for stock options under FASB ASC 718-10-10, "Share-Based Payment".  Under this method, the Company records compensation cost based upon the fair value of those awards on the grant date over the service period of each award on a straight line basis.

The Company accounts for stock and stock options granted to non-employees on a fair value basis in accordance with FASB ASC 505-50-30, "Equity Based Payments to Non-Employees." Any stock or stock options issued to non-employees are recorded in the consolidated financial statements using the fair value method and then amortized to expense over the applicable service periods.

The fair value of the awards on the grant date is estimated using a Black-Scholes option pricing model. Assumptions utilized in the model for Speedus, Zargis, and DDC are evaluated and revised, as necessary, to reflect market conditions and experience. Expected volatility has been calculated based on the historical volatility of the Company's stock over the period commensurate with the expected term of the option. The expected term represents the period of time that options granted are expected to be outstanding and is estimated based on historical option exercise experience. The risk-free interest rates are equivalent to the U.S. Treasury yield in effect at the time of grant for the estimated life of the option grant. Estimated forfeiture rates based on historical experience.

EXPERTREQ-000662

*Contingencies*

We account for contingencies in accordance with Statement of FASB ASC 450-10-05, "Accounting for Contingencies". This ASC requires that we record an estimated loss when information available prior to issuance of our financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements and the amount of the loss can be reasonably estimated. Accounting for contingencies such as environmental, legal and income tax matters requires us to use our judgment. While we believe that our accruals for these matters are adequate, if the actual loss is significantly different than the estimated loss, our results of operations will be affected in the period that the difference is known.

16

Index
**Results of Operations**

*Year Ended December 31, 2009 Compared to Year Ended December 31, 2008*

Revenues increased approximately $305,000 from $156,000 to approximately $461,000 for the year ended December 31, 2009. The increase in revenues was primarily related to a new service contract completed by Zargis during 2009. In addition, DDC recognized revenue of approximately $51,000 during the year ended December 31, 2009 compared to $0 revenue in the year ended December 31, 2008.

Cost of sales increased approximately $136,000 from approximately $30,000 in the year ended December 31, 2008 to approximately $166,000 in the year ended December 31, 2009. Approximately $85,000 of this increase was an access and exclusivity fee relating to a 5% equity position in Zargis granted to 3M Company following the first sale of Zargis' software through the 3M distribution channel (which occurred in August of 2009). Approximately $73,000 of this increase in cost of sales was related to the increase of contracted labor and material costs associated with the increase of approximately $305,000 in revenue primarily in the Zargis segment.

Selling, general and administrative expenses decreased approximately $503,000 from approximately $3,731,000 for the year ended December 31, 2008 to approximately $3,228,000 for the year ended December 31, 2009. This decrease is primarily a result of a decrease in legal expenses relating to litigating patent infringement claims of approximately $525,000, a reduction in payroll related expenses of approximately $160,000 and a reduction of rent expense of approximately $96,000 in the corporate segment. In the Zargis segment there was an increase of approximately $107,000 in bad debt expense and a reduction in bonus expense of approximately $45,000. There was also a net increase in the DDC segment of approximately $86,000 in payroll related and other related expenses relating to a full year of operations in 2009 compared to only ten months of activity in the year ended December 31, 2008 since the March 5, 2008 date of acquisition. Also the Company increased stock compensation expense by approximately $128,000 in the year ended December 31, 2009 compared to the year ended December 31, 2008.

Research and development expenses decreased approximately $1,180,000 from approximately $2,926,000 for the year ended December 31, 2008 to approximately $1,746,000 for the year ended December 31, 2009. This decrease is primarily a result of the curtailment of spending on the Internet Initiative of approximately $420,000 in the corporate segment, a decrease in development spending in the Zargis segment of approximately $120,000 and a decrease of development spending of approximately $635,000 in the DDC segment.

Withholding tax provision decreased from approximately $1,300,000 in the year ended December 31, 2008 to a credit of approximately $1,183,000 in the year ended December 31, 2009. This change of approximately $2,483,000 was related to the settlement of withholding tax matter with the IRS in December 2009. See below for additional information on this matter.

Depreciation and amortization decreased approximately $59,000 from approximately $84,000 for the year ended December 31, 2008 to approximately $25,000 for the year ended December 31, 2009. This decrease is primarily a result of the amortization of approximately $62,000 of intangible assets in the DDC segment during the year ended December 31, 2008 prior to being written off as impaired in the fourth quarter of 2008. No amortization expense was incurred in the year ended December 31, 2009. This was offset by an increase of approximately $6,000 in depreciation, also in the DDC segment, and a reduction of approximately $3,000 as a result of assets becoming fully depreciated in the Zargis segment.

Investment income decreased approximately $189,000 from a net gain of approximately $353,000 for the year ended December 31, 2008 to a net gain of approximately $164,000 for the year ended December 31, 2009. Net interest income decreased approximately $176,000 from approximately $187,000 in the year ended December 31, 2008 to approximately $11,000 for the year ended December 31, 2009. These reductions in investment income and interest income are primarily related to a reduction in the amount of capital available for investment purposes during the year ended December 31, 2009. Other income decreased approximately $3,000 from $0 in the year ended December 31, 2008 to approximately $3,000 for the year ended December 31, 2009. This increase in other income was related to sale of a domain name during the year ended December 31, 2009. Net interest expense increased approximately $45,000 from approximately $51,000 for the year ended December 31, 2008 to approximately $96,000 for the year ended December 31, 2009. This net increase in interest expense is due to interest and dividends of approximately $45,000 relating to a convertible note issued to a minority owner in 2008. These investment income amounts will fluctuate based upon changes in the market value of the underlying investments, overall market conditions and the amount of funds available for short-term investment and are not necessarily indicative of the results that may be expected for any future periods.

*Non Recurring Charges*

<u>Withholding Tax Provision</u>

On January 22, 2009, the Internal Revenue Service (the "IRS") issued a "30-day letter" to the Company asserting that withholding income tax was due to the IRS in connection with this payment, plus interest and penalties, which totaled approximately $1.3 million ("Claim"). Thereafter, on February 23, 2009, the IRS issued notice of its intention to levy in respect of these claims. The Company appealed the IRS proposed tax adjustment and while the appeals process was underway, any related IRS levy had been stayed. The Company set aside sufficient cash to satisfy the Claim and other potential obligations that might have arisen with respect to this issue. The Company established a reserve of $1.3 million in accrued expenses and recorded a charge to the consolidated statement of operations for this claim at December 31, 2008.

17

Index

In December of 2009 the Company and the IRS reached an agreement in which the Company paid the IRS approximately $117,000 in full settlement of this matter. The Company reversed the $1.3 million reserve in accrued expenses and recorded a credit of approximately $1.2 million to the consolidated statement of operations in the year ended December 31, 2009.

<u>Non-public Company Investment Impairment.</u>

We have invested a portion of our assets in equity and debt instruments of non-publicly held companies. The Company monitors these investments for other than temporary impairment by considering current factors including economic environment, market conditions, operational performance and other specific factors relating to the business underlying the investment(s). The Company determined that based on the current general negative economic and liquidity environment affecting the ability of businesses to obtain credit and to raise money in the capital markets, and based on specific unobserved data received from the underlying entities indicating severe operational and liquidity problems, there was significant doubt as to whether these entities will be able to continue to

EXPERTREQ-000663

Case 3:18-cv-15099-RK-JBD   Document 123-18   Filed 05/13/22   Page 12 of 39 PageID: 5463

operate as going concerns. Therefore, during the fourth quarter of 2008 the Company recorded an impairment charge of $800,000 against these assets reducing the fair value of these non-public investments to zero as of December 31, 2008.

<u>Intellectual Property Impairment.</u>

The Company's acquisition of DDC included certain intangible assets which had a carrying value of $0.5 million at December 31, 2008, before adjustment. However, during the fourth quarter of 2008, in light of market conditions affecting the ability of this business to obtain credit and to raise money in the capital markets and, our ability to fund this operation and generate sufficient cash to fully realize these assets, the realization of these assets became uncertain. As a result, during the fourth quarter, we recognized an impairment loss in the amount of approximately $0.5 million.

**Liquidity and Capital Resources**

We have recorded operating losses and negative operating cash flows since our inception and have limited revenues. At December 31, 2009, we had an accumulated deficit of approximately $86.0 million. We do not expect to have earnings from operations or positive operating cash flow until such time as our strategic investments achieve successful implementation of their business plans and/or form alliances for the use of our capabilities in the future.

We may not have funds sufficient to finance our operations and enable us to meet our financial obligations for the next twelve months. There can be no assurances that we will be able to consummate any capital raising transactions, particularly in view of current economic conditions. On January 27, 2010 the Company engaged Morgan Joseph & Company, Inc., a full service investment bank, to evaluate strategic alternatives available to maximize shareholder value with respect to its Zargis subsidiary. The inability to generate future cash flow or raise funds to finance our strategic investments could have a material adverse effect on our ability to achieve our business objectives. The report of our independent registered public accounting firm for the fiscal year ended December 31, 2009 contains an explanatory paragraph which states that there is substantial doubt about our ability to continue as a going concern.

If we are not able to reduce or defer our expenditures, secure additional sources of revenue or otherwise secure additional funding, we may be unable to continue as a going concern, and we may be forced to restructure or significantly curtail our operations, file for bankruptcy or cease operations. In addition, a bankruptcy filing by one or more of our strategic investments could cause us to lose our investment and/or control and could prevent us from sharing in any future success of those strategic investments. The accompanying financial statements do not include any adjustments relating to the recoverability of the carrying amount of recorded assets or the amount of liabilities that might result should the Company be unable to continue as a going concern. Should we be successful in securing the necessary capital to continue our operations, it is likely that such arrangements would result in significant dilution to each shareholder's ownership interest in the Company.

Net cash used in operating activities was approximately $4,400,000 for the year ended December 31, 2009 compared to approximately $6,070,000 for the year ended December 31, 2008. This net decrease in cash used in operating activities of approximately $1,670,000 is primarily the result of an improvement in the net loss of approximately $5,762,000, an improvement of approximately $260,000 in non-cash expenses which are offset by negative cash flows of approximately $1,318,000 in impairments and negative changes in operating assets and liabilities of approximately $3,034,000 from 2008.

18

Net cash used in investing activities was approximately $1,764,000 for the year ended December 31, 2009 compared to net cash provided by investing activities of approximately $2,984,000 for the year ended December 31, 2008. This net increase in cash used in investing activities of approximately $4,748,000 is primarily the result of the purchase of United States Treasury Bills of approximately $1,750,000 in 2009 compared the maturation of United States Treasury Bills of approximately $2,997,000 in 2008.

Net cash provided from financing activities was approximately $307,000 for the year ended December 31, 2009 compared to net cash provided by financing activities of approximately $248,000 for the year ended December 31, 2008. This net increase in cash provided by financing activities of approximately $59,000 is a result of an increase in proceeds from the exercise of stock options of approximately $132,000 received in the year ended December 31, 2009, a reduction in preferred stock redemptions of approximately $100,000 and the repurchase of treasury stock of approximately $52,000, offset by a reduction by a minority investor in convertible note financing of approximately $150,000 and a reduction of capital contribution of approximately $75,000.

At December 31, 2009, the Company's future minimum lease payments due under non-cancelable leases aggregated approximately $20,000. These minimum future lease payments are due during the year ending December 31, 2010. In addition, in connection with a license agreement to which the Company is a party, a termination payment will be payable by the Company in the amount of $200,000 if the license agreement is terminated by the Company before September 1, 2011.

On March 5, 2008, the Company acquired a 75% interest in DDC, a newly formed company that was created to acquire the technology, assets and some of the operations of a developer and marketer of ultra-high speed storage systems for server networks and other applications. The acquisition price was $1,000,000. In exchange, the Company received $1,000,000 of redeemable preferred stock from DDC, which has been eliminated in consolidation.

This acquisition was accounted for using the purchase method of accounting. The results of operations of DDC have been included in the consolidated statements of operations from the date of acquisition. The fair value of the net assets acquired as of the acquisition date has been allocated: $195,000 to current assets, $34,000 to noncurrent assets, $580,000 to other intangible assets and $809,000 to liabilities. The $580,000 allocated as an intangible asset (reflecting intellectual property assets of DDC) was being amortized over a period of seven years until written off in the fourth quarter of 2008.

In connection with the acquisition, DDC issued $809,400 of redeemable preferred stock to the 25% owner, $100,000 of which was redeemed at the time of closing. The redeemable preferred stock accrues dividends equal to 8% of the original purchase price of $10 per share (the "Original Purchase Price"). The redeemable preferred stock will be redeemed for the Original Purchase Price plus accrued and unpaid dividends as follows: $120,000 during the year ended December 31, 2009, $50,000 out of a future financing by the Company, 50% out of the cash flow of DDC as defined, and to the extent that any redeemable preferred shares remain outstanding, the balance will be redeemed in 2013. The holders of the redeemable preferred stock have not issued a call for redemption and no redeemable preferred stock was redeemed in the year ended December 31, 2009 or as of the date of this report. On March 25, 2010, the holders of the redeemable preferred shares agreed to defer all obligations of DDC to redeem or make payments to the holders until April 1, 2011. The Company has reflected this redeemable preferred stock as a liability on its December 31, 2009 and 2008 consolidated balance sheets. For the years ended December 31, 2009 and 2008, the accrued dividends on this redeemable preferred stock of approximately $57,000 and $47,000, respectively has been recorded as interest expense on the Company's consolidated statements of operations.

In July 2008, DDC sold 300,000 shares of its common stock for a price of $1.00 per share. 225,000 shares were sold to Speedus and 75,000 shares were sold to a noncontrolling interest of DDC. The investment by Speedus has been eliminated in consolidation. The investment by the noncontrolling interest has been reflected in additional paid-in-capital during the year ended December 31, 2008. In connection with this sale of stock, DDC issued seven year warrants to purchase 56,250 and 18,750 shares of DDC common stock to Speedus and the noncontrolling interest, respectively, with an exercise price of $1.00 per share.

In October 2008, DDC sold $500,000 in 8% convertible notes, in the amounts of $250,000 to each of the Company and the noncontrolling interest. In December 2008, DDC agreed to sell an additional $500,000 in 8% convertible notes, in the amounts of $250,000 to each of the Company and the noncontrolling interest. At December 31, 2008, $75,000 had been advanced by each of the Company and the noncontrolling interest. In 2009, the remaining balance of $175,000 was advanced by each of the Company and the noncontrolling interest. The aggregate amount under the notes was due December 31, 2009 unless otherwise converted in connection with any financings completed by DDC. The holders of the notes have not issued a call for repayment of the loans and the loan was not repaid during the year ended December 31, 2009 or as of the date of this report. On March 25, 2010, the holders of the notes agreed to defer any and all obligations of the Company until April 1,

EXPERT REG 000864

1, 2011. The loan by the Company has been eliminated in consolidation. For the years ended December 31, 2009 and 2008, accrued interest on the convertible notes to the noncontrolling interest of approximately $40,000 and $4,000, respectively has been recorded as interest expense on the Company's consolidated statements of operations.

19

*Index*

We have invested a portion of our assets in a portfolio of marketable securities consisting of publicly traded equity securities. We purchase these securities in anticipation of increases in the fair market values of the securities. We have in the past and may in the future sell publicly traded equity securities we do not own in anticipation of declines in the fair market values of these securities. When we sell securities that we do not own, we must borrow the securities we sold in order to deliver them and settle the trades. Thereafter, we must buy the securities and deliver them to the lender of the securities. Our potential for loss on these transactions is unlimited since the value of the underlying security can keep increasing. At December 31, 2009 and 2008, we had not sold any securities that we did not own.

**Off-Balance Sheet Arrangements**

The Company does not have any off-balance sheet arrangements.

**Recent Accounting Pronouncements**

In June 2009, the Financial Accounting Standards Board ("FASB") issued its final Statement of Financial Accounting Standards ("SFAS") No. 168 – "The FASB Accounting Standards ASC Topic and the Hierarchy of Generally Accepted Accounting Principles a replacement of FASB Statement No. 162". ("SFAS No. 168"). SFAS No. 168 made the FASB Accounting Standards Codification (the "ASC") the single source of U.S. Generally Accepted Accounting Policies ("U.S. GAAP") used by nongovernmental entities in the preparation of financial statements, except for rules and interpretive releases of the SEC under authority of federal securities laws, which are sources of authoritative accounting guidance for SEC registrants. The ASC is meant to simplify user access to all authoritative accounting guidance by reorganizing U.S. GAAP pronouncements into roughly 90 accounting topics within a consistent structure; its purpose is not to create new accounting and reporting guidance. The ASC supersedes all existing non- SEC accounting and reporting standards and was effective for the Company beginning July 1, 2009. Following SFAS No. 168, the Board will not issue new standards in the form of Statements, FASB Staff Positions, or Emerging Issues Task Force Abstracts; instead, it will issue Accounting Standards Updates. The FASB will not consider Accounting Standards Updates as authoritative in their own right; these updates will serve only to update the ASC topic, provide background information about the guidance, and provide the bases for conclusions on the change(s) in the ASC.

In December 2007, the Financial Accounting Standards Board issued FASB ASC 810-10-65, "Noncontrolling Interests in Consolidated Financial Statements-an amendment of ARB ASC 860-10-60. FASB ASC 810-10-65 establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FASB ASC 810-10-65 will become effective as of the beginning of the Company's fiscal year beginning after December 15, 2008. The adoption of FASB ASC 810-10-65 did not have a material impact on the consolidated results of operations and financial condition.

In June 2008, the FASB ratified FASB ASC 815-40-15, "Determining Whether an Instrument (or an Embedded Feature) Is Indexed to an Entity's Own Stock". FASB ASC 815-40-15 provides that an entity should use a two step approach to evaluate whether an equity-linked financial instrument (or embedded feature) is indexed to its own stock, including evaluating the instrument's contingent exercise and settlement provisions. It also clarifies the impact of foreign currency denominated strike prices and market-based employee stock option valuation instruments on the evaluation. FASB ASC 815-40-15 is effective for fiscal years beginning after December 15, 2008. The implementation of this standard did not have a material impact on the Company's consolidated financial position and results of operations.

**ITEM 7A.   QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

A smaller reporting company is not required to provide the information required by this item.

**ITEM 8.    FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

The Consolidated Financial Statements of the Company and related Notes thereto and the financial information required to be filed herewith are included under Item 15 of this Form 10-K.

**ITEM 9.    CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None

20

*Index*

**ITEM 9A(T).    CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls And Procedures**

The Company, under the supervision and with the participation of its management, including the Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of the design and operation of the Company's "disclosure controls and procedures," as such term is defined in Rules 13a-15e and 15d-15e promulgated under the Securities Exchange Act of 1934, as amended, (the "Exchange Act"). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that such Disclosure Controls and Procedures were not effective. The Company did not complete an evaluation of its disclosure controls and procedures in time to file this Form 10-K by its due date. Such controls and procedures are designed to ensure that all material information required to be disclosed by the Company in reports that it files or submits under the Exchange Act is accumulated and communicated as appropriate to allow timely decisions regarding required disclosure and that all such information is recorded, processed, summarized and reported as specified in the rules and forms of the SEC.

EXPERTREQ-000665

**Management's Annual Report on Internal Control over Financial Reporting**

The Company's management is responsible for establishing and maintaining adequate internal control over financial reporting (as such term is defined in Rules 13a-15(f) and I5d-15(f) of the Securities Exchange Act of 1934, as amended). The Company's internal control over financial reporting is designed to provide reasonable assurance to the Company's management and Board of Directors regarding the reliability of financial reporting and the preparation and fair presentation of published financial statements for external purposes in accordance with generally accepted accounting principles in the United States ("GAAP").

The Company's internal control over financial reporting includes those policies and procedures that:

·   pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the Company's transactions and dispositions of the Company's assets;
·   provide reasonable assurance that the Company's transactions are recorded as necessary to permit preparation of the Company's financial statements in accordance with GAAP, and that the Company's receipts and expenditures are being made only in accordance with authorizations of the Company's management and the Company's directors; and
·   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on its financial statements.

Because of its inherent limitations, internal control over financial reporting cannot prevent or detect every potential misstatement. Therefore, even those systems determined to be effective can provide only reasonable assurances with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may decline.

The Company's management conducted an evaluation of the effectiveness of the Company's internal control over financial reporting, based on the framework and criteria established in Internal Control—Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, the Company's management assessed the effectiveness of the Company's internal control over financial reporting for the year ended December 31, 2009 and concluded that such internal control over financial reporting was not effective. This annual report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting.  We were not required to have, nor have we engaged our independent registered public accounting firm to perform, an audit on our internal control over financial reporting pursuant to the rules of the Securities and Exchange Commission that permit us to provide only managements' report in this annual report.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the Company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. In its assessment of the effectiveness of internal control over financial reporting as of December 31, 2009, management identified the following material weaknesses:

·   Timely closing of books and filing of reports
·   Failure to file timely tax returns.  Although we have filed extensions and made payments, where applicable, no income tax returns have been filed since 2005.

The above material weaknesses were identified in the second half of 2009, prior to the filing of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2008, which was not filed until October of 2009. At about that time, the Company hired a financial consultant and appointed a new Chief Financial Officer, and these individuals, along with other members of management, began taking steps to alleviate the material weaknesses that were reported. Although management feels it has made improvements in its controls and procedures over financial reporting, because of the turnover in the finance department, and the significant time spent on researching accounting issues mentioned above, the Company did not have sufficient time or management resources available to adequately test its control procedures. Therefore management cannot assure that the above noted material weaknesses have been completely rectified and saw the need to identify the above weaknesses for the fiscal year ended December 31, 2009.

Largely due to the improvements in the financial systems and internal controls that have been made to date, the Company reported its Form 10-Q for the third quarter of 2009 in a timely fashion and expects to file this Form 10-K prior to the required filing date.  In addition, the Company has engaged Amper Politziner & Mattia LLP to prepare and file all previously unfiled tax returns, and has submitted extension requests and estimated payments for the 2009 tax returns.

**Changes in Internal Control over Financial Reporting.**

With the exception of the changes noted above, there have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2008 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**ITEM 9B.   OTHER INFORMATION**

None.

22

*Index*

**PART III**

**ITEM 10.   DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

**Directors and Executive Officers**

The table below sets forth the names, ages and titles of the persons who were Directors and/or executive officers of the Company as of December 31, 2009.

| Name | Age | Position |
| --- | --- | --- |

EXPERTREQ-000666

| | | |
|---|---|---|
| Shant S. Hovnanian | 50 | Chairman of the Board of Directors, President and Chief Executive Officer |
| Vahak S. Hovnanian | 78 | Director |
| William F. Leimkuhler | 58 | Director |
| Jeffrey Najarian | 51 | Director |
| Stephen X. Graham | 57 | Director |
| John A. Kallassy | 45 | Chief Executive Office - Zargis Treasurer and Chief Financial Officer - Speedus |

Shant S. Hovnanian has served as our Chairman of the Board of Directors, President and Chief Executive Officer since October 1995. From June 1980 until January 1991, Mr. Hovnanian served as Executive Vice President of the V. S. Hovnanian Group (the "Hovnanian Group"), consisting of home building operations, real estate development and utility companies.  In 1995, Mr. Hovnanian served as a U.S. Delegate to the World Radio Conference of the International Telecommunications Union in Geneva, Switzerland.  Mr. Hovnanian is the son of Mr. Vahak S. Hovnanian.

Vahak S. Hovnanian has served as a Director since October 1995. Mr. Hovnanian has been Chairman of the Board and President of the Hovnanian Group since 1968. Mr. Hovnanian is the father of Mr. Shant S. Hovnanian.

William F. Leimkuhler has served as a Director since September 2000. Mr. Leimkuhler is the General Counsel and Director of Business Development of Paice Corporation, a privately held developer of advanced vehicle powertrains.  Mr. Leimkuhler is also a director of Integral Systems, Inc. and U.S. Neurosurgical, Inc. From 1994 through 1999, he held various positions with Allen & Company, a New York investment banking firm, initially serving as the firm's General Counsel.  Prior to that, Mr. Leimkuhler was a corporate partner with the New York law firm of Werbel & Carnelutti (now Heller Ehrman White & McAuliffe).

Jeffrey Najarian has served as a Director since October 2000. Mr. Najarian has been Chief Executive Officer of Starpoint Solutions, Inc., formerly TIS Worldwide, Inc., since its inception in 1992. A creator and founder of Starpoint, he has been instrumental in building one of the country's fastest growing, privately-held companies, as cited by Inc. magazine. From 1984-1992, Mr. Najarian worked at Setford-Shaw-Najarian, a recruiting/placement firm for technology specialists, becoming a partner after only three years. He led the staff in billing, propelling SSN to become a leading search firm for Wall Street banks.

Mr. Stephen X. Graham has served as a Director since November 11, 2009. Mr. Graham is Managing Director of Crosshill Financial Group, Inc., which he founded in 1988, and has been a General Partner of Crosshill Georgetown Capital, L.P. since November 2000 and Crosshill Debt II, L.P. since 2004. Prior to these roles Mr. Graham was a Principal with Kidder Peabody & Co., and held positions with Merrill, Lynch & Co. and Arthur Young & Co. Mr. Graham received a B.A. from Georgetown University and an MBA from the University of Chicago Graduate School Of Business. He is also a board member of NYSE-traded TNS Inc. and several private companies.

John A. Kallassy has served as Executive Vice President since September 2000 and Chief Executive Officer of Zargis Medical Corp. since November 2004. Mr. Kallassy has served in the additional capacity as Treasurer and Chief Financial Officer of Speedus Corp. since August 2009. In addition to developing and executing Zargis' business strategy, Mr. Kallassy is also responsible for evaluating new business investment opportunities at Speedus within several business sectors. Prior to his leadership roles at Speedus and Zargis, Mr. Kallassy was a founder and Chief Executive Officer of American Data Consultants, Inc. (ADC), a firm specializing in information services, direct marketing and marketing research. Mr. Kallassy sold ADC to R.L. Polk in 1997 and continued his employment for three years at R.L. Polk as the ADC division president and later as a corporate vice president where he led the product management and analytical consulting groups for a $100 million business unit that was ultimately sold to Equifax Inc. Mr. Kallassy holds a Bachelor of Science Degree in Biochemistry from the State University of New York which was completed at Leeds University in Leeds, England and earned his MBA from the Johnson School of Management at Cornell University.

23

**Board of Directors and Audit Committee Composition**

In December 2008, the Company received written notification from The Nasdaq Stock Market that it no longer complied with Nasdaq's audit committee and independent director requirements under Marketplace Rules. The Company Complied with this requirement by appointed a new outside director and audit committee member November 11, 2009.

**Audit Committee**

The Audit Committee of the Board currently consists of William F. Leimkuhler (Chairman) , Jeffrey Najarian, and Stephen X. Graham all independent non-employee directors. The Audit Committee has the duties and responsibilities set out in the Audit Committee Charter. Those include: selection and appointment of the independent auditor, review of its independence and of other services provided by it, and of the fees and other arrangements regarding its services; review with the independent auditor and management of the scope of the audit, and of significant financial reporting issues and judgments; review with the independent auditor and management of the annual audited financial statements and of the quarterly financial statements; and review with the independent auditor and management of the quality and adequacy of internal controls. The Board has determined that Mr. Leimkuhler is an "audit committee financial expert" within the meaning of the rules of the Securities and Exchange Commission.

The Audit Committee has adopted a charter which is available in the Investor Relations section of the Company's website at www.speedus.com.

**Audit Committee Report**

Management is responsible for the Company's internal control, consolidated financial statements and the financial reporting process. Amper, Politziner & Mattia, LLP ("Amper") served as the Company's independent public accountants in 2009 and is responsible for expressing an opinion on those consolidated financial statements based upon an audit in accordance with auditing standards generally accepted in the United States of America. The Committee's responsibilities include the monitoring and oversight of these processes.

The Committee has met and held discussions with management and Amper. The Committee has also reviewed and discussed the 2009 quarterly and annual consolidated financial statements with management and Amper. The Committee has also discussed with Amper matters required to be discussed by Statement on Auditing Standards No. 61, "Communication with Audit Committees", issued by the Auditing Standards Board of the American Institute of Certified Public Accountants.

Amper has also provided to the Committee the written disclosures required by Independence Standards Board Standard No. 1, "Independence Discussions with Audit Committees" and the Committee discussed with Amper that firm's independence.

Based upon the Committee's review and discussion of the 2009 annual consolidated financial statements with management and Amper, the Committee recommended to the Board of Directors that the Company's audited 2009 consolidated financial statements be included in the Company's Annual Report on Form 10-K for the year ended December 31, 2009 filed with the Securities and Exchange Commission.

**By the Audit Committee**

EXPERTREQ-000667

of the Board of Directors:

William F. Leimkuhler (Chairman)

Jeffrey Najarian

Stephen X. Graham

**Code of Ethics**

The Company is committed to conducting its business in accordance with applicable laws, rules and regulations and to full and accurate financial disclosure in compliance with applicable law. In order to promote honest and ethical conduct, the Board of Directors has adopted a Code of Business Conduct and Ethics applicable to all Directors, officers, employees and agents of the Company and a Code of Ethics for the Chief Executive Officer and Senior Financial Officers.

The Code of Business Conduct and Ethics and the Code of Ethics for the Chief Executive Officer and Senior Financial Officers are available in the Investor Relations section of the Company's website at www.speedus.com. A copy of either Code may also be obtained without charge by any person upon written request to Speedus Corp., 1 Dag Hammarskjold Blvd, Freehold, New Jersey 07728, Attention: Chief Financial Officer.

**Section 16(a) Beneficial Ownership Reporting Compliance**

The Company's Directors, executive officers and holders of more than 10% of the outstanding Common Stock are required to report their initial ownership of Common Stock and any subsequent changes in that ownership to the Securities and Exchange Commission. Specific due dates for these reports have been established by the Commission and the Company is required to disclose any failure by such persons to file these reports in a timely manner for the 2008 fiscal year. Based solely upon the Company's review of copies of such reports furnished to it, the Company believes that for the 2008 fiscal year its Directors, executive officers and holders of more than 10% of the outstanding Common Stock complied with all reporting requirements of Section 16(a) under the Exchange Act.

24

*Index*

**ITEM 11.   EXECUTIVE COMPENSATION**

**Summary Compensation Table**

The following table sets forth the salary and bonus, as well as certain other compensation, paid or accrued to each of the two most highly compensated executive officers of the Company (the "Named Executive Officers")  for the years ended December 31, 2009, 2008 and 2007  in all capacities in which they served. See "Employment Agreements".

| Name and Principal Position | Year | Salary | Bonus | Stock Awards | Option Awards (1) | Non-Equity Incentive Plan Compensation | Nonqualified Deferred Compensation Earnings | All Other Compensation (2) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Shant S. Hovnanian | 2009 | $ 126,000 | $ --- | $ --- | $ --- | $ --- | $ --- | $ --- | $ 126,000 |
| Chief Executive Officer | 2008 | 275,000 | --- | --- | --- | --- | --- | 75,162 | 350,162 |
| | 2007 | 275,000 | --- | --- | - | --- | --- | 171,526 | 446,526 |
| John A. Kallassy | 2009 | $ 225,000 | $ 32,000 | $ --- | $ 87,000 | $ --- | $ --- | $ --- | $ 344,000 |
| Executive Vice President | 2008 | 225,000 | 7,000 | --- | --- | --- | --- | --- | 232,000 |
| | 2007 | 225,000 | 53,000 | --- | --- | --- | --- | --- | 278,000 |

(1) In determining the aggregate grant date fair value, the stock options were valued using the Black-Scholes option pricing model. For information on the key assumptions used in valuing the options, see "Notes to Consolidated Financial Statements - Note 2, Summary of Significant Accounting Policies - Stock options."

(2) Under the terms of his employment contract, Mr. Hovnanian is entitled to certain benefits. See 'Employment Agreements'. The amount shown in the table above represents the total cost of these items to the Company without adjustment for the portion of these costs allocable to business use by the Company.

**Grants of Plan-Based Awards**

During 2009 a grant of 50,000 options to purchase common stock was and made to John A. Kallassy.  Mr. Kallassy exercised 30,000 of these options in 2009.  There were no grants of options to purchase Common Stock made to Named Executive Officers during 2008.

25

*Index*

**Outstanding Equity Awards at Fiscal Year-End**

The following table sets forth information regarding the outstanding stock option awards held by the Named Executive Officers as of December 31, 2009.

EXPERTREQ-000668

| Name | Number of Securities Underlying Unexercised Options | | Equity Incentive Plan Awards Number of Securities Underlying Unexercised Unearned | Option Exercise | Option Expiration |
| | Exercisable | Unexercisable | Options | Price | Date |
| --- | --- | --- | --- | --- | --- |
| Shant S. Hovnanian | 31,925 | --- | --- | $ 4.00 | 04/03/11 |
| | 62,500 | --- | --- | 4.40 | 04/25/12 |
| | 100,000 | --- | --- | 5.08 | 08/10/16 |
| John Kallassy | 56,250 | --- | --- | 12.00 | 09/05/10 |
| | 28,125 | --- | --- | 4.00 | 04/03/11 |
| | 25,000 | --- | --- | 6.00 | 07/15/05 |
| | 20,000 | --- | --- | 1.94 | 08/14/19 |

For additional information regarding stock options, see "Notes to Consolidated Financial Statements - Note 6. Stockholders' Equity."

**Option Exercises and Stock Vested**

During 2009 a grant of 50,000 options to purchase common stock was made to John A. Kallassy. Mr. Kallassy exercised 30,000 of these options in 2009.

**Compensation Committee**

The Compensation Committee of the Board currently consists of Jeffrey Najarian (Chairman) and William F. Leimkuhler, both independent non-employee directors. The Compensation Committee establishes and administers the Company's policies regarding compensation. In addition, the Compensation Committee, as well as the Board of Directors, administers the Company's Stock Incentive Plan and determines which eligible employees and consultants of the Company may participate in the Plan and the type, extent and terms of the awards to be granted to them.

**Compensation Discussion and Analysis**

The Company's compensation policy for all of its executive officers is formulated and administered by the Compensation Committee of the Board. Compensation of the Company's executive officers, exclusive of the Chief Executive Officer, is developed and approved by the Chief Executive Officer, subject to oversight by the Compensation Committee. Compensation of the Chief Executive Officer is developed and approved by the Compensation Committee. The Compensation Committee, as well as the Board of Directors, also administers the Company's Stock Incentive Plan, under which grants of various stock-based incentives may be made to employees (including executive officers), directors and consultants.

The primary goals of the Company's compensation policy are to attract, retain and motivate skilled executive officers and to provide incentives for them to act in the best interests of the Company's stockholders. In determining the level of executive compensation, certain quantitative and qualitative factors, including, but not limited to, the Company's operating and financial performance, the individual's level of responsibilities, experience, commitment, leadership and accomplishments relative to stated objectives, and marketplace conditions are taken into consideration.

The Company's compensation program for executives consists of four key elements, discussed in greater detail below: (1) base salary, (2) consideration for a performance-based bonus, (3) periodic grants of stock-based incentives, and (4) other benefits and perquisites.

26

*Base Salary.* Base salary amounts for executive officers take into account such factors as competitive industry salaries, an executive's scope of responsibilities, and individual performance and contribution to the organization.

*Performance-based Bonus.* Executive officers have an opportunity to receive performance-based bonus awards based on the overall performance of the Company and on specific individual performance targets.

*Stock-based Incentives.* Executive officers have an opportunity to receive stock-based incentives, generally grants of options to purchase the Company's common Stock. These awards provide employees with the incentive to stay with the Company for longer periods of time, which in turn, provides the Company with greater stability. Equity awards also are less costly to the Company than cash compensation.

*Other Benefits and Perquisites.* Executive officers receive the same general health and welfare benefits offered to all employees. Except as provided in employment contracts, the Company provides no other perquisites to executive officers. See Employment Contracts.

*Section 162(m) of the Code.* Section 162(m) of the Internal Revenue Code of 1986, as amended (the "Code"), generally limits the deductibility by the Company of compensation paid in any one year to any executive officer named in the Summary Compensation Table to $1,000,000. Option awards under the Stock Incentive Plan made in conformity with the "performance-based" exemption from Section 162(m) will be exempt from the limits of Section 162(m). While the Company's policy has always been to pursue a strategy of maximizing deductibility of compensation for all of its employees, the Compensation Committee believes it is important to maintain the flexibility to take actions it considers to be in the best interest of the Company and its stockholders, which may be based on considerations in addition to Section 162(m). In 2009 and 2008, none of the executive officers were paid cash compensation in excess of $1,000,000.

**Compensation Committee Report**

The Compensation Committee has reviewed and discussed the discussion and analysis of the Company's compensation which appears above with management and, based on such review and discussion, the Compensation Committee recommended to the Company's Board of Directors that the above disclosure be included in this Annual Report on Form 10-K.

By the Compensation Committee
of the Board of Directors:
Jeffrey Najarian (Chairman)
William F. Leimkuhler

EXPERTREQ-000669

27

Index

**Compensation of Directors**

The following table sets forth information regarding the cash fees, as well as certain other compensation, paid or accrued to our Directors for the year ended December 31, 2009.

| Name | Fees Earned or Paid in Cash | Stock Awards | Option Awards (1) (2) | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| Vahak S. Hovnanian | $ 18,000 | $ --- | $ 8,009 | $ --- | $ --- | $ --- | $ 26,009 |
| William F. Leimkuhler | 48,000 | --- | 8,009 | --- | --- | --- | 56,009 |
| Jeffrey Najarian | 18,000 | --- | 8,009 | --- | --- | --- | 26,009 |
| Stephen X. Graham | 2,550 | --- | 34,575 | --- | --- | --- | 37,125 |

(1) In determining the aggregate grant date fair value, the stock options were valued using the Black-Scholes option pricing model. For information on the key assumptions used in valuing the options, see "Notes to Consolidated Financial Statements - Note 2, Summary of Significant Accounting Policies - Stock options."

(2) At December 31, 2009, Messrs. Hovnanian, Leimkuhler, Najarian , and Graham  held stock options in the aggregate amounts of 31,875, 31,688, 30,000, and 10,000, respectively.

During 2009, our Directors who are not officers or employees ("Non-Employee Directors") received an annual retainer of $18,000, except for Mr. Graham who received $2,550 reflecting a pro-ration as a result of Mr. Graham  becoming a director of the Company on November 11, 2009. Mr. Leimkuhler received an additional retainer for services as a Director of two of the Company's majority-owned subsidiaries, as lead outside director of the Company and as the Chairman of the Company's Audit Committee in the aggregate amount of $48,000.  In addition, upon their initial election to the Board, new Non-Employee Directors are granted options to purchase 1,250 shares of Common Stock that are fully vested and immediately exercisable. Mr. Graham was granted options to purchase 7,500 shares of common stock that were fully vested and immediately exercisable upon becoming a director on November 11, 2009.  Upon the date of each annual meeting, Non-Employee Directors are granted options at fair market value to purchase an additional 2,500 shares of Common Stock that are fully vested and immediately exercisable. Our Directors of the Company who are officers or employees do not receive any additional compensation for serving on the Board or on any Board committee.

**Employment Agreements**

We entered into an agreement effective April 1, 2006 with Mr. Shant S. Hovnanian, Chairman and Chief Executive Officer of the Company. The agreement has a three-year term and provides for an initial annual salary of $275,000. Under the agreement, Mr. Hovnanian is entitled to be considered for an annual performance based bonus targeted at 50% or greater of his base salary, use of a Company apartment and car, a country club membership, and a $2,000,000 term life insurance policy with the beneficiary designated by Mr. Hovnanian. Under this agreement, Mr. Hovnanian was also granted 100,000 options in August 2006 to purchase shares of our Common Stock at the market value as of the effective date of the agreement. The options are fully vested and immediately exercisable.

We entered into an employment agreement effective September 5, 2000, and revised in 2006 with Mr. John A. Kallassy. The agreement provides that Mr. Kallassy will act as our Executive Vice President. The agreement, which has no term, provides for an annual salary of $225,000, subject to periodic review, and annual bonuses based on the executive's attainment of certain performance goals. Under this agreement, Mr. Kallassy was granted 56,250 options to purchase shares of our Common Stock at the market value as of the effective date of the agreement. All 56,250 options are now fully vested and exercisable. In 2005, Mr. Kallassy's bonus and salary were combined and the aggregate total paid as salary. Thereafter, Mr. Kallassy became entitled to bonuses based upon the achievement of certain agreed upon milestones.

28

Index

**Compensation Committee Interlocks and Insider Participation**

No interlocking relationship exists between the Board of Directors or the Compensation Committee and the Board of Directors or compensation committee of any other company, nor has any such interlocking relationship existed in the past.

**ITEM 12.    SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The following table sets forth information as of December 31, 2009 with respect to the beneficial ownership of our stock by (i) each person known by us to be the beneficial owner of more than 5% of the Common Stock; (ii) each person serving as a Director or Director nominee of the Company; (iii) each of our executive officers, and (iv) all our Directors and executive officers as a group. Unless otherwise indicated, all shares are owned directly and the indicated owner has sole voting and dispositive power with respect thereto.

EXPERTREQ-000670

| Beneficial Owner | Common Stock Beneficially Owned (1) | |
| | Number | Percent |
| --- | --- | --- |
| | 755,87 | |
| Shant S. Hovnanian (2)(3) | 9 | 18.0% |
| Vahak W. Hovnanian Asset Trust, the Paris J. Hovnanian Asset Trust and the Charentz J. Hovnanian Asset Trust (4) | 390,00 0 | 9.8% |
| | 729,16 | |
| Vahak S. Hovnanian (5) | 5 | 18.1% |
| William F. Leimkuhler (6) | 31,688 | * |
| Jeffrey Najarian (7) | 30,000 | * |
| Stephen X. Graham (8) | 10,000 | * |
| | 151,70 | |
| John Kallassy (9) | 0 | 3.7% |
| | 500,00 | |
| XO Holdings, Inc. (10) | 0 | 12.5% |
| | 2,098, | |
| All Directors and Executive Officers as a group (total 6 persons) | 432 | 47.4% |

\* Less than 1% of the outstanding Common Stock

(1)    Pursuant to the regulations of the Securities and Exchange Commission, shares are deemed to be "beneficially owned" by a person if such person directly or indirectly has or shares (i) the power to vote or dispose of such shares, whether or not such person has any pecuniary interest in such shares, or (ii) the right to acquire the power to vote or dispose of such shares within 60 days, including any right to acquire through the exercise of any option, warrant or right.

(2)    Includes options to purchase 194,425 shares of Common Stock pursuant to the Stock Incentive Plan, which are fully vested and exercisable.

(3)    Includes 34,375 shares of Common Stock owned by Mr. Shant S. Hovnanian's minor children for which Mr. Hovnanian, as custodian, has sole voting power.

(4)    These shares were donated by Shant S. Hovnanian as gifts to and held in equal portions by (i) the Vahak W. Hovnanian Asset Trust, (ii) the Paris J. Hovnanian Asset Trust and (iii) the Charentz J. Hovnanian Asset Trust (collectively, the "Trusts"), which were established for the benefit of Mr. Hovnanian's minor children. Mr. Hovnanian's wife is the trustee of the Trusts.

(5)    Includes options to purchase 31,875 shares of Common Stock pursuant to the Stock Incentive Plan, which are fully vested and exercisable.

(6)    Includes options to purchase 31,688 shares of Common Stock pursuant to the Stock Incentive Plan, which are fully vested and exercisable.

(7)    Includes options to purchase 30,000 shares of Common Stock pursuant to the Stock Incentive Plan, which are fully vested and exercisable.

(8)    Includes options to purchase 10,000 shares of Common Stock pursuant to the Stock Incentive Plan, which are fully vested and exercisable.

(9)    Includes options to purchase 129,375 shares of Common Stock pursuant to the Stock Incentive Plan, which are fully vested and exercisable.

(10)    Pursuant to a Stock Purchase Agreement dated as of June 13, 1999, the Company is required to use all reasonable efforts, subject to fiduciary duties under applicable law, to cause an XO Communications, Inc. representative to be elected to the Company's Board.

29

In addition, Verizon Communications Inc., formerly Bell Atlantic Corporation, has the right to appoint one director to the Board, so long as Verizon shall hold at least 1% of the shares of Common Stock outstanding on a fully diluted basis.

**Equity Compensation Plans**

The following table sets forth certain information as of December 31, 2009 for all compensation plans, including individual compensation arrangements, under which equity securities of the Company are authorized for issuance:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of Outstanding options, warrants and rights | Number of securities remaining available for further issuance |
| --- | --- | --- | --- |
| Equity compensation plans approved by security holders | 544,067 | $    5.06 | 269,895 |
| Equity compensation plans not approved by security holders | --- | $    --- | --- |

**ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information under 'Director Compensation' included in Item 11. of this Form 10-K is incorporated by reference.

**ITEM 14.    PRINCIPAL ACCOUNTANT FEES AND SERVICES**

EXPERTREQ-000671

Audit Fees represent fees for services rendered in connection with the annual audit and quarterly reviews of the Company's financial statements. For the years ended December 31, 2009 and 2008, the Company paid or accrued $140,000 and $183,000 for audit fees to Amper, Politziner & Mattia, LLP.

Audit-Related Fees represent fees for services rendered in connection with assurance and related services that are reasonably related to the performance of the audit or review of the financial statements and are not reported as Audit Fees. For the years ended December 31, 2009 and 2008, the Company did not pay or accrue any amounts for audit-related fees.

Tax Fees represent fees for services rendered in connection with tax compliance, tax advice and tax planning. For the years ended December 31, 2009 and 2008, the Company paid or accrued $13,750 and $21,350 for tax fees to Amper, Politziner & Mattia, LLP, respectively.

All Other Fees represent fees for services rendered other than those described above. For the year ended December 31, 2008, the Company paid PricewaterhouseCoopers LLP $5,000 in fees in connection with the Company's change in its principal accountant. The Audit Committee of the Company's Board of Directors has established a policy requiring it's pre-approval of all audit and non-audit services provided by its independent registered public accounting firm. The policy requires the general pre-approval of annual audit services and all other permitted services.

All of the audit and non-audit services described above were approved by the Audit Committee and not pursuant to the waiver of pre-approval provisions set forth in applicable rules of the SEC.

30

**PART IV**

**ITEM 15.    EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a) **Financial Statements and Financial Statement Schedules**

| | | Page(s) |
|---|---|---|
| (1) | Consolidated Financial Statements | |
| | Report of Independent Registered Public Accounting Firm | 33 |
| | Consolidated Balance Sheets as of December 31, 2009 and 2008 | 34 |
| | Consolidated Statements of Operations for the years ended December 31, 2009 and 2008 | 35 |
| | Consolidated Statements of Changes in Stockholders' Equity for the years ended December 31, 2009 and 2008 | 36 |
| | Consolidated Statements of Cash Flows for the years ended December 31, 2009 and 2008 | 37 |
| | Notes to Consolidated Financial Statements | 38-50 |

(b) **Exhibits**

| | |
|---|---|
| 3.1a | Certificate of Incorporation. (1) |
| 3.1b | Certificate of Amendment to Certificate of Incorporation dated November 28, 2007 (2) |
| 3.2 | By-laws. (1) |
| 4.1 | Form of Common Stock Certificate. (1) |
| 4.3 | Form of Rights Agreement between SPEEDUS.COM, Inc. and Equiserve Trust Company, N.A., as Rights Agent. The Rights Agreement includes as Exhibit A the Certificate of Designation, Preferences and Rights of Series A Junior Participating Preferred Stock of SPEEDUS.COM, Inc., as Exhibit B the form of Rights Certificate and as Exhibit C the form of Summary of Rights to Purchase Shares of Series A Junior Participating Preferred Stock. (3) |
| 10.1 | Speedus Corp. 2005 Stock Incentive Plan. (4) |
| 10.2 | Employment Agreement, dated as of April 1, 2006, between Speedus Corp. and Shant S. Hovnanian. (5) |
| 10.3 | Amended and Restated Agreement of Limited Partnership of CellularVision of New York, L.P., dated as of July 7, 1993, by and between Hye Crest Management, Inc., Bell Atlantic Ventures, XXIII, Inc. and the limited partners set forth on the signature page thereto. (1) |
| 10.4 | Agreement, dated as of January 12, 1996, by and among CellularVision USA, Inc., CellularVision of New York, L.P., Hye Crest Management, Inc., Shant S. Hovnanian, Vahak S. Hovnanian, Bernard B. Bossard and Bell Atlantic Ventures XXIII, Inc. (1) |
| 14 | Code of Ethics for Chief Executive Officer and Senior Finance Officers (6) |
| 21 | Subsidiaries of Speedus Corp. (1) |

EXPERTREQ-000672

23.1 Consent of Independent Registered Public Accounting Firm
(https://s
ec.report/
Documen
t/000114
0361-11-
009367/#
ex23_1.h
tm)

31.1 Certification of Chief Executive Officer Pursuant To Rule 13a-14 of the Securities Exchange Act of 1934, As Adopted Pursuant To Section 302 of The Sarbanes-Oxley Act Of 2002
(https://s (7)
ec.report/
Documen
t/000114
0361-11-
009367/#
ex31_1.h
tm)

31.2 Certification of Chief Financial Officer Pursuant To Rule 13a-14 of the Securities Exchange Act of 1934, As Adopted Pursuant To Section 302 of The Sarbanes-Oxley Act Of 2002
(https://s (7)
ec.report/
Documen
t/000114
0361-11-
009367/#
ex31_2.h
tm)

32.1 Certification of Chief Executive Officer Pursuant To 18 U.S.C. Section 1350, As Adopted Pursuant To Section 906 Of The Sarbanes-Oxley Act Of 2002 (7)
(https://s
ec.report/
Documen
t/000114
0361-11-
009367/#
ex32_1.h
tm)

32.2 Certification of Chief Financial Officer Pursuant To 18 U.S.C. Section 1350, As Adopted Pursuant To Section 906 Of The Sarbanes-Oxley Act Of 2002 (7)
(https://s
ec.report/
Documen
t/000114
0361-11-
009367/#
ex32_2.h
tm)

31

---

Index
--------------------------------------------------------

(1) Incorporated by reference to the Company's Registration Statement in Form S-1 (File No. 33-98340) which was declared effective by the Commission on February 7, 1996.

(2) Incorporated by reference to the Company's Form 8-K filed on December 4, 2007.

(3) Incorporated by reference to the Company's Form 8-K filed on January 16, 2001.

(4) Incorporated by reference to the Company's Definitive Proxy Statement filed on October 13, 2005.

(5) Incorporated by reference to the Company's Form 10-Q filed on August 14, 2006.

(6) Incorporated by reference to the Company's Form 10-K filed on April 2, 2007.

(7) Filed herewith.

(c) **Financial Statement Schedules**

None.

32

---

Index

EXPERTREQ-000673

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors
Speedus Corp. and Subsidiaries

We have audited the accompanying consolidated balance sheets of Speedus Corp. and subsidiaries as of December 31, 2009 and 2008, and the related consolidated statements of operations, stockholders' equity, and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Speedus Corp. and its Subsidiaries as of December 31, 2009 and 2008 and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming the Company will continue as a going concern. As more fully described in Note 1 to the consolidated financial statements, the Company has incurred significant recurring losses and net cash outflows from operations since inception. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Note 1 to the consolidated financial statements. The consolidated financial statements do not include any adjustments that may result from the outcome of this uncertainty.

S/Amper, Politziner, & Mattia, LLP
March 30, 2010
New York, New York

33

*Index*

### SPEEDUS CORP.
### CONSOLIDATED BALANCE SHEETS
#### December 31,

| | 2009 | | 2008 |
|---|---|---|---|
| **ASSETS** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 150,010 | $ | 6,007,757 |
| United States Treasury bills | 1,750,000 | | - |
| Accounts receivable, net of allowances of $107,385 and $0 | 54,975 | | 17,390 |
| Inventory | 98,222 | | 30,000 |
| Marketable securities | 4,960 | | 2,633 |
| Other current assets | 8,000 | | 10,678 |
| Total current assets | 2,066,167 | | 6,068,458 |
| Property and equipment, net of accumulated depreciation of $38,414 and $39,150 | 36,795 | | 47,011 |
| Other assets | 22,447 | | 22,447 |
| Total assets | $ 2,125,409 | $ | 6,137,916 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current liabilities: | | | |
| Accounts payable | $ 350,386 | $ | 174,293 |
| Accrued liabilities | 226,392 | | 1,898,167 |
| Current portion of convertible note to noncontrolling interest | - | | 328,883 |
| Current portion of redeemable preferred stock | - | | 378,110 |
| Total current liabilities | 576,778 | | 2,779,453 |

EXPERTREQ-000674

| | 2009 | 2008 |
|---|---|---|
| Convertible note to noncontrolling interest, net of current portion | 543,608 | - |
| Redeemable preferred stock ($.001 par value; 100,000 shares authorized; 70,940 shares issued and outstanding), net of current portion | 812,972 | 378,110 |
| Total liabilities | 1,933,358 | 3,157,563 |
| Commitments and Contingencies | | |
| Stockholders' equity: | | |
| Preferred stock ($.01 par value; 20,000,000 shares authorized): | | |
| Series A Junior Participating ($.01 par value; 4,000 shares authorized; no shares issued) | - | - |
| Common stock ($.01 par value; 50,000,000 shares authorized; 5,498,006 and 5,438,006 shares issued and outstanding) | 54,980 | 54,380 |
| Additional paid-in capital | 92,829,557 | 92,178,868 |
| Treasury stock (at cost; 1,502,410 shares) | (6,136,611) | (6,136,611) |
| Accumulated deficit | (85,960,079) | (83,116,284) |
| Total Speedus stockholders' equity | 787,847 | 2,980,353 |
| Noncontrolling deficit | (595,796) | - |
| Total stockholders' equity | 192,051 | 2,980,353 |
| Total liabilities and stockholders' equity | $ 2,125,409 | $ 6,137,916 |

The accompanying notes are an integral part of these consolidated financial statements.

34

Index

**SPEEDUS CORP.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**

| | For the years ended December 31, | |
|---|---|---|
| | **2009** | **2008** |
| Revenues | $ 461,177 | $ 155,870 |
| Expenses: | | |
| Cost of sales | 166,327 | 30,352 |
| Selling, general and administrative | 3,228,149 | 3,731,428 |
| Research and development | 1,745,754 | 2,926,068 |
| Withholding tax (reversal) provision | (1,183,184) | 1,300,000 |
| Impairment loss on intangible assets | - | 518,210 |
| Impairment loss on other investments | - | 800,000 |
| Depreciation and amortization | 24,524 | 84,114 |

EXPERTREQ-000675

| | | |
|---|---|---|
| Total operating expenses | 3,981,570 | 9,390,172 |
| Operating loss | (3,520,393) | (9,234,302) |
| Investment income | 163,693 | 352,999 |
| Interest income | 10,785 | 187,433 |
| Other income | 2,800 | - |
| Interest expense | (96,476) | (50,703) |
| Loss from continuing operations | (3,439,591) | (8,744,573) |
| Loss from discontinued operations | - | (351,938) |
| Loss from disposal of discontinued operations | - | (105,365) |
| Loss from discontinued operations | - | (457,303) |
| Net loss including noncontrolling interest | (3,439,591) | (9,201,876) |
| Less: Net loss attributed to noncontrolling interest | (595,796) | - |
| Net loss attributed to Speedus | $ (2,843,795) | $ (9,201,876) |
| Earnings per share attributed to Speedus common stockholders: | | |
| Loss per common share - basic and diluted: | | |
| Continuing operations | $ (0.72) | $ (2.19) |
| Discontinued operations | - | (0.12) |
| Loss per common share - basic and diluted | $ (0.72) | $ (2.31) |
| Weighted average common shares outstanding - basic and diluted | 3,946,144 | 3,976,107 |

The accompanying notes are an integral part of these consolidated financial statements.

35

*Index*

**SPEEDUS CORP.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**

**For the years ended December 31, 2008 and 2009**

| | Common Stock | | Additional Paid-in-capital | Treasury Stock | | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | Shares | Amount | | |
| Balance, January 1, 2008 | 5,438,006 | $ 54,380 | $ 91,797,457 | 1,445,634 | $ (6,085,078) | $ (73,914,408) | $ 11,852,351 |
| Stock based compensation | | | 306,411 | | | | 306,411 |
| Repurchase of common stock | | | | 56,776 | (51,533) | | (51,533) |

EXPERTREQ-000676

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Capital contribution in subsidiary by noncontrolling interest | | | | 75,000 | | | 75,000 |
| Net loss including noncontrolling interest | | | | | | (9,201,876) | (9,201,876) |
| Balance, December 31, 2008 | 5,438,006 | $ 54,380 | $ 92,178,868 | 1,502,410 | $ (6,136,611) | $ (83,116,284) | $ 2,980,353 |
| Stock based compensation | | | 434,524 | | | | 434,524 |
| Exercise of stock options | 60,000 | 600 | 130,900 | | | | 131,500 |
| Subsidiary Access and Exclusivity Fee | | | 85,265 | | | | 85,265 |
| Net loss including noncontrolling interest | | | | | | (3,439,591) | (3,439,591) |
| Balance, December 31, 2009 | 5,498,006 | $ 54,980 | $ 92,829,557 | 1,502,410 | $ (6,136,611) | $ (86,555,875) | $ 192,051 |

The accompanying notes are an integral part of these consolidated financial statements.

36

Index

## SPEEDUS CORP.
### CONSOLIDATED STATEMENTS OF CASH FLOWS
#### For the years ended December 31,

| | 2009 | 2008 |
|---|---|---|
| Cash flows from operating activities: | | |
| Net loss including noncontrolling interest | $ (3,439,591) | $ (9,201,876) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 24,524 | 112,763 |
| Bad debt expense | 107,385 | - |
| Unrealized investment (gains)/losses | (2,327) | 15,901 |
| Stock based compensation | 434,524 | 306,411 |
| Access and exclusivity fee | 85,265 | - |
| Impairment loss on intangible assets | - | 518,210 |
| Impairment loss on other assets | - | 800,000 |
| Accrued dividends on preferred stock | 56,752 | 46,820 |
| Accrued interest on convertible note | 39,725 | 3,883 |
| Changes in operating assets and liabilities, net of acquisition: | | |
| Accounts receivable | (144,970) | (12,240) |
| Inventory | (68,222) | (30,000) |
| Marketable securities | - | 73,656 |
| Other current assets | 2,678 | 258,795 |
| Other assets | - | 402,680 |
| Accounts payable | 176,093 | 127,880 |
| Accrued liabilities | (1,671,775) | 507,364 |
| Net cash used in operating activities | (4,399,939) | (6,069,753) |
| Cash flows from investing activities: | | |
| Property and equipment additions | (14,308) | (13,015) |

EXPERTREQ-000677

| | | | |
|---|---|---|---|
| United States Treasury bills: | | | |
| Purchases | (1,750,000) | | - |
| Maturities | - | | 2,996,700 |
| Net cash (used in) provided by investing activities | (1,764,308) | | 2,983,685 |
| | | | |
| Cash flows from financing activities: | | | |
| Convertible note financing in subsidiary by noncontrolling interest | 175,000 | | 325,000 |
| Capital contribution in subsidiary by noncontrolling interest | - | | 75,000 |
| Redemption of preferred stock | - | | (100,000) |
| Repurchase of stock | - | | (51,533) |
| Proceeds from the exercise of stock options | 131,500 | | - |
| Net cash provided by financing activities | 306,500 | | 248,467 |
| | | | |
| Net decrease in cash and cash equivalents | (5,857,747) | | (2,837,601) |
| | | | |
| Cash and cash equivalents, beginning of year | 6,007,757 | | 8,845,358 |
| Cash and cash equivalents, end of year | $ 150,010 | | $ 6,007,757 |
| | | | |
| Supplemental information of business acquired: | | | |
| Fair value of assets acquired: | | | |
| Other current assets | $ - | | $ 195,000 |
| Non current assets | - | | 34,000 |
| Other intangible assets | - | | 580,400 |
| Less-liabilities assumed: | | | |
| Redeemable preferred stock | - | | (809,400) |
| Cash paid less-cash acquired | - | | - |
| Acquisition of business, net of cash acquired | $ - | | $ - |

The accompanying notes are an integral part of these consolidated financial statements.

37

---

Index

**SPEEDUS CORP.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**1. Organization and Business**

*Organization*

Speedus Corp. ("Speedus" or the "Company"), a Delaware corporation, was formed in October 1995 as CellularVision USA, Inc. ("CVUS") to combine the ownership of predecessor companies that were under common control. In January 1999, through a 'short form merger' as allowed under Delaware law, CVUS changed its name to SPEEDUS.COM, Inc. In June 2002, in the same manner, SPEEDUS.COM, Inc. changed its name to Speedus Corp. Unless the context requires otherwise, the term Company includes the Speedus Corporate Segment and its wholly- and majority-owned subsidiaries.

*Business Overview*

EXPERTREQ-000678

Speedus Corp. operates primarily through its two majority-owned subsidiaries Zargis Medical Corp. ("Zargis") and Density Dynamics Corp. ("DDC").

In 2001 we co-invested with Siemens Corporate Research, Inc., a subsidiary of Siemens Corporation, in Zargis to develop advanced diagnostic decision support products and services for primary care physicians, pediatricians, cardiologists and other healthcare professionals. In March of 2008 we acquired a majority interest in DDC, a company breaking new ground in the development of DRAM based, energy efficient, sold-state drives ("SSD") with I/O acceleration technology. For additional information on each of these business segments and our other assets and operations, see the discussions below and "Notes to Consolidated Financial Statements — Note 11, Business Segment Information."

*Zargis*

Zargis is a medical device company focused on improving health outcomes and cost effectiveness through the development of computer-aided medical devices and telemedicine based delivery systems.  Zargis was formed in 2001 when we co-invested with Siemens Corporate Research, Inc., a subsidiary of Siemens Corporation.  As part of this transaction, Siemens contributed certain intellectual property including a core technology used in the Zargis Cardioscan™ device (Cardioscan).

Cardioscan is a non-invasive, diagnostic support solution that automatically analyzes acoustical data from a patient to determine whether or not the patient possesses a suspected diastolic or systolic murmur and whether or not they present a Class I indication for echocardiography referral. Heart murmurs can be a sign of serious types of valvular or other heart disease. Zargis' patented technology utilizes advanced signal processing algorithms deployed on a standard pc computer platform. Cardioscan received its initial FDA clearance in May 2004 and received its most recent clearance for Cardioscan in February, 2009. Cardioscan is fully integrated with the ZargisTelemed™ portal is also cleared for marketing in Australia, Canada, India, Singapore, South Africa and 31 European states.

In September of 2009, Zargis also announced FDA clearance to market its Signal X6™ device. Signal X6 is noninvasive and simultaneously records heart and lung sounds from six adhesive acoustic sensors. The recordings can be evaluated locally or, for locations where a cardiac specialist is not immediately available for consultation, transmitted through the Internet for remote evaluation. The sensors are adhesive, rather than handheld, which may reduce motion noise and increases clarity when compared to handheld stethoscopes. Zargis initially released Signal X6 in August 2009, when 510(k) clearance for the device was received.

In addition to the development of Cardioscan, Signal X6 and Zargis Telemed, Zargis has been awarded several contracts by the U.S. Army, most recently in August of 2009, to develop prototype versions of telemedicine systems for use in cardiology. These systems record, synchronize and analyze heart sounds, lung sounds and ECG signals in pediatric patients who are being cared for by remote military treatment facilities. The systems have been fully integrated with an existing Army telehealth platform.

Demand for medical systems designed to remotely project the expertise of cardiologists and other medical specialists is growing within both military and civilian environments worldwide and it is for this reason that Zargis has identified the field of telemedicine as a key focus area for product commercialization.

In February 2003, we acquired a controlling interest in Zargis of approximately 63%.  At December 31, 2009, as a result of continued investment, our primary equity ownership was approximately 90%.

38

In October 2007, Zargis and the 3M Company entered into an exclusive multi-year marketing alliance involving Zargis' heart sound analysis software and 3M Littmann's next-generation electronic stethoscope. Under the agreement, Zargis supported 3M in its efforts to develop a next-generation stethoscope that is compatible with Zargis' heart sound analysis software. In addition, the alliance provides Zargis with a wide-range of marketing and promotional opportunities along with exclusive rights to sell its heart sound analysis software through the global distribution network of the Littmann brand.  The agreement with 3M, based on the total number of Zargis fully diluted shares as of the agreement date, grants 3M a 5% equity position in Zargis following the first sale of Zargis' software through the 3M distribution channel (which occurred in August of 2009) as an access and exclusivity fee and an additional 5% equity in Zargis in the event that other conditions are met.  The agreement also entitles 3M to a royalty payment based on sales of certain Zargis products and a seat on the Zargis Board of Directors.  For the year ended December 31, 2009, the Company recorded an access and exclusivity fee to cost of sales of approximately $85,000 on the consolidated statements of operations reflecting the fair value of the 5% equity position vested by 3M in August 2009.

*Density Dynamics*

In March 2008, we obtained approximately a 75% equity interest in DDC. DDC is a newly formed company that was created to acquire the technology, assets and some of the operations of a developer and marketer of ultra-high speed storage systems for server networks and other applications.

DDC is continuing development of its line of environmentally friendly DRAM based solid-state storage and I/O acceleration technology. The Jet.io RamFlash and DramJet Solid State Drives are built in a standard 3.5" drive format. These drives are the core components for DDC high performance storage products. In January 2010, DDC launched its JetX10 acceleration appliance and its JetPod and JetNode expansion chassis which integrate the Jet.io Solid State Drives to deliver the highest performance and greatly reduces complexity, space requirements and power consumption in traditional storage solutions. All DDC products are designed for enterprise and cloud computing environments which demand the highest performance, durability and lowest power consumption. See note 3 for further discussion.

*Other Business Activities*

<u>F&B Gudtfood.</u>

In October 2008 we transferred the operations and liabilities of the remaining F&B restaurant store in to an unrelated third party for no consideration.  We have reflected the accounts of F&B as a discontinued operation in our consolidated financial statements for the year ending December 31, 2008.

<u>Local Multipoint Distribution Service (LMDS) License</u>

We have an FCC commercial operating license which covers between 150 – 300 MHz of spectrum in the New York City area. The license has been renewed through February 1, 2016 conditioned upon demonstrating to the FCC by June 1, 2012 that we are providing "substantial service." As of December 31, 2009 the Company had not demonstrated to the FCC that it was providing "substantial service"; however, the Company expects it will demonstrate to the FCC that it is providing this "substantial service" by June 1, 2012. This entity had limited operations during 2009 and 2008.

<u>Internet initiatives</u>

In the fourth quarter of 2008, we ceased allocation of any material resources to our portfolio of internet initiatives, which included NetfreeUs, Wibiki, Adchooser and iMarklet.  These entities had limited operations during 2009 and 2008.

EXPERTREQ-000679

*Liquidity*

We have recorded operating losses and negative operating cash flows since our inception and have limited revenues. At December 31, 2009, we had an accumulated deficit of approximately $86.0 million. We do not expect to have earnings from operations or positive operating cash flow until such time as our strategic investments achieve successful implementation of their business plans and/or form alliances for the use of our capabilities in the future.

We may not have funds sufficient to finance our operations and enable us to meet our financial obligations for the next twelve months. There can be no assurances that we will be able to consummate any capital raising transactions, particularly in view of current economic conditions. On January 27, 2010 the Company engaged Morgan Joseph & Company, Inc., a full service investment bank, to evaluate strategic alternatives available to maximize shareholder value with respect to its Zargis subsidiary. The inability to generate future cash flow or raise funds to finance our strategic investments could have a material adverse effect on our ability to achieve our business objectives.

These conditions raise substantial doubt about our ability to continue as a going concern.

If we are not able to reduce or defer our expenditures, secure additional sources of revenue or otherwise secure additional funding, we may be unable to continue as a going concern, and we may be forced to restructure or significantly curtail our operations, file for bankruptcy or cease operations. In addition, a bankruptcy filing by one or more of our strategic investments could cause us to lose our investment and/or control and could prevent us from sharing in any future success of those strategic investments. The accompanying financial statements do not include any adjustments relating to the recoverability of the carrying amount of recorded assets or the amount of liabilities that might result should the Company be unable to continue as a going concern.  Should we be successful in securing the necessary capital to continue operations, it is likely that such arrangements would result in significant dilution to each shareholder's ownership interest in the Company.

39

*Index*

**2. Summary of Significant Accounting Policies**

*Financial statements and principles of consolidation*

The consolidated financial statements include the accounts of Speedus and its wholly-owned subsidiaries. All significant intercompany accounts and transactions have been eliminated in consolidation.

*Noncontrolling interests*

Companies in which Speedus directly or indirectly owns more than 50% of the outstanding voting securities or that Speedus has effective control over are accounted for under the consolidation method of accounting. Under this method, those companies' balance sheets and results of operations, from the date Speedus acquired control, are included in Speedus' consolidated financial statements. Through the year ended December 31, 2009, Zargis and DDC continued to generate losses which reduced the noncontrolling interest to zero. Effective January 1, 2009, the Company adopted FASB ASC Topic 810, "Consolidation," which established new standards governing the accounting for and reporting of noncontrolling interests in partially owned consolidated subsidiaries and the loss of control of subsidiaries. Certain provisions of this standard indicate, among other things, that noncontrolling interests (previously referred to as minority interests) be treated as a separate component of equity and that losses of a partially owned consolidated subsidiary be allocated to the noncontrolling interest even when such allocation might result in a deficit balance. This standard also required changes to certain presentation and disclosure requirements. The provisions of the standard were applied to all noncontrolling interests prospectively. The net loss attributed to the noncontrolling interests has been separately designated in the accompanying consolidated statements of operations. Losses attributable to the noncontrolling interest in a subsidiary may exceed the noncontrolling interests in the subsidiary's equity. The noncontrolling interest shall continue to be attributed its share of losses even if that attribution results in a deficit noncontrolling interest balance.

Companies in which Speedus owns less than 20% of the outstanding voting securities and does not have the ability to exercise significant influence are accounted for under the cost method of accounting.

*Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the financial statements and the reported amounts of operating revenues and expenses during the reporting periods. Significant estimates and assumptions include the adequacy of the calculations related to stock based compensation, allowance for doubtful accounts, and other than temporary impairment of investments and certain accruals. Actual results could differ from those estimates.

*Cash and Cash Equivalents*

The Company considers all highly liquid interest earning investments with original maturities of three months or less to be cash equivalents. At December 31, 2009 and 2008, cash equivalents consisted of money market funds.  At times the Company has cash and cash equivalents balances in excess of the FDIC and SPIC insured limits.

*Marketable Securities*

All marketable securities are defined as trading securities under the provisions of FASB ASC 320-10-05, "Accounting for Certain Investments in Debt and Equity Securities." At December 31, 2009 and 2008, marketable securities consisted of publicly traded equity securities which were recorded at the fair market value of approximately $5,000 and approximately $3,000 as of December 31, 2009 and 2008, respectively.  Unrealized gains or losses are included in investment income in the accompanying  consolidated statements of operations.

*Other investments*

We have also invested a portion of our assets in equity and debt instruments of non-publicly held companies. The Company monitors these investments for other than temporary impairment by considering current factors including economic environment, market conditions, operational performance and other specific factors relating to the business underlying the investment(s). The Company determined that based on the current general negative economic and liquidity environment affecting the ability of businesses to obtain credit and to raise money in the capital markets, and based on specific unobserved data received from the underlying entities indicating severe operational and liquidity problems, there was significant doubt as to whether these entities will be able to continue to operate as going concerns. Therefore, during the fourth quarter of 2008 the Company recorded an impairment charge of $800,000 against these assets reducing the fair value of these non-public investments to zero as of December 31, 2008.

*Intellectual Property Impairment*

The Company's acquisition of DDC included certain intangible assets which had a carrying value of $0.5 million at December 31, 2008, before adjustment. However, during the fourth quarter of 2008, in light of market conditions affecting the ability of this business to obtain credit and to raise money in the capital markets, and our ability to fund this operation and generate sufficient cash to fully realize these assets, the realization of these assets became uncertain. As a result, during the fourth quarter of 2008, we recognized an impairment loss in the amount of EXPERT REQ 0000680

40

*Securities sold and not purchased*

The Company has in the past and may in the future sell publicly traded equity securities it does not own in anticipation of declines in the fair market values of the securities. When the Company effects such transactions, it must borrow the securities it sold in order to deliver them and settle the trades. These amounts are shown on the balance sheet as 'Securities sold and not purchased' and represent the value of these securities at fair market value. The Company's potential for loss on these transactions is unlimited since the value of the underlying security can keep increasing which could have a material adverse effect on the Company's consolidated financial statements. At December 31, 2009 and 2008, there were no securities sold and not purchased.

*Fair Value of Financial Instruments*

Cash and cash equivalents, U.S. Treasury bills, accounts payable and accrued expenses are reflected in the consolidated balance sheets at their carrying value, which approximates fair value due to the short-term nature of these instruments and the variability of the respective interest rates, where applicable.  Pursuant to FASB ASC 820-10-05 "Fair Value Measurements", the fair value of our cash equivalents and U.S. Treasury bills are determined based on "Level 1" inputs, which consist of quoted prices in active markets for identical assets.

*Accounts receivable*

Accounts receivable are recorded at the invoice amount and are not interest bearing.  The Company reviews its accounts receivable aging quarterly, on a customer by customer basis, and records an allowance for bad debt at such time that a receivable is deemed to be likely uncollectable.

*Inventory*

Inventories are stated at the lower of cost or market with cost being determined on a first-in, first-out basis.

*Property and Equipment*

Property and equipment consists of office equipment which is recorded at cost and depreciated on a straight-line basis over the estimated useful lives of the assets, ranging from three to seven years.

When assets are fully depreciated, it is the Company's policy to remove the costs and related accumulated depreciation from its books and records.

*Long-lived assets*

The Company periodically evaluates the net realizable value of long-lived assets, including fixed and intangible assets, in accordance with FASB ASC 360-10-05 "Accounting for the Impairment of Long-Lived Assets", relying on anticipated future cash flows. The Company's evaluation of anticipated future cash flows considers operating results, business plans and economic projections, as well as, non-financial data such as market trends, product and development cycles, and changes in management's market emphasis. An impairment in the carrying value of an asset is recognized when the expected future operating cash flows derived from the asset are less than its carrying value.

*Revenue Recognition*

Zargis recognizes service revenue upon completion of services performed under contracts, in accordance with the provisions of the Securities and Exchange Commission Staff Accounting Bulletin No. 104, "Revenue Recognition". Zargis and DDC recognize product revenue upon the shipment of product and transfer of title to customers.

*Income Taxes*

As required by FASB ASC 740-10-05  "Accounting for Income Taxes," the Company is required to provide for deferred tax assets or liabilities arising due to temporary differences between the book and tax basis of the Company's assets and liabilities.

FASB ASC 740-10-05 prescribes a comprehensive model for the manner in which a company should recognize, measure, present and disclose in its financial statements all material uncertain tax positions that the Company has taken or expects to take on a tax return.  As of December 31, 2009, the only tax jurisdictions to which the Company is subject are the United States and several states where the Company operates. Open tax years relate to years in which unused net operating losses were generated. Thus, the Company's open tax years extend back to 1996. In the event that the Company concludes that it is subject to interest and/or penalties arising from uncertain tax positions, the Company will present interest and penalties as a component of income taxes.  The Company has no unrecognized tax positions or any interest and penalties as of and for the years ended December 31, 2009 and 2008.

41

*Earnings Per Share*

Basic and diluted earnings (loss) per common share are determined in accordance with FASB ASC 260-10-05.  For the years ended December 31, 2009 and 2008 outstanding stock options and warrants in the weighted average amounts of 583,000 and 558,000, respectively have been excluded from the diluted loss per share since their effect would be antidilutive as the Company has losses in each of these years.

*Stock Options*

The Company accounts for stock options under FASB ASC 718-10-10, "Share-Based Payment".  Under this method, the Company records compensation cost based upon the fair value of those awards on the grant date over the service period of each award on a straight line basis. Stock based compensation expense was approximately $435,000 and $306,000 for the years ended December 31, 2009 and 2008, respectively.

The Company accounts for stock and stock options granted to non-employees on a fair value basis in accordance with FASB ASC 505-50-30, "Equity Based Payments to Non-Employees."  Any stock or stock options issued to non-employees are recorded in the consolidated financial statements using the fair value method and then amortized to expense over the applicable service periods.

EXPERTREQ-000681

The fair value of the awards on the grant date was estimated using a Black-Scholes option pricing model. Assumptions utilized in the model for Speedus, Zargis, and DDC are evaluated and revised, as necessary, to reflect market conditions and experience. Expected volatility has been calculated based on the historical volatility of the Company's stock over the period commensurate with the expected term of the option. The expected term represents the period of time that options granted are expected to be outstanding and is estimated based on historical option exercise experience. The risk-free interest rates are equivalent to the U.S. Treasury yield in effect at the time of grant for the estimated life of the option grant. Estimated forfeiture rates are based on historical experience. These assumptions were:

|  | Year ended December 31, | |
| --- | --- | --- |
|  | **2009** | **2008** |
| Risk-free interest rates | 2 - 4% | 2 - 4% |
| Expected lives | 7 years | 3 - 6 years |
| Expected forfeiture rates | 11 - 30% | 11 - 30% |
| Expected volatility | 124 - 135% | 106 - 124% |
| Expected dividend yield rates | 0% | 0% |

*Recent Accounting Pronouncements*

In June 2009, the Financial Accounting Standards Board ("FASB") issued its final Statement of Financial Accounting Standards ("SFAS") No. 168 – "The FASB Accounting Standards ASC Topic and the Hierarchy of Generally Accepted Accounting Principles a replacement of FASB Statement No. 162". ("SFAS No. 168"). SFAS No. 168 made the FASB Accounting Standards Codification (the "ASC") the single source of U.S. Generally Accepted Accounting Policies ("U.S. GAAP") used by nongovernmental entities in the preparation of financial statements, except for rules and interpretive releases of the SEC under authority of federal securities laws, which are sources of authoritative accounting guidance for SEC registrants. The ASC is meant to simplify user access to all authoritative accounting guidance by reorganizing U.S. GAAP pronouncements into roughly 90 accounting topics within a consistent structure; its purpose is not to create new accounting and reporting guidance. The ASC supersedes all existing non-SEC accounting and reporting standards and was effective for the Company beginning July 1, 2009. Following SFAS No. 168, the Board will not issue new statements in the form of Statements, FASB Staff Positions, or Emerging Issues Task Force Abstracts; instead, it will issue Accounting Standards Updates. The FASB will not consider Accounting Standards Updates as authoritative in their own right; these updates will serve only to update the ASC topic, provide background information about the guidance, and provide the bases for conclusions on the change(s) in the ASC.

In December 2007, the Financial Accounting Standards Board issued FASB ASC 810-10-65, "Noncontrolling Interests in Consolidated Financial Statements-an amendment of ARB 860-10-60. FASB ASC 810-10-65 establishes accounting and reporting standards for the noncontrolling interest in a subsidiary and for the deconsolidation of a subsidiary. FASB ASC 810-10-65 will become effective as of the beginning of the Company's fiscal year beginning after December 15, 2008. The adoption of FASB ASC 810-10-65 did not have a material impact on the consolidated results of operations and financial condition.

In June 2008, the FASB ratified FASB ASC 815-40-15, "Determining Whether an Instrument (or an Embedded Feature) Is Indexed to an Entity's Own Stock). FASB ASC 815-40-15 provides that an entity should use a two step approach to evaluate whether an equity-linked financial instrument (or embedded feature) is indexed to its own stock, including evaluating the instrument's contingent exercise and settlement provisions. It also clarifies the impact of foreign currency denominated strike prices and market-based employee stock option valuation instruments on the evaluation. FASB ASC 815-40-15 is effective for fiscal years beginning after December 15, 2008. The implementation of this standard did not have a material impact on the Company's consolidated financial position and results of operations.

42

*Index*
*Reclassifications*

Certain reclassifications have been made to the prior years' financial statements to conform to the current year's presentation.

**3. Acquisition**

On March 5, 2008, the Company acquired a 75% interest in Density Dynamics Corp., a newly formed company that was created to acquire the technology, assets and some of the operations of a developer and marketer of ultra-high speed storage systems for server networks and other applications. The purchase price was $1,000,000. In exchange, the Company received $1,000,000 of redeemable preferred stock from DDC, which has been eliminated in consolidation. The operations of DDC prior to its acquisition are not material to the 2008 financial statements.

This acquisition was accounted for using the purchase method of accounting. The results of operations of DDC have been included in the consolidated statements of operations from the date of acquisition. The value of the net assets acquired as of the acquisition date has been allocated: $195,000 to current assets, $34,000 to noncurrent assets, $580,000 to other intangible assets and $(809,000) to liabilities. The $580,000 allocated as an intangible asset (reflecting intellectual property assets of DDC) was being amortized over a period of seven years until written off as impaired in the fourth quarter of 2008.

In connection with the acquisition, DDC issued $809,400 of redeemable preferred stock to the 25% owner, $100,000 of which was redeemed at the time of closing. The redeemable preferred stock accrues dividends equal to 8% of the original purchase price of $10 per share (the "Original Purchase Price"). The redeemable preferred stock will be redeemed for the Original Purchase Price plus accrued and unpaid dividends as follows: $120,000 during the year ended December 31, 2009, $50,000 out of a future financing by the Company, 50% out of the cash flow of DDC as defined, and to the extent that any redeemable preferred shares remain outstanding, the balance will be redeemed in 2013. The Company has reflected this redeemable preferred stock as a liability on its December 31, 2009 and 2008 consolidated balance sheets. The holders of the redeemable preferred stock have not issued a call for redemption and no redeemable preferred stock was redeemed in the year ended December 31, 2009 or as of the date of this report. On March 25, 2010, the holders of the redeemable preferred shares agreed to defer all obligations of DDC to redeem or make payments to the holders until April 1, 2011. As a result of this agreement all of the redeemable preferred stock has been reflected as a non-current liability. For the years ended December 31, 2009 and 2008, accrued dividends on this redeemable preferred stock of approximately $57,000 and approximately $47,000 has been recorded as interest expense on the Company's consolidated statements of operations.

In July 2008, DDC sold 300,000 shares of its common stock for a price of $1 per share. 225,000 shares were sold to Speedus and 75,000 shares were sold to the noncontrolling interest of DDC. The investment by Speedus has been eliminated in consolidation. The investment by the noncontrolling interest has been reflected in additional paid-in-capital during the year ended December 31, 2008. In connection with this sale of stock, DDC issued seven year warrants to purchase 56,250 and 18,750 shares of DDC common stock to Speedus and the noncontrolling interest, respectively, with an exercise price of $1 per share.

In October 2008, DDC sold $500,000 in 8% convertible notes, in the amounts of $250,000 to each of the Company and the noncontrolling interest. In December 2008, DDC agreed to sell an additional $500,000 in 8% convertible notes, in the amounts of $250,000 to each of the Company and the noncontrolling interest. At December 31, 2008, $75,000 had been advanced by each of the Company and the noncontrolling interest. In 2009, the remaining balance of $175,000 was advanced by each of the Company and the noncontrolling interest. The aggregate amount under the notes is due December

EXPERTREQ-000682

31, 2009 unless otherwise converted in connection with any financings completed by DDC. The holders of the notes have not issued a call for repayment of the loans and the loans were not repaid during the year ended December 31, 2009 or as of the date of this report. On March 25, 2010, the holders of the notes agreed to defer any and all obligations DDC has under the notes until April 1, 2011. As a result of this agreement the loans have been reflected as a non-current liability. The loan by the Company has been eliminated in consolidation. For the years ended December 31, 2009 and December 31, 2008, accrued interest on these convertible notes to the noncontrolling interest of approximately $40,000 and $4,000 has been recorded as interest expense on the Company's consolidated statements of operations.

43

*Index*

## 4. Property and Equipment

Property and equipment consists of the following:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2008** |
| Office equipment | $ 75,209 | $ 86,161 |
| Less accumulated depreciation | (38,414) | (39,150) |
| Property and equipment | $ 36,795 | $ 47,011 |

Depreciation and amortization expense was approximately $25,000 and approximately $84,000 for the years ended December 31, 2009 and 2008, respectively. Depreciation and amortization expense is included in 'Depreciation and amortization' on the accompanying Consolidated Statement of Operations and not allocated to 'Selling, general and administrative', 'Research and development' or 'Cost of sales'.

## 5. Accrued Liabilities

Accrued liabilities approximately consist of the following:

|  | December 31, | |
|---|---|---|
|  | **2009** | **2008** |
| Professional fees | $ 80,000 | $ 182,000 |
| Withholding tax provision (see Note 10) | - | 1,300,000 |
| Income taxes | 63,000 | 171,000 |
| Other accrued expenses | 83,000 | 245,000 |
| Total accrued liabilities | $ 226,000 | $ 1,898,000 |

## 6. Stockholders' Equity

*Stock Options*

(a) In November 2005, stockholders approved the Company's 2005 Stock Incentive Plan to replace the 1995 Stock Incentive Plan which expired in October 2005. While no new grants can be made under the 1995 Plan, options outstanding at the expiration of the 1995 Plan will remain outstanding until exercise, cancellation or expiration. Options available for grant at the expiration of the 1995 Plan have been made available for grant under the 2005 Plan. To the extent that options granted under the 1995 Plan are cancelled or expire, those options would be available for issuance under the 2005 plan. Similar to the 1995 Plan, the 2005 Plan provides for the grant of various stock–based incentives, including non-qualified and incentive stock options, to employees, directors and consultants. The Company has issued new shares for the exercise of stock options and expects to continue to do so in the future.

See Note 2 for information on the Company's accounting policy for stock options.

Aggregate stock option activity and weighted average prices under both Plans for the years ended December 31, 2009 and 2008 is summarized as follows:

|  | 2009 | | 2008 | |
|---|---|---|---|---|
|  | **Options** | **Price** | **Options** | **Price** |
| Outstanding at January 1 | 617,088 | $ 6.98 | 550,938 | $ 7.84 |
| Granted | 122,250 | 2.20 | 85,000 | 0.93 |
| Exercised | (60,000) | 2.19 | - | - |
| Cancelled | (60,284) | 4.93 | - | - |
| Expired | (71,992) | 19.35 | (3,850) | 4.14 |
| Forfeited | (3,000) | 0.42 | (15,000) | 5.05 |
| Outstanding at December 31 | 544,062 | $ 5.06 | 617,088 | $ 6.98 |
| Exercisable at December 31 | 519,812 | $ 5.28 | 617,088 | $ 6.98 |

EXPERTREQ-000683

| | Stock options outstanding | | Stock options exercisable | |
|---|---|---|---|---|
| Available for grant at December 31 | 269,895 | | 106,869 | |
| Weighted average fair value per share of grants during year | | $ 1.74 | | $ 0.28 |

44

Stock options generally have ten year terms; however, 25,000 and 50,000 options granted in 2008 have three and five year terms, respectively. During the years ended December 31, 2009 and 2008 the Company recorded approximately $210,000 and $41,000, respectively in stock compensation expense relating to its corporate segment, and at December 31, 2009, there was approximately $600 in unrecognized compensation cost related to outstanding stock options that is expected to be recognized over a weighted average of 4.3 years.

The following table aggregates certain information concerning currently outstanding and exercisable stock options under both Plans at December 31, 2009:

| | | Stock options outstanding | | | Stock options exercisable | | |
|---|---|---|---|---|---|---|---|
| Range of exercise prices | Options | Weighted average remaining life (years) | Weighted average exercise price | Aggregate intrinsic value | Options | Weighted average exercise price | Aggregate intrinsic value |
| $ 0.38 - 1.00 | 96,750 | 5.1 | $ 0.81 | $ 177,385 | 72,500 | $ 0.94 | $ 123,550 |
| 1.94 - 4.00 | 131,512 | 4.1 | 3.49 | 14,150 | 131,512 | 3.49 | 14,150 |
| 4.28 - 8.32 | 247,050 | 5.0 | 5.22 | - | 247,050 | 5.22 | --- |
| 9.08 - 19.36 | 66,250 | 1.2 | 11.91 | - | 66,250 | 11.91 | --- |
| 20.80 - 55.00 | 2,500 | 0.2 | 55.00 | - | 2,500 | 55.00 | --- |
| | 544,062 | 4.3 | $ 5.06 | $ 191,535 | 519,812 | $ 5.28 | $ 137,700 |

Intrinsic value represents the excess of market value at December 31, 2009 over the exercise price of stock options. The aggregate intrinsic value for stock options outstanding and exercisable eat December 31, 2009 was approximately $138,000.

(b) In February 2002, the Board of Directors of Zargis Medical Corp. approved the Zargis 2002 Stock Option Plan and reserved 280,000 shares of Zargis common stock for issuance under the plan. In May 2007, the Board of Directors reserved an additional 120,000 shares for issuance under the plan. The Zargis 2002 Plan provides for the grant of various stock–based incentives, including non-qualified and incentive stock options, to employees, directors, advisors and consultants. Through December 31, 2009, there have been no options exercised under the Zargis 2002 Plan.

Zargis' accounting policy for stock options is the same as the Company's. See Note 2.

Aggregate stock option activity and weighted average prices under the Zargis 2002 Plan for the two years ended December 31, 2009 is summarized as follows:

| | 2009 | | 2008 | |
|---|---|---|---|---|
| | Options | Price | Options | Price |
| Outstanding at January 1 | 352,158 | $ 3.03 | 310,158 | $ 2.97 |
| Granted | 4,000 | 3.50 | 42,000 | 3.50 |
| Exercised | - | - | - | - |
| Cancelled | (17,500) | 3.25 | - | - |
| Forfeited | - | - | - | - |
| Outstanding at December 31 | 338,658 | $ 3.03 | 352,158 | $ 3.03 |
| Exercisable at December 31 | 272,650 | $ 2.91 | 218,142 | $ 2.75 |
| Available for grant at December 31 | 61,342 | | 47,842 | |
| Weighted average fair value per share of grants during year | | $ 2.89 | | $ 2.89 |

Stock options have ten year terms. 4,000 options granted in 2009 were fully vested at December 31, 2009.  42,000 options granted in 2008 vest over two years.

During the years ended December 31, 2009 and 2008 Zargis recorded approximately $162,000 and $121,000, respectively in stock compensation expense.  At December 31, 2009 there was approximately $38,000 of unrecognized compensation cost related to outstanding stock options that is expected to be recognized over a weighted average period of 6.1 years.

45

The following table aggregates certain information concerning currently outstanding and exercisable stock options under the Zargis 2002 Plan at December 31, 2009:

| Stock options outstanding | Stock options exercisable |
|---|---|
| | |

| Range of exercise prices | Options | Weighted average remaining life (years) | Weighted average exercise price | Aggregate intrinsic value | Options | Weighted average exercise price | Aggregate intrinsic value |
|---|---|---|---|---|---|---|---|
| $   0.50 | 30,000 | 3.0 | $   0.50 | $   90,000 | 30,000 | $   0.50 | $   90,000 |
| 1.75 | 6,000 | 3.0 | 1.75 | 10,500 | 6,000 | 1.75 | 10,500 |
| 2.50 | 59,634 | 4.4 | 2.50 | 59,634 | 59,634 | 2.50 | 59,634 |
| 3.50 | 243,024 | 7.0 | 3.50 | - | 177,016 | 3.50 | - |
| | 338,658 | 6.1 | $   3.03 | $   160,134 | 272,650 | $   2.90 | $   160,134 |

Intrinsic value represents the excess of market value at December 31, 2009 over the exercise price of stock options. The aggregate intrinsic value for stock options outstanding and exercisable at December 31, 2009 was approximately $160,000 based on an estimated fair market value as determined by the Board of Directors.

(c) In March 2008, the Board of Directors of Density Dynamics Corp. approved the Density Dynamics Corp. 2008 Long term Incentive Plan and reserved 450,000 shares of DDC common stock for issuance under the plan. The DDC 2008 Plan provides for the grant of various stock–based incentives, including non-qualified and incentive stock options, to employees, directors, advisors and consultants. Through December 31, 2009, there have been no options exercised under the DDC 2008 Plan.

DDC's accounting policy for stock options is the same as the Company's. See Note 2.

Aggregate stock option activity and weighted average prices under the DDC 2008 Plan for the two year ended December 31, 2009 is summarized as follows:

| | 2009 | | 2008 | |
|---|---|---|---|---|
| | Options | Price | Options | Price |
| Outstanding at January 1 | 378,000 | $   1.08 | - | $   - |
| Granted | 77,000 | 2.11 | 378,000 | 1.08 |
| Exercised | (100) | 1.00 | - | - |
| Cancelled | (21,000) | 1.00 | - | - |
| Forfeited | (132,000) | - | - | - |
| Outstanding at December 31 | 301,900 | $   1.34 | 378,000 | $   1.08 |
| Exercisable at December 31 | 118,667 | $   1.00 | 75,000 | $   1.00 |
| Available for grant at December 31 | 148,000 | | 72,000 | |
| Weighted average fair value per share of grants during year | | $   0.90 | | $   0.90 |

Stock options have ten year terms. Of the 77,000 options granted in 2009, 25,000 vested quarterly over three years and 52,000 vested annually over five years. Of the 378,000 options granted in 2008, 20,000 vested immediately and 110,000, 148,000 and 100,000 vest over one, five and eight years, respectively.

During the years ended December 31, 2009 and 2008 DDC recorded approximately $63,000 and approximately $144,000, respectively in stock compensation expense, and at December 31, 2009, there was approximately $153,000 of unrecognized compensation cost related to outstanding stock options that is expected to be recognized over a weighted average period of 8.4 years.

The following table aggregates certain information concerning currently outstanding and exercisable stock options under the DDC 2008 Plan at December 31, 2009:

| | Stock options outstanding | | | | Stock options exercisable | | |
|---|---|---|---|---|---|---|---|
| Range of exercise prices | Options | Weighted average remaining life (years) | Weighted average exercise price | Aggregate intrinsic value | Options | Weighted average exercise price | Aggregate intrinsic value |
| $   1.00 | 232,900 | 8.3 | $   1.00 | $   349,350 | 110,500 | $   1.00 | $   165,750 |
| 2.50 | 69,000 | 9.0 | 2.50 | - | 8,167 | 2.50 | - |
| | 301,900 | 8.4 | $   1.34 | $   349,350 | 118,667 | $   1.10 | $   165,750 |

During the year ended December 31, 2008, DDC issued 100,000 warrants to an employee. The warrants have a ten year term and an exercise price of $2.50 per share. 25,000 warrants were immediately exercisable and 75,000 warrants vest upon the achievement of specified goals. The fair value of the immediately exercisable warrants at the time of issuance was determined using the Black-Scholes option-pricing model and $60,000 was included in the approximately $144,000 stock compensation expense related to DDC and is included in selling, general and administrative expenses in the consolidated statements of operations for the year ended December 31, 2008.

EXPERTREQ-000685

See Note 3 for information on additional warrants issued by DDC during the year ended December 31, 2008.

*Treasury Stock*

During the years ended December 31, 2009 and 2008, the Company repurchased zero and 56,776 shares, respectively, of its own Common Stock.

*Stockholder Rights Plan*

On January 11, 2001, the Company's Board of Directors adopted a stockholder rights plan in which preferred stock purchase rights will be distributed as a dividend at the rate of four rights for each share of the Company's Common Stock.

Each right generally will entitle stockholders, in certain circumstances, to buy one one-ten thousandth of a newly issued share of Series A Junior Participating Preferred Stock of the Company at an exercise price of $50.00. The rights generally will be exercisable and transferable apart from the Common Stock only if a person or group acquires beneficial ownership of 17% or more of the Common Stock or commences a tender or exchange offer upon consummation of which such person or group would beneficially own 17% or more of the Common Stock.

If any person becomes the beneficial owner of 17% or more of the Company's Common Stock, then each right not owned by a 17% or more stockholder or certain related parties will entitle its holder to purchase, at the right's then current exercise price, shares of Common Stock (or, in certain circumstances as determined by the Board, cash, other property, or other securities) having a value of twice the right's exercise price. In addition, if, after any person has become a 17% or more stockholder, the Company is involved in a merger or other business combination transaction with another person in which its Common Stock is changed or converted, or sells 50% or more of its assets or earning power to another person, each right will entitle its holder to purchase, at the right's then current exercise price, shares of common stock of such other person having a value of twice the right's exercise price.

The Company will generally be entitled to redeem the rights at $.01 per right at any time until the tenth day following public disclosure that a person or group has become the beneficial owner of 17% or more of the Company's common stock. The rights will expire on January 26, 2011.

47

**8. Discontinued Operations**

During December 2007, the Company closed one of its F&B Restaurant stores as a result of continued losses. At December 31, 2007, based upon an offer to purchase the leasehold estate, the Company recorded a loss in the amount of $71,000 representing the difference between the carrying value of the leasehold estate and the estimated net proceeds to be received by the Company in the amount $342,000 which had been recorded as assets held for sale. In April 2008, the landlord did not agree to the proposed sale and terminated the lease effective May 2008. As a result, the Company recorded an additional loss in the amount of $342,000 during the year ended December 31, 2008. As a result of continued losses, in October 2008 the Company transferred the operations and right to use the assets of its remaining F&B Restaurant store to an unrelated third party for no consideration. The net assets and liabilities and results of operations of F&B are presented as discontinued operations for all periods presented in these financial statements as shown below.

The loss from discontinued operations of F&B for the year ended December 31, 2008 consists of:

|  | 2008 |
| --- | --- |
| Revenues | $ 409,628 |
| Cost of sales | 142,297 |
| Selling, general and administrative | 603,597 |
| Depreciation | 15,672 |
| Total operating expenses | 761,566 |
| Operating loss | (351,938 ) |
| Investment income | - |
| Net loss from discontinued operations | $ (351,938 ) |

**9. Income taxes**

As of the date of this report, the Company has not filed any income tax returns since 2005. As of December 31, 2009, the Company estimated that it has a deferred tax asset of approximately $52 million, relating primarily to book operating losses. An offsetting valuation allowance of $52 million has been established as the Company had no ability to carryback its losses and a limited earnings history.

A reconciliation of the Company's effective income tax rate and the federal tax rate is as follows:

|  | Year ended December 31, | |
| --- | --- | --- |
|  | **2009** | **2008** |
| Statutory rate | (34 )% | (34 )% |
| Benefit from tax refund | -- % | -- % |
| Permanent difference: goodwill impairment | -- % | -- % |
| State and local income taxes, net of federal benefit | (11 )% | (11 )% |
| Change in valuation allowance | 45 % | 45 % |
| Effective rate | 0% | 0% |

At December 31, 2009, the Company estimated that it has net operating loss carryforwards of approximately $109 million which expire between 2015 and 2029. Under the provisions of the Internal Revenue Code, certain substantial changes in the Company's stock ownership may result in a limitation on the amounts of net operating loss carryforwards which can be utilized in future years. Furthermore, as the Company has not filed any income tax returns since 2005, it is possible that adjustments may ultimately be made which could significantly reduce the actual amount of available net operating loss carryforwards.

**10. Commitments and Contingencies**

*Withholding Tax Dispute Description*

On March 30, 2004, the Company entered into an Employment Agreement with Mr. Shant S. Hovnanian, effective as of April 25, 2002 (the "Employment Agreement"), providing for Mr. Hovnanian's employment as President and Chief Executive Officer of the Company. The Employment Agreement provided that Mr. Hovnanian was to be paid an annual salary. The Employment Agreement

EXPERTREQ-000886

separately provided for Mr. Hovnanian to receive a contingent payment equal to 20% of the net proceeds (after legal and other expenses) realized by the Company from a Technology Rights Agreement dispute against Western International Communications and certain related claims. The Company reached a $15 million settlement of this claim in February 2004, resulting in a contingent payment of approximately $2.8 million, which was paid to an entity that Mr. Hovnanian controlled.

48

On January 22, 2009, the Internal Revenue Service (the "IRS") issued a "30-day letter" to the Company asserting that withholding income tax was due to the IRS in connection with this payment, plus interest and penalties, which totaled approximately $1.3 million ("Claim"). Thereafter, on February 23, 2009, the IRS issued notice of its intention to levy in respect of these claims. The Company appealed the IRS proposed tax adjustment and while the appeals process was underway, any related IRS levy had been stayed. The Company set aside sufficient cash to satisfy the Claim and other potential obligations that might have arisen with respect to this issue. Accordingly, the Company established a reserve of $1.3 million in accrued expenses and recorded a charge to the consolidated statement of operations for this claim at December 31, 2008.

In December of 2009 the Company and the IRS reached an agreement in which the Company paid the IRS approximately $117,000 in full settlement of this matter. The Company reversed its $1.3 million reserve in accrued expenses and recorded a credit of approximately $1.2 million to the consolidated statement of operations for the year ended December 31, 2009.

*Noncancelable Leases*

At December 31, 2009, future minimum lease payments of approximately $20,000 are due under noncancelable leases that expire in 2010. Rent expense was approximately $134,000 and $230,000 for the years ended December 31, 2009 and 2008, respectively.

*Other Contingencies*

In connection with a license agreement to which the Company is a party, a termination payment will be payable by the Company in the amount of $200,000 if the license agreement is terminated by the Company before September 1, 2011.

## 11. Business Segment Information

The following table sets forth the Company's financial performance by reportable operating segment for the years ended December 31, 2009 and 2008.

| | Year ended December 31, 2009 | | | |
|---|---|---|---|---|
| | Zargis | DDC | Corporate and other | Totals |
| Revenues from external customers | $ 410,252 | $ 50,925 | $ - | $ 461,177 |
| Depreciation and amortization | 8,864 | 15,660 | - | 24,524 |
| Operating loss | (1,418,288) | (1,720,541) | (381,564) | (3,520,393) |
| Fixed assets | 15,420 | 21,375 | - | 36,795 |
| Total assets | 139,662 | 79,981 | 1,905,766 | 2,125,409 |

| | Year ended December 31, 2008 | | | |
|---|---|---|---|---|
| | Zargis | DDC | Corporate and other | Totals |
| Revenues from external customers | $ 155,870 | $ - | $ - | $ 155,870 |
| Depreciation and amortization | 11,945 | 72,169 | - | 84,114 |
| Operating loss | (1,587,619) | (2,818,289) | (4,828,394) | (9,234,302) |
| Fixed assets | 9,976 | 37,035 | - | 47,011 |
| Total assets | 148,725 | 90,884 | 5,898,307 | 6,137,916 |

The Company has no foreign operations. During the years ended December 31, 2009 and 2008, the Company had sales with the U.S. Army of approximately 67% and 83%, respectively of total Company revenues. The Company's accounting policies for segments are the same as those described in Note 2.

49

## 12. Subsequent event

*Investment Bank Engagement*

On January 27, 2010 the Company engaged Morgan Joseph & Company, Inc., a full service investment bank, to evaluate strategic alternatives available to maximize shareholder value in its Zargis subsidiary. In connection with this agreement Morgan Joseph & Company was paid an initial retainer of $25,000, which is fully creditable towards any future transaction fees, and was granted a five year warrant to purchase 8,681 shares of the Company common stock with an exercise price of $.01 per share.

EXPERTREQ-000687

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, in New York, New York on March 30, 2010

**SPEEDUS CORP.**

/s/ Shant S. Hovnanian
Shant S. Hovnanian
President, Chief Executive Officer and
Chairman of the Board of Directors

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Shant S. Hovnanian<br>Shant S. Hovnanian | Chairman of the Board of Directors,<br>President and Chief Executive Officer | February 14, 2011 |
| /s/ John A. Kallassy<br>John A. Kallassy | Treasurer and Chief Financial and<br>Accounting Officer | February 14, 2011 |
| /s/ Vahak S. Hovnanian<br>Vahak S. Hovnanian | Director | February 14, 2011 |
| /s/ William F. Leimkuhler<br>William F. Leimkuhler | Director | February 14, 2011 |
| /s/ Jeffrey Najarian<br>Jeffrey Najarian | Director | February 14, 2011 |
| /s/ Stephen X. Graham<br>Stephen X. Graham | Director | February 14, 2011 |

51

External Resources:

---

ex23_1.htm (https://sec.report/Document/0001140361-11-009367/ex23_1.htm) EXHIBIT 23.1

Zoom In  Zoom Out

# ex23_1.htm

Exhibit 23.1

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (File Nos. 333-53517 and 333-45730) and Form S-8 (File No. 333-141852) of Speedus Corp. of our report dated March 29, 2010 relating to the financial statements, which appears in this Form 10-K.

/s/ Amper, Politziner, & Mattia, LLP
New York, New York
February 14, 2011

---

ex31_1.htm (https://sec.report/Document/0001140361-11-009367/ex31_1.htm) EXHIBIT 31.1

Zoom In  Zoom Out

EXPERTREQ-000688

## ex31_1.htm

Exhibit 31.1

CERTIFICATION OF CHIEF EXECUTIVE OFFICER PURSUANT TO
RULE 13a-14 OF THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002

I, Shant S. Hovnanian, certify that:

1. I have reviewed this annual report on Form 10-K of Speedus Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 14, 2011

By:    /s/ Shant S. Hovnanian
Name:  Shant S. Hovnanian
Title: Chairman of the Board, President and Chief Executive Officer

---

ex31_2.htm ⬀ (https://sec.report/Document/0001140361-11-009367/ex31_2.htm) EXHIBIT 31.2

Zoom In    Zoom Out

## ex31_2.htm

Exhibit 31.2

CERTIFICATION OF CHIEF FINANCIAL OFFICER PURSUANT TO
RULE 13a-14 OF THE SECURITIES EXCHANGE ACT OF 1934,
AS ADOPTED PURSUANT TO SECTION 302
OF THE SARBANES-OXLEY ACT OF 2002

I, John A. Kallassy, certify that:

EXPERTREQ-000689

1. I have reviewed this annual report on Form 10-K of Speedus Corp.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regard reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:    February 14, 2011

By:     /s/ John A. Kallassy
Name:   John A. Kallassy
Title:   Treasurer and Chief Financial Officer

---

ex32_1.htm [link] (https://sec.report/Document/0001140361-11-009367/ex32_1.htm) EXHIBIT 32.1

Zoom In   Zoom Out

# ex32_1.htm

Exhibit 32.1

CERTIFICATION OF CHIEF EXECUTIVE OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Speedus Corp. (the "Company") on Form 10-K for the period ending December 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Shant S. Hovnanian, Chairman of the Board, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange of 1934, amended; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:    February 14, 2011

By:     /s/ Shant S. Hovnanian
Name:   Shant S. Hovnanian
Title:   Chairman of the Board, President and Chief Executive Officer

EXPERTREQ-000690

ex32_2.htm [↗] (https://sec.report/Document/0001140361-11-009367/ex32_2.htm) EXHIBIT 32.2

Zoom In   Zoom Out

# ex32_2.htm

Exhibit 32.2

CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906
OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Annual Report of Speedus Corp. (the "Company") on Form 10-K for the period ending December 31, 2009 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, John A. Kallassy, Treasurer and Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange of 1934, amended; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date:   February 14, 2011

By:      /s/ John A. Kallassy
Name:   John A. Kallassy
Title:    Treasurer and Chief Financial Officer

---

Additional Files

| File | Sequence | Description | Type | Size |
|------|----------|-------------|------|------|
| 0001140361-11-009367.txt (https://sec.report/Document/0001140361-11-009367/0001140361-11-009367.txt) | | Complete submission text file | | 1277250 |

$SPDE (/Ticker/SPDE)

---

© 2021 SEC.report | Contact (https://sec.report/contact.php) | (⊙) (https://www.reddit.com/search/?q=site%3Asec.report) | (twitter) (https://twitter.com/EdgarInsider)
Data is automatically aggregated and provided "as is" without any representations or warranties, express or implied.
SEC.report is not affiliated with the U.S. S.E.C. or EDGAR System. Disclosure & Privacy Policy (https://sec.report/privacy_policy.php)
SEC CFR Title 17 of the Code of Federal Regulations. (https://ecfr.io/Title-17/)

EXPERTREQ-000691